WENDY J. OLSON, Bar No. 7634
wendy.olson@stoel.com
NICOLE C. HANCOCK, Bar No. 6899
nicole.hancock@stoel.com
STOEL RIVES LLC
101 S. Capitol Boulevard, Suite 1900
Boise, ID 83702
Telephone: (208) 389-9000

LATONIA HANEY KEITH, Bar No. 9721
lhaney@post.harvard.edu
MCKAY CUNNINGHAM, Bar No. 10178
cunninghammckay@gmail.com
877 W. Main Street, Suite 503
Boise, ID 83702
Telephone: (512) 983-8000

HAYLEY STEELE (pro hac vice pending)
steelehc@ballardspahr.com
BALLARD SPAHR LLP
2000 IDS Center, 80 South 8th Street
Minneapolis, MN 55402-2119
Telephone: (612) 371-3211

CAREY R. DUNNE (pro hac vice pending)
carey@freeandfair.org
KEVIN TROWEL (pro hac vice pending)
kevin@freeandfair.org
MARTHA REISER (pro hac vice pending)
martha@freeandfair.org
FREE & FAIR LITIGATION GROUP
266 West 37th Street, 20th Floor
New York, NY 10018
Telephone: (646) 434-8604

DAVID L. AXELROD (pro hac vice pending)
axelrodd@ballardspahr.com
LESLEY F. WOLF (pro hac vice pending)
wolfl@ballardspahr.com
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
Telephone: (215) 665-8500

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| NORTHWEST ASSOCIATION OF INDEPENDENT SCHOOLS, SUN VALLEY COMMUNITY SCHOOL, INC., FOOTHILLS SCHOOL OF ARTS AND SCIENCES, INC., THE COMMUNITY LIBRARY ASSOCIATION, INC., COLLISTER UNITED METHODIST CHURCH, INC., MARY HOLLIS ZIMMER, MATTHEW PODOLSKY, JEREMY WALLACE on behalf of his minor child, A.W., and CHRISTINA LEIDECKER on behalf of herself and her minor child, S.L., <br><br> Plaintiffs, <br><br> v. | Case No. <br><br> **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

RAÚL LABRADOR, in his capacity as the
Attorney General for the State of Idaho, JAN
BENNETTS, in her capacity as Prosecuting
Attorney for Ada County, Idaho, and MATT
FREDBACK, in his capacity as Prosecuting
Attorney for Blaine County, Idaho,

               Defendants.

## COMPLAINT

1.     This lawsuit seeks to preliminarily and permanently enjoin the enforcement of Idaho House Bill 710 (hereinafter, "H.B. 710," or the "Act"), which codifies an unprecedented attempt by the government to control speech and ideas in private institutions.  H.B. 710 took effect on July 1, 2024.

2.     As relevant to this lawsuit, the Act limits the ability of private K-12 schools and privately funded public libraries to provide minors (whatever their age) with books, art, movies, and other materials that contain non-obscene content that is disfavored by the State of Idaho. Through the Act's vague and overbroad definition of material that is "harmful to minors," the Act infringes on the First Amendment rights of such schools and libraries.  It also infringes on the fundamental liberty interest of parents who choose those private entities over State-controlled public schools and libraries for the educational development of their minor children.  And it denies minors who attend private schools or patronize privately funded public libraries the right to receive constitutionally protected, non-obscene material.

3.     The Act violates the First Amendment of the United States Constitution as incorporated against the State of Idaho by the Fourteenth Amendment, and the Due Process Clause of the Fourteenth Amendment, and it should be preliminarily and permanently enjoined.

## INTRODUCTION

4.      It is axiomatic in our democratic, pluralistic society, that a "child is not the mere creature of the state" and the United States Constitution "excludes any general power of the state to standardize its children."[1]

5.      The Constitution serves as a bulwark against state overreach in this context.

6.      The First Amendment protects the expressive speech and conduct of private non-profit entities, including private schools like Plaintiffs Sun Valley Community School, Inc., an Idaho non-profit corporation ("SVCS") and Foothills School of Arts and Sciences, Inc. ("Foothills"), and privately funded public libraries like Plaintiffs The Community Library Association, Inc. ("The Community Library") and Collister United Methodist Church, Inc. ("Collister").[2]

7.      The Fourteenth Amendment protects the fundamental liberty interest of parents, including Plaintiffs Mary Hollis Zimmer, Matthew Podolsky, and Christina Leidecker (collectively, the "Parent Plaintiffs"), to direct the education and development of their children, independent of State-controlled institutions, using constitutionally protected materials chosen for that purpose by the Private Entity Plaintiffs, even (and especially) when the State disapproves of the content contained in those materials.

---

[1] *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 535 (1925).

[2] Hereinafter, Plaintiffs SVCS and Foothills are referred to collectively as the "Private School Plaintiffs," and Plaintiffs The Community Library and Collister are referred to collectively as the "Library Plaintiffs."  The Private School Plaintiffs and Library Plaintiffs are together collectively referred to as the "Private Entity Plaintiffs."

8.      And the First Amendment guarantees the right of minors, including Plaintiffs A.W. and S.L. (collectively, the "Minor Plaintiffs"), to receive the constitutionally protected materials the Private Entity Plaintiffs and their parents have together determined are appropriate for their educational, social, and emotional development.

9.      The Act's vague and overbroad definition of "harmful to minors" conflicts with decades of settled constitutional law and extends well beyond the State's limited authority to restrict the materials that private parties, like the Private Entity Plaintiffs, may provide to minors.

10.      The unconstitutional harm caused by H.B. 710 is exacerbated by its enforcement provisions, which threaten the Private Entity Plaintiffs with harassing and meritless litigation for engaging in constitutionally protected speech and conduct.  The Act authorizes Defendants to seek broad injunctive relief against the Private Entity Plaintiffs in an effort to prohibit them from providing constitutionally protected, non-obscene materials to minors.  It also gives private actors a cause of action and a financial incentive to file suit against the Private Entity Plaintiffs based on the private actors' personal, subjective assessment of what their community considers "harmful to minors."

11.      On its face, the Act encompasses works of significant cultural, historical, literary and scientific import that are central to an informed education.  Indeed, the broad language of the Act subjects the Private Entity Plaintiffs to suit for providing minors with health education textbooks, images of canonical works of art like Michealangelo's *David*, significant works of literature like Toni Morrison's *The Bluest Eye*, and even the Bible, if a Defendant or citizen complainant subjectively believes members of their community would find them offensive.  The Constitution does not permit the State to engage in content-based censorship to mollify a community's most sensitive and censorious members.

12.     The harm to Plaintiffs is immediate and substantial.  The Private Entity Plaintiffs do not provide minors with any material that is "obscene" or "harmful to minors" under *Miller v. California*, 413 U.S. 15 (1973), and its progeny; the Parent Plaintiffs do not wish to educate their children using material that is "obscene" or "harmful to minors" under *Miller* and its progeny; and Minor Plaintiffs do not wish to receive material that is "obscene" or "harmful to minors" under *Miller* and its progeny.  The effect of H.B. 710 on Plaintiffs, in other words, will be to prohibit and chill only constitutionally protected, non-obscene speech and conduct.

13.     For the reasons set forth herein, H.B. 710 violates the First and Fourteenth Amendments to the U.S. Constitution and it should be enjoined.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action is brought under 42 U.S.C. § 1983 and seeks to vindicate rights protected by the First and Fourteenth Amendments to the United States Constitution.

15.     Plaintiffs seek remedies in this action under 42 U.S.C. §§ 1983, 1988, and 28 U.S.C. §§ 2201, 2022, and Federal Rules of Civil Procedure 65 and 57.

16.     Defendants reside within this District and/or perform official duties within the State of Idaho.  Accordingly, this Court has personal jurisdiction over the Defendants.

17.     Venue is proper under 28 U.S.C § 1391(b) and (e) because Defendants are public officials in the State of Idaho, sued in their official capacities, and their offices are located in this District.

## PARTIES

### I.    Plaintiffs

18.    Plaintiff Northwest Association of Independent Schools ("NWAIS") is a registered 501(c)(3) non-profit corporation based in Seattle, Washington.  NWAIS brings these claims on behalf of its members Plaintiffs SVCS and Foothills.

19.    NWAIS is an association of 109 independent private schools in the Northwest United States and British Columbia, Canada.  NWAIS has member schools in Idaho, Alaska, Montana, Nevada, Oregon, Utah, Washington, Wyoming, and British Columbia.  All NWAIS members pay annual dues to the association.

20.    NWAIS's mission is to encourage, support, and strengthen independent education in the Northwest United States, including in Idaho.  It offers a rigorous accreditation program to its member schools in Idaho and elsewhere, promotes sound and ethical practices, fosters professional growth by sponsoring workshops, conferences and other educational opportunities, and promotes communication among member schools and with the public and government officials.

21.    NWAIS's member schools in Idaho (and elsewhere) have a constitutional right to create and offer age-appropriate curricula free of undue interference from the State, including curricula that satisfy NWAIS's rigorous accreditation standards.  Parents in Idaho (and elsewhere) that have chosen an NWAIS-accredited school over a State-controlled public school for their children's education have a constitutional right to do so.  NWAIS's accreditation standards ensure parents that the curriculum at NWAIS-accredited schools were developed to further the educational, emotional, and social development of their children, without regard to the content-based preferences of the State.

22.    Plaintiff SVCS is an independent private school in Sun Valley, Idaho that serves students in pre-kindergarten through twelfth grade.  It is registered as a 501(c)(3) non-profit corporation.  SVCS is accredited by, and a member of, NWAIS.

23.    SVCS's mission is to inspire its students to think critically, engage confidently, embrace challenges, and lead impactful, purposeful lives.  SVCS works to prepare its students for an evolving world by helping them acquire a proven body of knowledge and develop a useful array of skills and abilities.

24.    To further this mission, experienced educators at SVCS thoughtfully select the materials the school makes available to its students in its curriculum and libraries to help prepare students for college and for life.

25.    SVCS does not make available any material that is "obscene" or "harmful to minors" as those terms are defined in *Miller* and its progeny.  SVCS does make available to its students certain constitutionally protected, non-obscene materials that contain content described in Section 1 of H.B. 710 that Defendants and/or some Idahoans may find subjectively offensive, and that may therefore fall within the scope of H.B. 710's prohibition.

26.    SVCS wishes to continue making these materials available to its students, consistent with its educational mission and NWAIS's accreditation standards, and free from H.B. 710's overbroad and vague prohibition.

27.    Plaintiff Foothills is an independent private school in Boise, Idaho that serves students in pre-kindergarten through ninth grade and is a registered 501(c)(3) non-profit corporation.  Foothills is accredited by, and a member of, NWAIS.

28.     Foothills' mission is to ignite in its students a passion for learning through a progressive approach to education.  Through a challenging inquiry-based curriculum, Foothills students explore their ideas and develop curiosity, creativity, critical thinking, and confidence.

29.     In developing this curriculum and cultivating its school library, Foothills exercises the significant discretion that State and federal law affords private schools in Idaho. Foothills carefully considers the materials it makes available to its students through its curriculum, in its classroom libraries, and elsewhere within its facilities.  Foothills does not make available to its students any material that is "obscene" or "harmful to minors" as those terms are defined in *Miller* and its progeny.  Foothills does make available to its students certain constitutionally protected, non-obscene materials that contain content described in Section 1 of H.B. 710 that Defendants and/or some Idahoans may find subjectively offensive, and that may therefore fall within the scope of H.B. 710's prohibition.

30.     Foothills has selected the materials in its curriculum, its libraries, and elsewhere in its facilities because the materials contribute to the educational, emotional, and social development of its students, and will help prepare them for high school, higher education, and the world beyond.  Foothills wishes to continue making these materials available to its students consistent with its educational mission and NWAIS's accreditation standards, and free from H.B. 710's overbroad and vague prohibition and undue State interference.

31.     Plaintiff The Community Library is a privately funded library in Ketchum, Idaho that is open to all members of the public.  It was founded in 1955 by seventeen women as a privately funded, privately governed, and publicly minded library to encourage intellectual and creative pursuits in central Idaho.

32.     The Community Library is a registered 501(c)(3) non-profit corporation.  The
Community Library's founders believed, and the current staff and Board of Trustees continue to
believe, that The Community Library can best encourage independent thinking and free access
for all by maintaining The Community Library's status as a private non-profit corporate entity
not dependent on funding from, or subject to oversight by, the State.

33.     The Community Library occupies more than 25,000 square feet and contains
more than 107,000 physical volumes.  It also provides free wireless internet access and 15
computer terminals for use by members and non-members, a digital collection containing tens of
thousands of volumes provided by several private entities with which The Community Library
has contractual agreements, and the Center for Regional History.

34.     Any member of the public with a picture ID can sign up for a library card and
membership is free.  Nearly 5,000 people from all over the State of Idaho, nearly every state in
the United States, and abroad hold library cards from The Community Library.

35.     The Community Library loans more than 120,000 volumes per year to its
members, of which approximately 2/3 are physical books and 1/3 are electronic or digital books
(hereinafter, "e-books").

36.     Because The Community Library is open to the public and any member of the
public can obtain a library card and check out books for free, The Community Library believes it
is subject to H.B. 710's prohibition.  The Community Library carefully considers each volume it
maintains, adds, or removes from its collection to ensure that its collection serves the interests
and needs of the community, including its minor patrons.  The Community Library does not
make available to minors any material that is "obscene" or "harmful to minors" as those terms
are defined in *Miller* and its progeny.

37.     The Community Library wishes to curate its collection and serve its community consistent with the First and Fourteenth Amendments to the U.S. Constitution and free from undue interference by the State.

38.     Plaintiff Collister is a United Methodist church in Boise, Idaho.  It is a registered 501(c)(3) non-profit corporation.

39.     Collister believes that all people are children of God and worthy of respect, love and a church family.  Consistent with that belief, Collister voted last year to become a Reconciling Ministry, which is a United Methodist affiliation in which affiliated churches commit to achieve LGBTQ+ justice and full inclusion in their churches' life and leadership.  In becoming a Reconciling Ministry, Collister codified its pre-existing commitment to welcoming and affirming people of every gender identity, gender expression, and sexual orientation.

40.     To help effectuate its commitments as a Reconciling Ministry, Collister opened a lending library that distributes books that focus on LGBTQ+ people and topics.  Some of the books are geared towards minors and others are geared towards adults.  Any member of the public is welcome to borrow books from the lending library.

41.     Because Collister's lending library is open to the public and any member of the public can borrow books for free, Collister believes it is subject to H.B. 710's prohibition. Collister carefully considers the materials it includes in its lending library and it does not make available any material that is "obscene" or "harmful to minors" as those terms are defined in *Miller* and its progeny.

42.     Collister wishes to continue to curate the contents of its lending library and serve its community in a manner consistent with the First and Fourteenth Amendments to the U.S. Constitution and free from undue interference by the State.

43.     Plaintiff Mary Hollis Zimmer is a resident of Hailey, Idaho.  She is the parent of a student at SVCS who will be in the 11th grade during the 2024-25 school year.  Ms. Zimmer has a fundamental right to direct the upbringing and education of her minor child and she wishes her child to have access to all constitutionally protected, non-obscene materials that SVCS wishes to make available to her, without regard to the State's content-based preferences.

44.     Plaintiff Matthew Podolsky is a resident of Boise, Idaho.  He is the parent of a student at Foothills who will be in the 5th grade during the 2024-25 school year.  Mr. Podolsky has a fundamental right to direct the upbringing and education of his minor child and he wishes his child to have access to all constitutionally protected, non-obscene materials that Foothills wishes to make available to him, without regard to the State's content-based preferences.

45.     Plaintiff Jeremy Wallace is a resident of Boise, Idaho.  He is the parent of Minor Plaintiff A.W., who also resides in Boise, Idaho, and is a student at a private high school (the "Private School") in Boise.  A.W. will be in 11th grade during the 2024-25 school year.  Mr. Wallace brings these claims as next friend to A.W.

46.     A.W. is a dedicated student and a member of student government at the Private School and she plans to attend college after she graduates from the Private School.  A.W. wishes to receive all constitutionally protected materials that the Private School identifies as appropriate for her educational, emotional, and social development, without regard to the State's content-based preferences.

47.     Plaintiff Christina Leidecker is a resident of Hailey, Idaho and the parent of Minor Plaintiff S.L., who is 17 years old, and another minor who is 15 years old.  Ms. Leidecker and her minor children are patrons of The Community Library.  Ms. Leidecker brings these claims on behalf of herself and as next friend to S.L.

48.     Ms. Leidecker has a fundamental right to direct the upbringing and education of her minor children, including S.L., and she wishes for her minor children to have access to all constitutionally protected, non-obscene materials that The Community Library wishes to make available to them, without regard to the State's content-based preferences.

49.     S.L. is a resident of Hailey, Idaho, and is the daughter of Ms. Leidecker.  S.L. is 17 years old and she is a dedicated student and avid reader.  S.L. wishes to receive all constitutionally protected, non-obscene materials that Ms. Leidecker and The Community Library wish to make available to her, without regard to the State's content-based preferences.

## II.     Defendants

50.     Defendant Raúl Labrador is the Attorney General of Idaho.  He is sued in his official capacity only, as Idaho's Attorney General, a position in which he acts under color of law to enforce H.B. 710.  H.B. 710 provides Defendant Labrador "a cause of action for injunctive relief against any school or public library that violates" the law.  § 18-1517B(5).  As residents of or non-profit corporate entities doing business in Idaho, each Plaintiff is subject to the jurisdiction of Defendant Labrador.

51.     Defendant Jan Bennetts is the Prosecuting Attorney for Ada County, Idaho.  She is sued in her official capacity only, as Prosecuting Attorney, a position in which she acts under color of law to enforce H.B. 710.  H.B. 710 provides county prosecuting attorneys, like Defendant Bennetts, "a cause of action for injunctive relief against any school or public library that violates" the law.  § 18-1517B(5).  Plaintiffs Foothills, Collister, Matthew Podolsky, and A.W. reside or do business in Ada County and are subject to Defendant Bennetts's jurisdiction.

52.     Defendant Matt Fredback is the Prosecuting Attorney for Blaine, County, Idaho. He is sued in his official capacity only, as Prosecuting Attorney, a position in which he acts

under color of law to enforce H.B. 710.  H.B. 710 provides county prosecuting attorneys, like

Defendant Fredback, "a cause of action for injunctive relief against any school or public library

that violates" the law.  § 18-1517B(5).  Plaintiffs SVCS, The Community Library, Mary Hollis

Zimmer, Christina Leidecker, and S.L. reside or do business in Blaine County and are subject to

Defendant Fredback's jurisdiction.

## FACTUAL ALLEGATIONS

### I.    The First Amendment and Minors

53.    The First Amendment to the United States Constitution is incorporated against the

State by the Fourteenth Amendment.

54.    The First Amendment prohibits the State from imposing content-based

restrictions on private actors' ability to provide minors with non-obscene speech and materials.[3]

55.    Indeed, "[s]peech that is neither obscene as to youths nor subject to some other

legitimate proscription cannot be suppressed solely to protect the young from ideas or images

that a legislative body thinks unsuitable for them. . . .  [T]he values protected by the First

Amendment are no less applicable when government seeks to control the flow of information to

minors."[4]

56.    In *Miller*, the Court "set forth . . . the test for obscenity that controls to this day:

'(a) whether the average person, applying contemporary community standards would find that

the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or

describes, in a patently offensive way, sexual conduct specifically defined by the applicable state

---

[3] *Erznoznik v. Jacksonville*, 422 U.S. 205, 212–13 (1975); *Video Software Dealers Ass'n v. Schwarzenegger*, 556 F.3d 950, 957 (9th Cir. 2009), *aff'd sub nom. Brown v. Entm't Merch. Ass'n*, 564 U.S. 786 (2011); *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1208 (9th Cir. 2010).

[4] *Erznoznik*, 422 U.S. at 213–14.

law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value.'"[5]

57.    Under *Miller* and its progeny, "the proper inquiry is not whether an ordinary member of any given community would find serious literary, artistic, political, or scientific value in allegedly obscene material, but whether a reasonable person would find such value in the material, taken as a whole."[6]

58.    In light of this settled authority, H.B. 710 violates Plaintiffs' rights "to legitimately share and access non-obscene materials without the interference of the state."[7]

## II.    Overview of the Statutory Scheme

59.    H.B. 710 is the culmination of a multi-year effort by members of the Idaho State Legislature (hereinafter, the "Legislature") to enact a law restricting public and private schools, and public libraries (including privately funded public libraries), from providing certain materials to minors.

60.    In 2023, an earlier and materially similar iteration of the law was vetoed by Governor Brad Little because of its "ambiguity," the "unintended consequences" it would have on minors' access to information, and because it would impose the most restrictive view of what materials are "harmful to minors" on all library patrons and school students.[8]

---

[5] *Reno v. ACLU*, 521 U.S. 844, 872 (1997) (quoting *Miller*, 413 U.S. at 93).

[6] *Pope v. Illinois*, 481 U.S. 497, 500–01 (1987).

[7] *Powell's Books*, 622 F.3d at 1215.

[8] Letter from Idaho Governor Brad Little to the Hon. Mike Moyle, Speaker of the Idaho House of Representatives, concerning House Bill 314aaS (Apr. 5, 2023), available at https://gov.idaho.gov/wp-content/uploads/2023/04/veto_h-314_2023.pdf.

61.     Governor Little signed H.B. 710 into law on April 10, 2024.  After signing the

Act, Governor Little asserted that he had "signed that stinking library bill."[9]

62.     Section 1 of the Act, which amends § 18-1514 of the Idaho Code, is entitled

"OBSCENE MATERIALS – DEFINITIONS" (hereinafter the "Definitional Provision") and it

defines some, but not all, of the terms used in the Act's substantive prohibition.  *See* § 18-

1514(1)–(11).  The Definitional Provision establishes a standard for identifying materials that

private actors, like Private Entity Plaintiffs, may not make available to minors; that parents,

including the Parent Plaintiffs, may not choose to include in their children's private education;

and that minors, including the Minor Plaintiffs, may not access from their private schools or

libraries.

63.     Section 2 of the Act, codified in § 18-1517B to the Idaho Code, is entitled

"CHILDREN'S SCHOOL AND LIBRARY PROTECTION," and it contains the Act's

substantive prohibition in subparagraph (2) (hereinafter, the "Substantive Prohibition").  § 18-

1517B(2).  Section 18-1517B(2) prohibits private entities, including the Private Entity Plaintiffs,

from providing minors with any material that falls within the Act's scope.  *See* §§ 18-1517B(2)

(extending prohibition to "a school or public library"), 18-1514(11) (defining "school" to include

"any public or private school providing instruction for students in kindergarten through

grade 12").

64.     Section 2 also includes the Act's enforcement provisions in subparagraphs (3)–(5)

and (7).  § 18-1517B(3)–(5), (7).

---

[9] Ruth Brown and Logan Finney, *Gov. Little signs library bill regarding 'obscene content'*,
IDAHO REPORTS, April 10, 2024, https://blog.idahoreports.idahoptv.org/2024/04/10/gov-little-
signs-library-bill-regarding-obscene-content/.

65.     Subparagraphs (3) and (4) provide a mechanism by which parents and minors may enforce the Act through a civil claim against entities including the Private Entity Plaintiffs. § 18-1517B(3)–(4).  The Act provides that plaintiffs who successfully bring suit are entitled to a $250 cash bounty and compensation for "actual damages" (hereinafter, the "Citizen Enforcement Provision").  § 18-1517B(4).

66.     Subparagraph (5) authorizes the Attorney General and county prosecutors to enforce the Act through an application for injunctive relief (hereinafter, the "Government Enforcement Provision").  § 18-1517B(5).

67.     Subparagraph (7) directs private entities, including the Private Entity Plaintiffs, to create a "policy and readily accessible form" by which "a person"—any person—may "request review of material the person considers to be harmful to minors" (hereinafter, the "Review Provision").  § 18-1517B(7).

68.     Section 3 of the Act identifies "[a]n emergency existing therefor, which . . . is hereby declared to exist," and instructs that the Act "shall be in full force and effect on and after July 1, 2024."

III.    **The Scope of the Act**

a.  *The Substantive and Definitional Provisions*

69.     The unbounded and undefined authority conferred in H.B. 710's Substantive and Definitional Provisions invites arbitrary enforcement and provides a mechanism by which the Defendants, parents, and minor students and patrons may censor the constitutionally protected speech and conduct of private parties, including the Plaintiffs, based on their own subjective beliefs and sensitivities.

i. <u>"Harmful to Minors"</u>

70.     The scope of the Act's Substantive Prohibition turns principally on the definition

of "harmful to minors," which is found in subparagraph 6 of the Definitional Provision.

Subparagraph 6 provides in full:

> "Harmful to minors" includes in its meaning the quality of any
> material or of any performance or of any description or
> representation, in whatever form, of nudity, sexual conduct, sexual
> excitement, or sado-masochistic abuse, when it:
>
> > (a) Appeals to the prurient interest of minors as judged by the
> > average person, applying contemporary community standards;
> > and
> >
> > (b) Depicts or describes representations or descriptions of
> > nudity, sexual conduct, sexual excitement, or sado-masochistic
> > abuse which are patently offensive to prevailing standards in the
> > adult community with respect to what is suitable material for
> > minors and includes, but is not limited to, patently offensive
> > representations or descriptions of:
> >
> > > (i) Intimate sexual acts, normal or perverted, actual or
> > > simulated; or
> > >
> > > (ii) Masturbation, excretory functions or lewd exhibition of
> > > the genitals or genital area.  Nothing herein contained is
> > > intended to include or proscribe any matter which, when
> > > considered as a whole, and in context in which it is used,
> > > possesses serious literary, artistic, political or scientific value
> > > for minors.

§ 18-1514(6).

71.     The definition of "harmful to minors" is incorporated into each of the three

subparagraphs of the Substantive Prohibition.  *See* § 18-1517B(2)(a)–(c).

72.     The Substantive Prohibition provides in full:

> (2) Notwithstanding any other provision of law, a school or public
> library, or an agent thereof, shall not promote, give, or make
> available to a minor:
>
> > (a) Any picture, photograph, drawing, sculpture, motion picture
> > film, or similar visual representation or image of a person or
> > portion of the human body that depicts nudity, sexual conduct,
> > or sado-masochistic abuse *and that is harmful to minors*;

(b) Any book, pamphlet, magazine, printed matter however reproduced, or sound recording that contains any matter pursuant to paragraph (a) of this subsection or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sado-masochistic abuse *and that, taken as a whole, is harmful to minors*; or

(c) *Any other material harmful to minors.*

§ 18-1517B(2) (emphasis added).

73.     Section 18-1517B(2)(a)–(c) confirms the State's intention to sweep within the Substantive Prohibition nearly every medium through which disfavored content might be conveyed to minors.

74.     Taken together, these provisions amount to an unconstitutionally overbroad and vague effort to impose content-based restrictions on the Private Entity Plaintiffs' ability to provide minors with material that is disfavored by the State, but nevertheless protected by the First Amendment to the U.S. Constitution.

75.     Under *Miller* and its progeny, states may regulate materials that contain depictions of certain sexual conduct, but only if the material, taken as a whole, appeals to the prurient interest *and* lacks serious literary, artistic, political, or scientific value.  The latter aspect of the *Miller* test (hereinafter, the "Serious Value Requirement") ensures that every obscenity analysis considers the entire work, rather than just the allegedly obscene depiction or description, and it imposes an objective limitation on a state's authority to regulate material that some members of the community find subjectively offensive.

76.     H.B. 710 does not contain the Serious Value Requirement.

77.     Section 18-1517B(6)(b)(ii) of the Act contains a provision that echoes the Serious Value Requirement in certain respects, but it fails to offer the protections required by *Miller*.  For example, § 18-1517B(6)(b)(ii) ambiguously applies to "any matter," rather than to the "work"

under consideration.  It further provides that the "matter" be "considered . . . in context in which it is used," suggesting that the term "matter" refers to the specific "representation or description" of disfavored content, rather than to the "work" in which that content is found.  In other words, § 18-1517B(6)(b)(ii)  impermissibly extends First Amendment protection to specific "representation[s] or description[s]" of disfavored content *only* if the challenged "representation or description" *itself* has "serious literary, artistic, political or scientific value for minors."

78.    Further, this insufficiently protective provision applies only to certain materials described in § 18-1517B(6)(b)(ii) of the Act, i.e., those that include "[m]asturbation, excretory functions or lewd exhibition of the genitals or genital area."

79.    Moreover, the definition of "harmful to minors" in H.B. 710 fails to specifically define the content that the State seeks to regulate.  The Act identifies what the phrase "harmful to minors" "*includes* in its meaning," without limitation.  *See* § 18-1517B(6).

80.    The Act's indeterminacy is compounded by § 18-1517B(6)(b), which asserts that the definition of "harmful to minors" "*includes, but is not limited to*, [certain] patently offensive representations or depictions" described in that subparagraph.  § 18-1517B(6)(b) (emphasis added).

81.    The term "includes" is a term of enlargement, not of limitation.  If the Legislature had intended an exclusive definition for the term "harmful to minors," it would have used the word "means," as it did in every other definition in § 1.  *See id.* §§ 18-1514(1)-(5), (7)-(11).

82.    The definition of "harmful to minors" "includes" within its sweep particular "description[s] or representation[s]" of disfavored content, irrespective of the value of the works within which those "description[s] or representation[s]" are found.  § 18-1514(6).

83. For example, the definition of "harmful to minors" "includes . . . the quality of any material *or* of any performance *or* of any description *or* representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse. . . ." *Id.* (emphasis added). The use of the disjunctive throughout this part of the definition confirms that the Act includes within its sweep "description[s] or representation[s]" of disfavored content, including where those "description[s] or representation[s]" are merely a part of a larger work and even where such work, taken as a whole, has serious value to minors.

84. Under *Miller* and its progeny, the State may regulate material as obscene only if it "*predominantly* appeals to prurient interest," that is, it "trigger[s] responses over and beyond normal sexual arousal."[10] H.B. 710, by contrast, makes no references to the "predominant appeal" of the works it seeks to regulate. Instead, the Act's definition of "harmful to minors . . . includes" descriptions and depictions that might "[a]ppeal[] to the prurient interest," without regard to their predominance or their place in the broader context in the work. *See* § 18-1514(6)(a).

85. The Act's unconstitutionally narrow focus on specific descriptions and depictions is confirmed by the Substantive Prohibition.

86. Subparagraph (a) of the Substantive Prohibition concerns visual images of disfavored content. § 18-1517B(2)(a). It prohibits the Private Entity Plaintiffs from "promot[ing], giv[ing], or mak[ing] available" to minors "[a]ny picture, photograph, drawing . . . similar visual representation or image" that contains such content, irrespective of whether such "picture[s], photograph[s], drawing[s] . . . similar visual representation[s] or image[s]" are part of a broader work, and without regard to the role the disfavored content plays within the work. *Id.*

---

[10] *Powell's Books*, 622 F.3d at 1214 (emphasis added, internal quotation marks omitted).

87.     Subparagraph (b) concerns larger works that contain disfavored visual images, but it does nothing to limit the extraordinary scope of the Act.  § 18-1517B(2)(b).  Subparagraph (b) prohibits the Private Entity Plaintiffs from "promot[ing], giv[ing], or mak[ing] available" to minors any "book, pamphlet, magazine, printed matter . . . or sound recording" that contains depictions of disfavored content described in paragraph (a).  *Id.*  Because subparagraph (a) applies to visual depictions of disfavored content irrespective of where those visual depictions are found, subparagraph (b) is subsumed by subparagraph (a).

88.     In other words, if a "book, pamphlet, magazine, printed matter" or "sound recording" contains a depiction of disfavored content that falls within subparagraph (a), H.B. 710 prohibits the Private Entity Plaintiffs from providing that depiction to a minor, irrespective of what the rest of the "book, pamphlet, magazine, printed matter" or "sound recording" contains, the role the depiction plays in the larger work, or whether the work as a whole has serious value to the minor recipient.

89.     Subparagraph (b) contains a reference to the work "taken as a whole," § 18-1517B(2)(b), but because (b) is subsumed within (a), this clause does not limit the unconstitutional sweep of the Act.

90.     To the contrary, the clause does not reference the "literary, artistic, political or scientific value" of the work that contains the disfavored content, and the clause therefore bears no relationship to the relevant test under *Miller* and its progeny.

91.     Moreover, the "taken as a whole" clause in § 18-1517B(2)(b) does not limit the unconstitutional scope of the Act because it simply refers back to the definition of "harmful to minors," which is impermissibly focused on specific depictions and descriptions contrary to *Miller*.

92.     Finally, subparagraph (c) of the Substantive Prohibition broadly prohibits the Private Entity Plaintiffs from "promot[ing], giv[ing], or mak[ing] available" "any other material" to minors that contains disfavored content, irrespective of the content's form or location, the role it plays in a larger work, or the value to minors of a larger work within which the material is contained.  § 18-1517B(2)(c).

ii.  "Minor"

93.     Further, H.B. 710 fails to distinguish among minor students and patrons by age.

94.     "Minor" as used in the Act is defined to "mean[] any person less than eighteen (18) years of age."  § 18-1514(1).

95.     The Act, in turn, incorporates this definition into the definition of "harmful to minors," thereby prohibiting the Private Entity Plaintiffs from providing seventeen-year-olds with descriptions or depictions that are constitutionally protected and non-obscene as to them, but which may be inappropriate for kindergartners or other younger minors.  § 18-1514(6).

96.     In this way, H.B. 710 will deprive older minors—or, in the case of The Community Library and Collister, adults—of access to constitutionally protected materials that may not be appropriate for a Private Entity Plaintiff's youngest students or patrons.

iii.  "Sexual Conduct"

97.     The definition of "sexual conduct" includes within its scope certain depictions and descriptions of (1) "any act of . . . homosexuality" (hereinafter, the "Act of Homosexuality Clause") or (2) "physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or, if such person be a female, the breast" (hereinafter, the "Physical Contact Clause"). § 18-1514(3).

98.     These phrases are vague, overbroad, and extend beyond the State's limited authority to regulate material containing "depictions of sexual conduct" that also satisfy the *Miller* test.

99.     The Act of Homosexuality Clause, for example, is not limited to sexual acts among people of the same sex.  The phrase instead includes even innocuous images or descriptions of same sex couples holding hands, kissing, cohabitating, or engaged in parenting, where such descriptions or depictions offend the subjective sensibilities of a particular parent, student, or minor patron.

100.    The Act of Homosexuality Clause targets homosexuality.  The Act does not prohibit the distribution of materials that contain descriptions or depictions of similar materials that contain descriptions or depictions of "acts of heterosexuality."

101.    Similarly, the Physical Contact Clause extends to all physical contact, not only sexual contact.  The Clause therefore includes descriptions or depictions of sporting events that involve "physical contact" among clothed individuals, medical examinations of clothed or unclothed patients, or scientific interactions with clothed or unclothed subjects, among other innocuous and non-sexual possibilities.

102.    Although material encompassed in the Act of Homosexuality Clause and Physical Contact Clauses must also be "harmful to minors" in order to fall within the scope of H.B. 710, the Act's definition of "harmful to minors" fails to provide constitutionally meaningful guardrails on enforcement.  As noted above, the definition of "harmful to minors" describes only what that phrase "includes" and defines the outer bounds of the Act's scope by reference to local mores and the subjective sensitivities of Defendants and citizen complainants.

    iv. <u>"Material"</u>

103. The definition of "material" is incorporated into the Definitional and Substantive

Provisions, but it provides no guidance to the Private Entity Plaintiffs about the scope of the Act.

§ 18-1514(7).

104. "Material" is defined to "mean[] anything tangible which is harmful to minors,

whether derived through the medium of reading, observation or sound." *Id.*

105. The definition is incoherent on its face.  Putting aside that the noun "medium" is

not commonly understood or defined to encompass "reading, observation or sound," something

"tangible" cannot be "derived through the medium of reading, observation or sound."

    v. <u>"Performance"</u>

106. The definition of "Performance" confuses, rather than clarifies, the scope of the

Act.  § 18-1514(8).

107. "Performance" is defined to "mean[] any play, motion picture, dance or other

exhibition performed before an audience."  *Id.*

108. The phrase "harmful to minors" is defined to "include[] . . . any performance" that

also falls within § 18-1514(6)(a) and (b).  § 18-1514(6).

109. But the Substantive Prohibition fails to mention performances, plays, dances, or

exhibitions among its long list of media through which disfavored content may not be conveyed.

Specifically, § 18-1517B prohibits the Private Entity Plaintiffs from "promot[ing], giv[ing,], or

mak[ing] available . . . picture[s], photograph[s], drawing[s], sculpture[s], motion picture film[s],

. . . similar visual representation[s] or image[s,] . . . book[s], pamphlet[s], magazine[s], printed

matter however reproduced, . . . sound recording[s,] . . . [and] explicit and detailed verbal

descriptions or narrative accounts" that otherwise violate the Act.  § 18-1517B(2)(a)–(b).

"Performances," "play[s]," "dance[s]," and "exhibition[s]" are not included on that list.

110.    Section 18-1517B(c) refers to "any other material harmful to minors," but as described above, "material" refers only to "tangible" things, and therefore does not include plays, dances, or exhibitions performed before an audience.

111.    Because the Definitional Provision includes plays, dances, and other exhibitions performed before an audience and the Substantive Prohibition does not, the Private Entity Plaintiffs are left to guess whether plays, dances and other exhibitions performed before an audience fall within the scope of the Act.

vi.   <u>"Promote, give, or make available"</u>

112.    The prohibited acts—"promot[ing], giv[ing], or ma[king] available"—are also vague and overbroad in the context of the Act's entirely subjective, vague, and overbroad Definitional Provision.  § 18-1517B(2).

113.    The Act defines "promote" as used in the Substantive Prohibition to "mean[] to manufacture, issue, sell, give, provide, deliver, publish, distribute, circulate, disseminate, present, exhibit or advertise, or to offer or agree to do the same."  § 18-1514(9).  This definition includes "to . . . give," rendering the term "give" as used in the Substantive Prohibition superfluous.

114.    Among the acts prohibited in the Substantive Prohibition, "mak[ing] available," "manufactur[ing], . . . publish[ing], . . . present[ing], exhibit[ing] or advertis[ing], or to offer[ing] or agree[ing] to do the same" appear to create a form of strict liability on the Private Entity Plaintiffs for all of the works in their collections that contain disfavored content, without regard to whether a specific minor has been exposed to, or taken possession of, content that the State disfavors.

115.    For example, the Act appears to prohibit the Private Entity Plaintiffs from "offer[ing] or agree[ing]" to "present" a work that contains disfavored content, irrespective of the identity of the offeree or the counterparty to the agreement, and without regard to whether a minor is aware of the offer or agreement or comes into possession of content disfavored by the State.  The Act also appears to create liability for every work containing disfavored content that a school or library "make[s] available," again without regard to whether the disfavored content found in those works is appropriate for some minors or adults, or whether the work came into the possession of a minor for whom the disfavored content is not appropriate.

116.    The scope of the prohibition places an impermissible, even insurmountable, burden on the Private Entity Plaintiffs' ability to fulfill their constitutionally protected missions.

117.    The point of a school that educates minors who range in age from as young as four to as old as eighteen is to "make available" and "present" to the student body a wide range of works that appeal to students across age groups and academic grades, and with divergent interests, abilities, and maturity levels.

118.    This problem is also acute with respect to the Library Plaintiffs, who serve minors and adults of all ages, and who "make available" and "present" to the public works that encompass a concomitantly diverse range of interests, abilities, and maturity levels.

vii.   Scienter

119.    The Substantive Prohibition contains no scienter requirement to separate culpable from non-culpable conduct.

120.    This omission is conspicuous given that the Definitional Provision includes a definition for the term "knowingly," which is not found anywhere in the Substantive Prohibition. See § 18-1514(10).

121.    The absence of any mental state requirement encourages subjective enforcement of the Act, chills the exercise of First Amendment freedoms, and will result in the punishment of individuals and entities for behavior that they could not have known was unlawful.

b.   *The Enforcement Provisions*

122.    The Act's Enforcement Provisions are also incoherent and overbroad, and they invite harassment and arbitrary enforcement.

i.   <u>The Review Provision</u>

123.    The Review Provision directs that the Private Entity Plaintiffs "shall have a readily accessible form allowing a person to request review of material the person considers to be harmful to minors.  Such form shall contain the definition of 'harmful to minors,' as provided" in H.B. 710.  § 18-1517B(7).

124.    The scope of the Private Entity Plaintiffs' responsibility under the Review Provision is unconstitutionally vague and will chill conduct that is protected by the First Amendment.

125.    The Review Provision does not describe the Private Entity Plaintiffs' obligation under this provision beyond the procedural requirement that they have a "readily accessible form" that contains the information described in the provision.  The Review Provision does not define the term "readily accessible."

126.    Nevertheless, by inference, the Review Provision appears to confer authority on "a person"—any person—to demand a "review" of the materials in the possession of a private entity, including the Private Entity Plaintiffs, without regard to whether the person is affiliated with the private entity from whom they are demanding a "review."

127.    Further, whatever authority is conferred by the Review Provision is expressly premised on the subjective views of the person demanding the review.  The Review Provision authorizes such a person to demand a review of "material" that the complainant personally and subjectively "considers" to be "harmful to minors."

128.    The Review Provision also does not require the person requesting a review to identify a specific work or works, explain what he "considers" "harmful" about the works, or confirm that the private entity to whom he is submitting the demand has the works in its collection.

129.    The Review Provision will be understood by some to confer on any private citizen a freestanding right to demand that any private school or privately funded public library, including the Private Entity Plaintiffs, conduct a "review" of materials disfavored by the requesting individual and the State.

ii.  The Citizen Enforcement Provision

130.    The Citizen Enforcement Provision provides private citizens with a cause of action and a financial incentive to sue private entities, including the Private Entity Plaintiffs, for alleged violations of the Act.

131.    The Citizen Enforcement Provision provides in full:

> (3) Any minor who obtains material, or parent or legal guardian whose child obtained material, in violation of the provisions of [§ 18-1517B(2)] from a school or public library shall have a cause of action against such institution if:
>
>> (a) The institution gave or made available material harmful to minors, or the institution failed to take reasonable steps to restrict access by minors to material harmful to minors;
>>
>> (b) Prior to the filing of a cause of action, the minor, parent, or legal guardian has provided written notice to the school or public library asking for the relocation of such material to a section designated for adults only within sixty (60) days of receipt of the written notice; and

(c) Upon receipt of written notice and subsequent to the expiration of sixty (60) days, the institution's library board or board of trustees failed to relocate the material harmful to minors to an area with adult access only.

(4) Any minor, parent, or legal guardian who prevails in an action brought under this section may recover two hundred fifty dollars ($250) in statutory damages as well as actual damages and any other relief available by law, including but not limited to injunctive relief sufficient to prevent the defendant school or public library from violating the requirements of this section.

§ 18-1517B(3), (4).

132.    Through the Citizen Enforcement Provision, the State has empowered any parent or minor who disapproves of the content of a work to demand that the work be segregated from all minors.

133.    If a Private Entity Plaintiff disagrees with the content-based assessment of the parent or minor and declines to segregate the challenged material, the parent or minor is authorized to file a civil suit against the Private Entity Plaintiff and incentivized to do so by a cash reward and the availability of "actual damages."

134.    The Citizen Enforcement Provision will impose the views of the most sensitive parents and minors on all those who attend the private school or patronize the privately funded public library.

135.    Finally, under the Citizen Enforcement Provision, a complainant is authorized to seek injunctive relief that extends beyond a specific alleged violation of the Substantive Prohibition to include "injunctive relief . . . sufficient to prevent the defendant school or public library from violating the requirements of this section."  § 18-1517B(4).

136.    The apparent breadth of the remedy available to a citizen complainant is particularly threatening given the absence of any scienter requirement in the Substantive Prohibition.

iii.   The Government Enforcement Provision

137.   The Government Enforcement Provision provides Defendants with a cause of action to enjoin private parties, including the Private Entity Plaintiffs, from violating the Act.

138.   The Government Enforcement Provision provides in full:

> A county prosecuting attorney or the attorney general shall have a cause of action for injunctive relief against any school or public library that violates the provisions of [§ 18-1517B(2)].  The injunction shall be sufficient to prevent the defendant school or public library from violating the requirements of this section.

§ 18-1517B(5).

139.   Unlike the Citizen Enforcement Provision, the Government Enforcement Provision does not require Defendants to provide Private Entity Plaintiffs with notice or an opportunity to cure before seeking an injunction against them in an Idaho state court.

140.   Rather, Defendants are authorized to enforce the vague and overbroad language of H.B. 710 immediately upon learning of a purported violation of § 18-1517B(2).

141.   Litigation under the Government Enforcement Provision will be costly and lead to reputational damage, even if the private entity eventually prevails.

142.   Further, the Government Enforcement Provision permits Defendants to seek an injunction against a Private Entity Plaintiff for any violation of the Substantive Prohibition, including but not limited to those that do not involve a minor being exposed to, much less taking possession of, content disfavored by the State.  For example, Defendants may seek an injunction against a Private Entity Plaintiff for merely "agree[ing]" to "exhibit" a work that contains disfavored content.

143.   Finally, under the Government Enforcement Provision, the Defendants are authorized to seek injunctive relief that extends beyond a specific alleged violation of the

Substantive Prohibition to include an "injunction . . . sufficient to prevent the defendant school or public library from violating the requirements of this section." § 18-1517B(5).

144.     The apparent breadth of the remedy available to the Defendants is particularly threatening given the absence of any scienter requirement in the Substantive Prohibition.

iv.   The "Adults Only" Provisions

145.     The Act's vagueness and overbreadth is exacerbated by the absence of any definition for the terms "designated for adults only" and "adult access only," as used in § 18-1517B(3)(b) and (c), respectively (collectively, the "Adults Only Provisions").

146.     The two phrases have materially distinct plain meanings. The former requires only the "designat[ion]" of an area as "for adults only," whereas the latter appears to impose additional obligations to limit minors' ability to "access" materials with disfavored content.

147.     Notwithstanding this plain difference in meaning, the structure of the Act indicates that the Act's drafters intended the Adults Only Provisions to have the same meaning.

148.     Whatever the Legislature intended to convey with the Adults Only Provisions, they put the Private Entity Plaintiffs to an unconstitutional choice. Because the Private School Plaintiffs possess books, art, recordings, and other material in furtherance of their mission to educate minors, the segregation of any such materials into an "adults" section is equivalent to removing those materials from the school altogether. If the Private School Plaintiffs fail to segregate challenged material in this way, thereby denying access to all students in the school, they face expensive lawsuits that drain their resources and distract from their constitutionally protected missions.

149.     This lack of clarity also puts the Library Plaintiffs to an unconstitutional choice. The Library Plaintiffs do not maintain any part of their collections in segregated areas limited to

"adult access only."  They also do not wish to divert resources from their constitutionally

protected missions to create areas of their libraries that can be accessed by adults only.  Such

areas would signal disapproval of the content contained in the materials stored therein.

Accordingly, the Library Plaintiffs must either remove challenged material altogether, segregate

it in areas that infringe on the First Amendment rights of the libraries and their adult patrons, or

face the threat of expensive lawsuits that will drain their resources and distract from their

constitutionally protected missions.

### IV.    Unfounded Accusations About Schools and Libraries Create a Substantial Threat of Enforcement

150.    The Private Entity Plaintiffs face a substantial and immediate threat of

enforcement under the Act, which gives rise to a grave danger of self-censorship.[11]

151.    H.B. 710 is the product of a social climate in Idaho (and elsewhere) in which

schools and libraries have been inaccurately and unfairly castigated and villainized for using and

making available constitutionally protected materials with content that the State and some

Idahoans disapprove of.

152.    For example, following a January 2024 public hearing on H.B. 384—a

substantively identical predecessor to H.B. 710—an elected official in Idaho asserted in a press

release that individuals who testified in opposition to the bill believe "that children *should* be

exposed to obscene and pornographic materials."[12]  In the same statement, the official suggested

that in Idaho "children [are] stumbling upon hardcore porn in schools and libraries," that

---

[11] *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988), *certified question answered sub nom. Commonwealth v. Am. Booksellers Ass'n, Inc.*, 236 Va. 168 (1988).

[12] Dorothy Moon, *Idaho Republicans are Standing up for Children's Innocence*, IDAHOGOP (Jan. 18, 2024), https://idgop.org/2024/01/18/idaho-republicans-are-standing-up-for-childrens-innocence.

"[t]oday, people are writing and publishing things aimed at children that would have gotten them arrested just a few years ago," and that "misguided people in our schools and libraries are facilitating this filth."[13]

153.    A political party official in Idaho, testifying in support of H.B. 384, claimed that "obscene materials . . . *are* in libraries and schools in Idaho," and "[r]esearch shows that wherever sexually explicit obscene materials are available, rape, murder, and child molestation increase.  This means the risk goes up that I, one of my five children, one of your children could be raped, murdered, or molested."[14]

154.    In April 2023, a county sheriff in Idaho entered a public library with his body-worn camera with an individual who proceeded to identify books with content to which she objected.[15]  While in the library, the individual provided printed excerpts of certain books to the sheriff for his review.  During the visit, the individual showed the sheriff excerpts from several books, including one graphic novel in which a female character "kisses both male and female to figure out what she likes" and another with an "intentionally very androgenous [male] character" who "prefers boys."[16]  After showing the sheriff parts of the latter graphic novel, the individual asked, "is this necessary?  Illegal, no.  Unnecessary, yes."[17]  She compared certain books to "an old fashion guy in a van with a bowl of candy, trying to entice. . . ."[18]  The individual

---

[13] *Id.*

[14] *Id.*

[15] Michelle Zenarosa, *This Idaho sheriff thinks he had the right to raid your library and decide what you read*, Reckon (Feb. 28, 2024), https://www.reckon.news/news/2024/02/this-idaho-sheriff-thinks-he-has-the-right-to-raid-your-library-and-decide-what-you-can-read.html.

[16] 404 Media, *4 20 23 Hayden Library 1*, Reckon, at 31:20 (Feb. 25, 2024), https://www.youtube.com/watch?v=pFsrgmKHZiE.

[17] *Id.* at 31:50.

[18] *Id.* at 48:18.

acknowledged that she had not read all of books on her group's list of objectionable books, and that she relied on lists created by other "concerned citizens," including the list of "books that have been objected to, restricted, or banned in schools or public libraries all over the country."[19]

155.    A religious and political advocacy group based in Idaho (the "Group") has distributed a report called "Pornography in Public Schools and Libraries: A Statewide Problem" (the "Report"), which contains a list of five books that the group asserts "courts would likely consider 'obscene' for children and teenagers" (the "List").

156.    The List includes *It's Perfectly Normal: Changing Bodies, Growing Up, Sex, and Sexual Health*, an award-winning work of non-fiction intended to inform minors about puberty, sex, sexual health, and related issues.  It was first published in 1994, it has been updated several times, it has been translated into dozens of languages, and it has sold millions of copies.

157.    The Ninth Circuit has previously considered the content of *It's Perfectly Normal* and concluded it is not obscene, notwithstanding the Report's assertion to the contrary.  The Ninth Circuit has explained that *It's Perfectly Normal* is "a sexual education book containing simple line drawings that include non-obscene but unmistakable images of sexual intercourse and masturbation.  As its subtitle indicates, the book provides frank information about 'changing bodies, growing up, sex & sexual health,' and thus [it] does not lack serious scientific value even for children under the age of thirteen."[20]

158.    The Report also includes an appendix that lists Idaho libraries with one or more books from the List in their collection.  Plaintiff The Community Library is included on the list.

---

[19] *Id.* at 46:00.

[20] *Powell's Books*, 622 F.3d at 1213–14.

159.    On the Group's website, it purports to have identified thirty cities in Idaho, (including Boise and Ketchum) with schools and/or libraries "where pornographic books can be accessed by children."[21]

160.    In the "comments" section of that webpage, one commenter asked, "Is it possible to get separate lists for schools and libraries.  I'd like to know more specifically who to target in my community."  Another commenter urged others to go to their local library to "check out every book at the 'Pride Month' display" and to "keep renewing" to "make[] a statement and take[] disturbing books away from children."

161.    In January 2023, a group in northern Idaho organized a petition in an effort to prevent a public library from selecting any book for its "Kid's Book Club" that contains LGBTQ+ characters.  The request was occasioned by the inclusion in the Book Club of a book with a lesbian character.[22]

162.    Another group in northern Idaho has identified books, many written for "young adults, that the group claims are "obscene" and "pornographic."  Prior to the enactment of H.B. 710, the group's website included a page that poses the question "What qualifies as 'obscene' and 'pornographic'"?  As of February 5, 2024, the group's website answered that question with dictionary definitions that emphasized subjective disapproval and bore no relationship to the *Miller* test.  The group's website defined "obscene" to mean "disgusting to the senses," "abhorrent to morality or virtue," "containing or being language regarded as taboo in polite

---

[21] Kelly Cope, *Here's the list of schools and libraries distributing smut to children*, Idaho Family Policy Center (Feb. 22, 2023), https://idahofamily.org/heres-the-list-of-schools-and-libraries-distributing-smut-to-children/.

[22] Billy Buley, *Coeur d'Alene group starts petition asking library to stop using LGBTQ+ books content for Kid's Book Club selections*, KREM (Jan. 27, 2023 11:30 AM), https://www.krem.com/article/news/education/coeur-dalene-petition-lgbtq-books-content-kids-book-club/293-f415c5c8-faf9-4a41-b3ae-da17dbb51880.

usage," "repulsive by reason of crass disregard of moral or ethics principles," or "so excessive as to be offensive."[23]  The group's website currently asks, "What qualifies as 'obscene' and 'harmful to minors'?" and it includes a link to § 18-1514.[24]

163.    Another Idaho-based group asserts on its website that one Idaho public library had "at least 53 sexually-explicit and/or inappropriate books," and complained falsely that "schools, libraries, museums, and colleges/universities, and their employees, are EXEMPTED from criminal prosecution for disseminating material harmful to minors."[25]

164.    As a result of statements and incidents like these—including ones that have not been publicly reported upon—the Private Entity Plaintiffs fear that Defendants and private citizens will seek to enforce H.B. 710 using the Review Provision, the Government Enforcement Provision, and the Citizen Enforcement Provision, thereby infringing on the Private Entity Plaintiffs' constitutional rights.

## V.    The Private Entity Plaintiffs Fear They Will Face Enforcement Actions for Engaging in Constitutionally Protected Conduct and Speech

165.    NWAIS's rigorous accreditation standards are incompatible with H.B. 710's vague and overbroad content-based prohibition.  For example, H.B. 710 is incompatible with NWAIS's members' commitment to "free and open inquiry" insofar as H.B. 710 fails to exempt from its strictures all works that have serious literary, artistic, political, or scientific value for minors.  H.B. 710's Act of Homosexuality Clause is also inconsistent with its members'

---

[23] *How Did We Get Here?*, CleanBooks4Kids.com, https://web.archive.org/web/20240205030133/https://www.cleanbooks4kids.com/how-did-we-get-here (webpage archived on Feb. 5, 2024).

[24] *How Did We Get Here?*, CleanBooks4Kids.com, https://www.cleanbooks4kids.com/how-did-we-get-here (last visited July 23, 2024).

[25] *Parents Against Bad Books*, Idaho Parents for Educational Choice, https://www.idahoparentsforeducationalchoice.com/general-1 (last visited July 22, 2024).

commitment to "embrace diverse perspectives, cultures, backgrounds and identities" and to non-discrimination, including on the basis of sexual orientation.

166.    SVCS's approach to education emphasizes inquiry-based learning and the application of critical thinking.  Within the framework of a college-preparatory curriculum, SVCS encourages students to pursue their personal interests and passions with energy and conviction.  It also encourages students to develop a global perspective and to learn about and understand different traditions and ways of thinking.

167.    To further these objectives, SVCS makes materials available to its students that may differ from those found in Idaho public schools and some other private schools.

168.    Some constitutionally protected, non-obscene materials that SVCS has made available to students in the past, and that it intends to make available to students in the future, appear to fall within the scope of H.B. 710.

169.    For example, certain middle and upper school science courses at SVCS use textbooks that contain "nudity" and "sexual conduct" as those terms are defined in H.B. 710. Certain middle and upper school arts and humanities courses also rely on source material that contain "nudity" as that term is defined in H.B. 710.

170.    As a part of the school's social-emotional learning program, SVCS also provides age-appropriate health and sex education programs for its lower school, middle school and high school students.  This includes presentations to 8th-grade students about pregnancy, sexually transmitted infections, suicide awareness and substance refusal.  The materials that accompany these programs also contain "nudity" and/or "sexual conduct" as those terms are defined in H.B. 710.

171.     In advance of the health education presentations to 8th-grade students, SVCS sends a letter home to parents and guardians describing the units in detail and providing all presentation materials.  Parents and guardians are given the opportunity to raise questions with the school or to have their child "opt-out" of the program if the parent or guardian wishes for their child to do so.  On the rare occasions in which parents have expressed concerns about the health education program or any other aspects of the SVCS curriculum, SVCS has worked out solutions directly with the parents involved without any need for intervention by the State.

172.     SVCS is aware from the scope of H.B. 710 that the State disapproves of the content found in some of the materials described in the preceding paragraphs.  SVCS is also aware that some Idahoans are subjectively offended by such content.  Accordingly, SVCS is concerned that it may be subject to complaints or enforcement proceedings as a result of H.B. 710.

173.     SVCS's concerns are exacerbated by H.B. 710's vagueness and its civil enforcement provision.  Because H.B. 710 does not clearly define what "harmful to minors" means, SVCS, the State, and members of the public cannot know with any degree of certainty what materials fall within the scope of the law.  The Act's vagueness, coupled with the fact that any member of the public—including individuals unaffiliated with SVCS—can demand a "review" of materials SVCS uses in its curriculum or library, gives rise to a reasonable fear that SVCS will be subject to litigation under H.B. 710, even if such litigation is frivolous.

174.     As a non-profit, SVCS has limited resources to engage in such litigation. Engaging in such litigation would also require SVCS to divert resources away from its core educational activities.

175.    SVCS is also concerned that removing materials from its curriculum or school libraries in an effort to comply with H.B. 710 could risk SVCS's accreditation status with NWAIS.  In particular, SVCS is concerned that attempting to comply with H.B. 710 could run afoul of NWAIS's accreditation standards concerning free inquiry, diversity and non-discrimination.

176.    Foothills offers an independent, progressive education that focuses on project-based learning experiences.  Foothills believes that its students should identify and pursue their own areas of interest and seek to understand real-world issues, while at the same time mastering academic benchmarks.

177.    Consistent with Foothills' approach to pedagogy, the books, art and other materials it makes available to its students may reflect a wider variety of subjects and contain more diverse content than the materials found in public schools and some other private schools. Foothills encourages its experienced and dedicated teachers to assemble classroom library collections meant to inspire student inquiry, consistent with the students' educational, social and emotional development, and in service of achieving appropriate academic benchmarks.  Because Foothills encourages this type of student-driven inquiry, the materials made available to students within each grade level vary from year to year.

178.    Some constitutionally protected, non-obscene materials that Foothills has made available to students in the past, and that it intends to make available to students in the future, fall within the scope of H.B. 710.

179.    For example, Foothills deliberately makes available to its students materials that reflect and celebrate the diverse experiences of its community of parents and students. Beginning at the early childhood level, Foothills makes available to students materials that depict

same-sex characters engaged in non-sexual and non-obscene activities, including parenting and living together as a family.  Older students have access to age-appropriate materials that depict same-sex characters kissing, holding hands, and engaging in other non-obscene conduct.  Some of these materials include descriptions or depictions of "act[s] of . . . homosexuality" as that overbroad and undefined phrase is used in H.B. 710.

180.    Further, Foothills makes available to its students works of serious artistic and literary value that contain descriptions or depictions of content that appears to fall within the scope of H.B. 710.  For example, teachers at Foothills have in the past provided students with celebrated works of art that depict "nudity" as that term is defined in the Act.  Foothills teachers have also made available to students non-obscene works of fiction and non-fiction that address sexual assault in ways that appear to fall within H.B. 710's vague and overbroad prohibition.

181.    Foothills also provides its students with age-appropriate health education that is not derived from or limited by the policy statement found in Idaho Statutes § 33-1608 ("Family Life and Sex Education – Legislative Position").  The health education curriculum at Foothills includes lessons concerning puberty for older elementary school students and lessons concerning sexual health for junior high students.

182.    Foothills' health education curriculum includes non-obscene materials with content that falls within the definitions of "sexual conduct" and "sexual excitement" as those terms are used in H.B. 710.

183.    Foothills, at its discretion, communicates a summary of some health education lessons to the parents of its students, so that parents may answer students' questions and otherwise continue the discussion of these important issues with their children at home.

184.    Foothills is aware from the scope of H.B. 710 that the State disapproves of the content found in some of the materials described in the preceding paragraphs.  Foothills is also aware that some Idahoans are subjectively offended by such content.  Accordingly, Foothills is concerned that it may be subject to complaints or enforcement proceedings as a result of H.B. 710.

185.    Foothills' concerns are exacerbated by the law's vagueness and its civil enforcement provision.  Because H.B. 710 does not clearly define what "harmful to minors" means, Foothills, the State, and members of the public cannot know with any degree of certainty what material falls within the scope of the law.  This vagueness, coupled with the fact that any member of the public—including individuals unaffiliated with Foothills—can demand a "review" of materials Foothills uses in its curriculum or library, gives rise to a reasonable fear that Foothills will be subject to litigation under H.B. 710, even if such litigation is frivolous.

186.    As a non-profit corporation, Foothills has limited resources to engage in such litigation.  Engaging in such litigation would also require Foothills to divert resources away from its core educational activities.

187.    Foothills is also concerned that removing materials from its curriculum or school libraries in an effort to comply with H.B. 710 could risk Foothills' accreditation status with NWAIS.  In particular, Foothills is concerned that attempting to comply with H.B. 710 could run afoul of NWAIS's accreditation standards concerning free inquiry, diversity and non-discrimination.

188.    The Community Library endeavors to apply the highest professional standards to its acquisition and collection maintenance activities.  The library is committed to providing wide access to information deriving from many cultural backgrounds, social values, and beliefs and to

providing opportunities for its patrons to explore content that might be controversial, unorthodox, or unacceptable to others.

189.    Consistent with that mission, The Community Library has works in its collection that contain descriptions or depictions that fall within the scope of H.B. 710 and that some members of the community might find personally and subjectively offensive, including, but not limited to, books with LGBTQ+ characters, books addressing sexual assault, and science and art books that contain nudity.

190.    H.B. 710 is also vague, overbroad, and impractical as applied to The Community Library's online resources.

191.    The library provides free Internet access on its 15 computer terminals and free wireless Internet, which visitors may use to access the Internet from their personal devices.  The terminals and wireless Internet are available for use by adult and minor patrons, and a patron need not have a library card to use the library's terminals or wireless Internet.  The library does not control the content of the Internet and, consistent with its mission to encourage free inquiry, it does not censor the online materials that may be accessed on its terminals or over its wireless Internet.

192.    Indeed, The Community Library cannot practicably implement the content-based restrictions of H.B. 710 with respect to the library's provision of Internet access on its terminals and over its wireless Internet, and any effort to implement the State's content-based restrictions would impose a substantial burden on adults' and minors' ability to access materials on the Internet.

193.    Similarly, The Community Library offers patrons access to more than 58,000 digital works through private companies with which the library contracts.  Patrons may access

digital works from any Internet-enabled device, including the library's 15 computer terminals, a personal computer or smartphone connected to the library's wireless Internet, or from a computer or smartphone in the user's home.  The library does not control the content made available by the private e-book providers with which it contracts, and the library is unwilling to request that private e-book providers limit their offerings to comply with the vague and overbroad prohibitions of H.B. 710.

194.    The Community Library has limited resources to defend its collection against claims under H.B. 710.  The Community Library has 30 full-time and 12 part-time staff members, and it cannot afford to fund litigation to defend its provision of works that are protected by the First Amendment with resources that would otherwise be allotted to its core educational mission.

195.    The Community Library's concerns about potential litigation related to H.B. 710 are also exacerbated by the law's vagueness and its civil enforcement provision.  Because H.B. 710 does not clearly define what "harmful to minors" means, The Community Library, the State, and members of the public cannot know with any degree of certainty what material falls within the scope of the law.  This vagueness, coupled with the fact that any member of the public—including individuals unaffiliated with The Community Library—can demand a "review" of materials in the library's collection, gives rise to a reasonable fear that The Community Library will be subject to litigation under H.B. 710, even if such litigation is frivolous.

196.    Collister makes available a variety of books in its lending library that involve LGBTQ+ characters and themes as part of its commitment to be a Reconciling Ministry.  That includes, but is not limited to, books geared towards adults that discuss the treatment of

LGBTQ+ people and topics in religious scriptures, as well as books geared towards children that involve non-sexual depictions of same-sex couples co-parenting and cohabitating.

197.     Even though the books in Collister's lending library are constitutionally protected and not obscene, they appear to contain "act[s] of . . . homosexuality" as that term is used in H.B. 710.

198.     Collister makes the books in its collection available on a shelf that was crafted by one of its congregants.  Collister has deliberately placed the shelf in the welcome area of the church, near the building's entrance, along with a copy of the church's Reconciling Ministry statement, to reiterate that welcoming and affirming LGBTQ+ community members is central to Collister's mission.

199.     Any member of the public can borrow the books, provided they sign their name on a sign-out sheet.

200.     Collister is aware that the State and some Idahoans disapprove of some of the material in Collister's library and Collister therefore reasonably fears that it will be subject to litigation as a result of H.B. 710.

201.     Collister's concerns are exacerbated by the law's vagueness and its civil enforcement provision.  Because H.B. 710 does not clearly define what "harmful to minors" means, Collister, the State, and members of the public cannot know with any degree of certainty what material falls within the scope of the law.  This vagueness, coupled with the fact that any member of the public—including individuals unaffiliated with Collister—can demand a "review" of materials in Collister's lending library, gives rise to a reasonable fear that Collister will be subject to litigation under H.B. 710, even if such litigation is frivolous.

202.     As a non-profit corporation, Collister has limited resources to engage in such litigation.  Engaging in such litigation would also require Collister to divert resources away from core church activities.

203.     Collister also cannot create an "adults only" section for material that the State or some Idahoans may disapprove of or find offensive.  Collister's church lacks the physical space for such a section and the resources to reliably monitor access to such a section.  Moreover, creating such a section would cast opprobrium over the materials, undermining the inclusive and welcoming message that Collister is attempting to send by including the materials in its lending library in the first place.

## VI.     H.B. 710 Violates Parent Plaintiffs' Substantive Due Process Rights

204.     The Parent Plaintiffs have exercised their fundamental liberty interest to direct their children's education by selecting a private school over State-controlled public schools.

205.     Parent Plaintiff Mary Hollis Zimmer's child is a rising 11th-grade student at SVCS.  Ms. Zimmer chose SVCS for her child's education because she believes in the school's mission and its approach to education.  She prefers SVCS's educational approach, including the materials it makes available to students, to that of the State-controlled public schools.  She is actively involved in helping to shape students' experience at SVCS, including by currently serving on the school's Board of Trustees and previously holding leadership positions on the school's Parents' Association.

206.     Ms. Zimmer wants her child to be able to access all of the materials SVCS wishes to make available to her child without undue interference from the State.

207.     For instance, Ms. Zimmer wants her child to be able to access all of the materials that SVCS determines are appropriate for her child's education—particularly with regard to

science, art, and health education—even if those materials contain content that meets the definition of "nudity" or "sexual conduct" as those terms are defined in H.B. 710.  She also wants her child to be able to access materials SVCS wishes to make available to her child that address LGBTQ+ themes and content even if those materials contain "act[s] of . . . homosexuality" as that term is used in H.B. 710.  Ms. Zimmer understands that SVCS has already made some such material available to her child and she wishes SVCS to continue to have the ability to do so.

208.    H.B. 710 violates Ms. Zimmer's fundamental right to direct her child's education by imposing the State's content-based preferences on SVCS.  H.B. 710 impedes SVCS's ability to educate her child consistent with its mission and Ms. Zimmer's wishes.

209.    Parent Plaintiff Matthew Podolsky's child is a rising 5th-grade student at Foothills.  Mr. Podolsky chose to send his child to Foothills because he believes in the school's approach to early childhood education.  In particular, Mr. Podolsky values the emphasis the school places on social emotional learning and development, and the ways in which the school incorporates its students' interests into its curriculum.

210.    Mr. Podolsky believes that all children regardless of whether they attend public or private school should be able to access all constitutionally protected, non-obscene material that their teachers or schools believe are appropriate for their educational development.  As a parent of a child at Foothills, he wants his child to be able to access the materials that Foothills has determined are appropriate for his child's education without undue interference from the State.

211.    For instance, Mr. Podolsky wants his child to be able to access books and other materials addressing LGBTQ+ people and themes, as well as materials relevant to art or science that contain "nudity" as that term is defined in H.B. 710.  Mr. Podolsky understands that

Foothills has already made some such material available to his child.  As his child gets older, he also wants his child to receive the health and sex education curriculum that Foothills makes available to its students, even if the curriculum includes "nudity" or "sexual conduct" as those terms are defined in H.B. 710.

212.    H.B. 710 violates Mr. Podolsky's fundamental right to direct his child's education by imposing the State's content-based preferences on Foothills.  H.B. 710 impedes Foothills' ability to educate his child consistent with its mission and Mr. Podolsky's wishes.

213.    Parent Plaintiff Christina Leidecker and each of her minor children, including Plaintiff S.L., have library cards with which they may borrow books from The Community Library's physical and digital collections.  Ms. Leidecker has visited The Community Library regularly over the last 30 years, on her own and with one or both of her minor children.

214.    Ms. Leidecker shares The Community Library's commitment to free inquiry and trusts the staff at The Community Library to make curatorial choices about the materials it makes available to its adult and minor patrons.  She values the library's independence from the State and its ability to make decisions about the holdings in its catalog free from State interference, and without regard to the State's content-based preferences.

215.    Ms. Leidecker also values the diverse array of materials that The Community Library makes available to her and her minor children.  She regularly browses the library's physical and digital holdings, and she has checked out hundreds of books in her 30 years as a library patron, including some that contain descriptions and depictions of "nudity" and "sexual conduct," as those terms are defined in H.B. 710.

216.    She also encourages her minor children, including Plaintiff S.L., to freely explore the library's contents and to check out materials that interest them.  Ms. Leidecker is aware that

her minor child, S.L., has checked out materials that contain descriptions or depictions of "nudity" and "sexual conduct," as those terms are defined in H.B. 710.  Ms. Leidecker has regular discussions with her minor children, including S.L., about the materials that they have checked out from The Community Library and is available to answer any questions that arise.

217.    It is particularly important to Ms. Leidecker that same-sex couples and families in her community are supported and respected like any other family.  To that end, it is important to Ms. Leidecker that her minor children, including S.L., have access to books that depict and describe LGBTQ+ characters without stigma.  Ms. Leidecker is aware that The Community Library has many such books, and she wants those books to remain available to her minor children, irrespective of the State's content-based disapproval.

218.    Ms. Leidecker wishes to receive all constitutionally protected materials that The Community Library wishes to make available to her, free from any content-based stigma imposed by H.B. 710.  Ms. Leidecker also wishes to exercise her right to direct the upbringing and education of her minor children, including S.L., by making available to them all constitutionally protected, non-obscene materials that The Community Library wishes to make available to minors, without regard to the content-based preferences expressed in H.B. 710.

## VII.   H.B. 710 Violates Minor Plaintiffs' Right to Receive Constitutionally Protected Materials

219.    H.B. 710 infringes Minor Plaintiffs' right to receive constitutionally protected material that their parents wish for them to access and that the Private Entity Plaintiffs wish to make available to them.

220.    For example, A.W. wishes to receive the educational materials selected for students by the Private School, which her parents selected for her education, without interference from the State.  Mr. Wallace and A.W. are aware that the materials that are included in her

curriculum and school library undergo a rigorous screening process that involves review by the Private School's administration, and there is already a system in place that gives parents the opportunity to raise concerns about particular materials.  A.W. fears that the imposition of an overbroad and vague law that extends beyond the State's constitutional authority, coupled with its civil enforcement provision, will result in the removal of non-obscene materials that have important educational value to her.

221.    Indeed, there are books that the Private School currently makes available to students, including A.W., that fall within the scope of H.B. 710.

222.    For example, A.W. read Maya Angelou's award-winning, best-selling autobiography *I Know Why the Caged Bird Sings* after checking it out from the Private School's library.  A.W. is aware that *I Know Why the Caged Bird Sings* contains a description of a sexual assault that appears to fall within the definitions of "sexual conduct," "sexual excitement," and "sado-masochistic abuse," as those terms are defined in the Act.  A.W. is also aware that some people find that aspect of *I Know Why the Caged Bird Sings* subjectively offensive and have called for its removal from school libraries.

223.    A.W. has discussed the book with her parent, Mr. Wallace, and he has indicated his support for her access to the book.  Because both the Private School and her parent, Mr. Wallace, wish for A.W. to have access to *I Know Why the Caged Bird Sings*, A.W. wishes to have access to it notwithstanding the State's content-based preferences expressed in H.B. 710.

224.    A.W. also borrowed *Impressionism* by Karen H. Grimme and Norbert Wolf, a book about French Impressionist painting, from the Private School's library in preparation for a school-sponsored trip A.W. took to France.  In *Impressionism*, A.W. viewed images of French Impressionist paintings that contain "nudity" as that term is defined in H.B. 710.

225.    A.W. has discussed *Impressionism* with her parent, Mr. Wallace, and he has indicated his support for her access to the book.  Because both the Private School and her parent, Mr. Wallace, wish for A.W. to have access to *Impressionism*, A.W. wishes to have access to it notwithstanding the State's content-based preferences expressed in H.B. 710.

226.    A.W. and her parent, Mr. Wallace, believe that *Impressionism* and *I Know Why the Caged Bird Sings* have serious literary, artistic, and political value for A.W., given her age and maturity.  A.W. wishes to continue to be able to access these and similar materials, which her school has determined are appropriate for her age and maturity level.  This is particularly important to A.W. as she enters upper-level high school courses and prepares for college.

227.    S.L. has been a patron of The Community Library since her mother, Plaintiff Christina Leidecker, began bringing S.L. to The Community Library when S.L. was a small child.  S.L. has visited The Community Library regularly since then, often with a parent and, in recent years, on her own.  S.L. received a library card in her own name from The Community Library when she was three years old.

228.    S.L. has checked out more than 1,100 books from The Community Library's physical collection and dozens of e-books and other digital materials from The Community Library's online collection.

229.    S.L has checked out physical and digital works from The Community Library that contain content that appears to fall within the scope of H.B. 710, including books that contain descriptions and depictions of "nudity" and "sexual conduct," as those terms are defined in H.B. 710.  The books that S.L. has read, including those that contain content described in H.B. 710 and disfavored by the State, have helped her to better understand the world, other people, and her own experiences growing up.

230.     S.L. values The Community Library's dedication to free inquiry and the breadth of the library's collection of physical and digital works.  She also values the physical layout of the library, including her ability to browse in the children's section, the young adult section, and the adult section, and to discover books from all three sections that pique her interest and inspire her.  With the knowledge and consent of Ms. Leidecker, S.L. has checked out books from The Community Library's children's section, young adult section, and adult section.  S.L. is aware that Ms. Leidecker is available to discuss any questions raised by the books she selects.

231.     S.L. is aware that The Community Library's collection includes physical and digital works that she has not yet read that contain content described in H.B. 710 that is disfavored by the State.  S.L. wishes to have access to all materials that The Community Library wishes to make available to her, without regard to the State's content-based preferences expressed in H.B. 710.

## CLAIMS FOR RELIEF

### COUNT ONE - First Amendment, Overbreadth and Content-Based Restriction
(*NWAIS and Private Entity Plaintiffs against all Defendants*)

232.     All prior paragraphs are incorporated herein by reference as if fully set forth herein.

233.     The Private Entity Plaintiffs are private, non-profit corporations that possess First Amendment rights.  *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010).  For SVCS and Foothills that includes a First Amendment right to select the materials they wish to include in their school libraries and their curricula.  For The Community Library and Collister, that includes a First Amendment right to curate their collections and to determine the placement of books within their libraries.

234.     H.B. 710 infringes the Private Entity Plaintiffs' First Amendment rights by regulating substantially more speech than the First Amendment permits.  *See Powell's Books*, 622 F.3d at 1208; *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2397 (2024).  For example, H.B. 710 fails to incorporate *Miller*'s Serious Value Requirement; it focuses on individual descriptions and depictions of disfavored content without regard to the works in which those descriptions or depictions are found; it is not limited to works that predominantly appeal to the prurient interest of minors; it restricts descriptions and depictions of innocuous, non-obscene, and non-sexual conduct, including non-sexual descriptions and depictions of same-sex couples; and it deprives older minors and adults access to constitutionally protected material.

235.     In the alternative, H.B. 710 violates the Private Entity Plaintiffs' First Amendment rights by imposing a content-based restriction on "the topic[s] discussed, or the idea[s] or message[s] expressed" in the materials the Private Entity Plaintiffs may make available to minors.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015); *Boyer v. City of Simi Valley*, 978 F.3d 618, 621 (9th Cir. 2020).  In particular, H.B. 710 impermissibly regulates the availability of constitutionally protected, non-obscene material based on whether the material contains certain content like nudity, sexual conduct, or acts of homosexuality.  *But see Erznoznik*, 422 U.S. at 211.  This content-based restriction is unconstitutional because it is neither narrowly tailored nor the least restrictive means of accomplishing a compelling government interest.

236.     H.B. 710's deficiencies under the First Amendment are exacerbated by the law's vagueness which makes it impossible for the Private Entity Plaintiffs to determine the scope of what material the law prohibits.  For example, the law's failure to concretely define the term "harmful to minors"—instead, providing what the term "includes" and not what it "means"—

threatens the Private Entity Plaintiffs with enforcement proceedings for exercising their First Amendment rights.  *Reno v. ACLU*, 521 U.S. at 871–72.

### COUNT TWO - Fourteenth Amendment, Vagueness
*(NWAIS and Private Entity Plaintiffs against all Defendants)*

237.   All prior paragraphs are incorporated herein by reference as if fully set forth herein.

238.   "In our constitutional order, a vague law is no law at all."  *United States v. Davis*, 588 U.S 445, 447 (2019).  A law is "void for vagueness if its prohibitions are not clearly defined."  *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  A law is impermissibly vague if it either "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" or "authorizes or even encourages arbitrary and discriminatory enforcement."  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

239.   "[V]agueness concerns are more acute when a law implicates First Amendment rights, and, therefore, vagueness scrutiny is more stringent."  *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022).  When First Amendment freedoms are implicated, a statute must provide a "greater degree of specificity and clarity than would be necessary under ordinary due process principles."  *California Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1150 (9th Cir. 2001).

240.   H.B. 710 is unconstitutionally vague on its face with respect to NWAIS and the Private Entity Plaintiffs because it fails to provide fair notice of what materials private K-12 schools and privately funded public libraries, including the Private Entity Plaintiffs, may make available to minor students and patrons; and because the Act invites and encourages arbitrary and discriminatory content-based enforcement based on the subjective sensitivities of the Defendants, and the parents and minors charged with enforcing the Act.

### COUNT THREE - First Amendment, Adult Patron Right to Receive
*(Plaintiff Leidecker against Defendants Labrador and Fredback)*

241.    All prior paragraphs are incorporated herein by reference as if fully set forth herein.

242.    As an adult patron of The Community Library, Ms. Leidecker has a First Amendment right to view and checkout materials in the library's collection that are not obscene as to her.

243.    H.B. 710 violates that right by subjecting The Community Library's contents to the community standards of appropriateness that apply to the library's youngest minor patrons. In particular, any non-obscene material that The Community Library removes in order to comply with that standard will result in Ms. Leidecker being deprived of constitutionally protected material to which she is entitled.

244.    Even if The Community Library were to create an "adult access only" section for challenged materials, that would still violate the First Amendment rights of Ms. Leidecker. Because of the stigma associated with "adults only" sections, Ms. Leidecker would be chilled from entering such a section to review and checkout material.

### COUNT FOUR – First Amendment, Minors' Right to Receive
*(Minor Plaintiffs and their parents against all Defendants)*

245.    All prior paragraphs are incorporated herein by reference as if fully set forth herein.

246.    The First Amendment "protects the right to receive information and ideas." *Stanley v. Georgia*, 394 U.S. 557, 564 (1969).  The "right to receive information . . . extends to educational settings."  *See Pac. Coast Horseshoeing Sch., Inc. v. Kirchmeyer*, 961 F.3d 1062, 1069 (9th Cir. 2020).

247.     The parents of the Minor Plaintiffs want their children to have access to constitutionally protected materials that the Private Entity Plaintiffs wish to make available to the Minor Plaintiffs, but which fall within the scope of H.B. 710.  The Minor Plaintiffs wish to receive constitutionally protected materials that their parents and the Private Entity Plaintiffs wish to make available to them, but which fall within the scope of H.B. 710.

248.     The parents of the Minor Plaintiffs want their children to access constitutionally protected materials that fall within the scope of H.B. 710 without incurring the stigma of accessing material that the State has deemed "obscene" and "harmful to minors."  The Minor Plaintiffs similarly wish to access those constitutionally protected materials free of the stigma imposed by H.B. 710.

249.     H.B. 710 infringes the First Amendment rights of the Minor Plaintiffs.

### COUNT FIVE – Fourteenth Amendment, Liberty Interest of Parents
*(Parent Plaintiffs against all Defendants)*

250.     All prior paragraphs are incorporated herein by reference as if fully set forth herein.

251.     "The Due Process Clause [of the Fourteenth Amendment] specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."  *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (internal citations and quotation marks omitted).

252.     Parent Plaintiffs have a fundamental liberty interest in directing the education of their children, including by selecting a private school over a public school controlled by the State.  *See Pierce*, 268 U.S. at 534–35; *Meyer v. Nebraska*, 262 U.S. 390 (1923).

253.     Defendants have deprived Parent Plaintiffs of this right in violation of the Fourteenth Amendment to the U.S. Constitution by imposing content-based restrictions on the non-obscene materials that private entities, including the Private Entity Plaintiffs, may provide to students, including the Parent Plaintiffs' children, in connection with their education.

254.     The U.S. Constitution entitles Parent Plaintiffs to be free from any burden to a fundamental right unless the infringement is narrowly tailored to serve a compelling state interest.

255.     Defendants lack any compelling, or even rational, interest for burdening Parent Plaintiffs' liberty interest in educating their children with non-obscene materials.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs respectfully request that this Court:

256.     Issue preliminary and permanent injunctive relief restraining Defendants, their employees, agents, and successors in office from enforcing H.B. 710;

257.     Declare H.B. 710 facially unconstitutional under the First and Fourteenth Amendments to the United States Constitution;

258.     Award Plaintiffs costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

259.     Grant such additional relief as the interests of justice may require.


DATED: July 25, 2024                    STOEL RIVES LLP
                                        /s/ Wendy J. Olson
                                        Wendy J. Olson
                                        Nicole C. Hancock

/s/ Latonia Haney Keith
Latonia Haney Keith


/s/ McKay Cunningham
McKay Cunningham


FREE + FAIR LITIGATION GROUP
/s/ Carey Dunne
Carey Dunne
Kevin Trowel
Martha Reiser


BALLARD SPAHR LLP
/s/ David L Axelrod
David L. Axelrod
Lesley F. Wolf
Hayley Steele

*Attorneys for Plaintiffs*