Deborah A. Ferguson, Bar No. 5333
Craig Durham, Bar No. 6428
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, ID 83702
Tel.: (208) 484-2253
daf@fergusondurham.com
chd@fergusondurham.com

Michael J. Grygiel (*pro hac vice*)
Daniela Del Rosario Wertheimer (*pro hac vice*)
CORNELL LAW SCHOOL
FIRST AMENDMENT CLINIC
Myron Taylor Hall
Ithaca, NY 14853
Tel.: (607) 255-8518
mjg395@cornell.edu
ddw83@cornell.edu

Kelly L. McNamee (*pro hac vice* pending)
Christina N. Hernsdorf (*pro hac vice* pending)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
Tel.: (212) 812-0400
Fax: (212) 812-0399
KMcNamee@FoleyHoag.com
CHernsdorf@FoleyHoag.com

*Attorneys for Penguin Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **NORTHWEST ASSOCIATION OF INDEPENDENT SCHOOLS**, *et al.*,<br><br>　　　　　　Plaintiffs,<br>　　v.<br><br>**RAÚL LABRADOR,** in his official capacity as the Attorney General of the State of Idaho, *et al.*,<br>　　　　　　Defendants. | Lead Case No. 1:24-cv-00335-AKB (Consolidated Action)<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| **PENGUIN RANDOM HOUSE LLC**, *et al.,*<br><br>　　　　　　Plaintiffs,<br>　　v.<br><br>**RAÚL LABRADOR**, in his official capacity as the Attorney General of the State of Idaho, *et al.*,<br>　　　　　　Defendants. | Case No. 1:25-cv-00061-AKB (Member Case) |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 3

I.    HB 710's Structure and Scope ....................................................................................... 3

     A.   The Substantive Prohibitions ................................................................................ 4

     B.   The Definitional Provisions ................................................................................... 4

     C.   The Act's Enforcement Mechanisms ..................................................................... 5

II.   Procedural History ........................................................................................................ 6

III.  The Negative and Continuing Impacts of HB 710 ........................................................ 8

     A.   Public Library Harms ............................................................................................ 8

     B.   Public School Library Harms ................................................................................ 12

     C.   Harms to Students and Parents .............................................................................. 13

     D.   Harms to Publishers .............................................................................................. 14

     E.   Harms to Authors .................................................................................................. 15

LEGAL STANDARD .............................................................................................................. 17

ARGUMENT ........................................................................................................................... 17

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS ...... 17

     A.   The Act Is Unconstitutionally Overbroad in Violation of the First Amendment. ..... 18

          1.   Standard for Facial Challenges Under the First Amendment. ......................... 18

          2.   HB 710 is an Unjustified and Unnecessary Burden on Older Minors'
              First Amendment Right to Access Materials Not Obscene as to Them. ........ 19

     B.   The Act is Void for Vagueness. .............................................................................. 24

          1.   HB 710 Fails to Satisfy the Stringent Vagueness Test Applicable to
              Laws that Threaten Constitutionally Protected Rights. ................................. 24

              a.   The Act's Definitions of "Minor" and "Adolescent Minor" are
                   Unduly Vague. ..................................................................................... 25

              b.   The Act's Definition of "Sexual Conduct" is Unduly Vague. ................... 25

              c.   The Act's Definition of "Sexually Explicit" is Unduly Vague. ................. 26

          2.   The Act Fails to Provide Minimal Guidelines to Govern Enforcement. ........ 27

          3.   Plaintiffs' Vagueness Challenge is Not Speculative or Hypothetical. ........... 29

C.   HB 710 Targets Materials that Depict Any Act of Homosexuality and Thus Discriminates Based on Viewpoint in Violation of the First Amendment. .................30

II.  PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION ..................................33

III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST BOTH FAVOR AN INJUNCTION..................................................................................................34

CONCLUSION...................................................................................................................35

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Beverage Association v. City & County of San Francisco*,
916 F.3d 749 (9th Cir. 2019) ..................................................................................34

*California Chamber of Commerce v. Council for Education & Research on Toxics*,
29 F.4th 468 (9th Cir. 2022) ..................................................................................33

*Cornelius v. NAACP Legal Defense & Education Fund, Inc.*,
473 U.S. 788 (1985)................................................................................................30

*Elrod v. Burns*,
427 U.S. 347 (1976)................................................................................................34

*Erznoznik v. Jacksonville*,
422 U.S. 205 (1975)................................................................................................19

*Federal Communications Commission v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)...........................................................................................24, 29

*Fayetteville Public Library v. Crawford County*,
760 F. Supp. 3d 811 (W.D. Ark. 2024)..............................................................20, 28

*Free Speech Coalition, Inc. v. Paxton*,
606 U.S. 461 (2025)................................................................................................19

*Ginsberg v. New York*,
390 U.S. 629 (1968)................................................................................................19

*Gross v. FBL Financial Services, Inc.*,
557 U.S. 167 (2009)................................................................................................33

*Imperial Sovereign Court v. Knudsen*,
699 F. Supp. 3d 1018 (D. Mont. 2023)..................................................................28

*Johnson v. United States*,
576 U.S. 591 (2015)................................................................................................24

*Kolender v. Lawson*,
461 U.S. 352 (1983)...........................................................................................27, 28

*Marshall v. Amuso*,
571 F. Supp. 3d 412 (E.D. Pa. 2021) ....................................................................33

iii

*Melendres v. Arpaio,*
   695 F.3d 990 (9th Cir. 2012) ..................................................................................34

*Miller v. California,*
   413 U.S. 15 (1973)...............................................................................................7, 19

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024)..................................................................................................18

*National Wildlife Federation v. Coston,*
   773 F.2d 1513 (9th Cir. 1985) ................................................................................17

*Northwest Association of Independent Schools v. Labrador,*
   166 F.4th 1148 (9th Cir. 2026) ......................................................................... *passim*

*Northwest Association of Independent Schools v. Labrador,*
   776 F. Supp. 3d 837 (D. Idaho 2025) ................................................................ *passim*

*Perlot v. Green,*
   609 F. Supp. 3d 1106 (D. Idaho 2022) ..................................................................17

*Planned Parenthood Greater Northwest v. Labrador,*
   684 F. Supp. 3d 1062 (D. Idaho 2023) ..............................................................33, 34

*Porretti v. Dzurenda,*
   11 F.4th 1037 (9th Cir. 2021) .................................................................................34

*Powell's Books, Inc. v. Kroger,*
   622 F.3d 1202 (9th Cir. 2010) ............................................................................18, 19

*Puente Arizona v. Arpaio,*
   821 F.3d 1098 (9th Cir. 2016) ................................................................................17

*Reno v. American Civil Liberties Union,*
   521 U.S. 844 (1997)..................................................................................................24

*Rosenberger v. Rector & Visitors of University of Virginia,*
   515 U.S. 819 (1995)..................................................................................................30

*Short v. Brown,*
   893 F.3d 671 (9th Cir. 2018) ..................................................................................17

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,*
   455 U.S. 489 (1982)..................................................................................................26

*Virginia v. American Booksellers Association, Inc.,*
   484 U.S. 383 (1988)..............................................................................................20, 21

**Statutes**

Idaho Code § 18-1514............................................................................................. *passim*

Idaho Code § 18-1517B ........................................................................................... *passim*

**Other Authorities**

Idaho House Bill 710 ........................................................................................................1

Idaho House Bill 795 ........................................................................................................8

Idaho House Bill 796 ........................................................................................................8

Idaho House Bill 819 ........................................................................................................8

Idaho Senate Bill 1448........................................................................................... *passim*

Statement of Purpose and Fiscal Note, H.B. 819,
     68th Legis., 2d Reg. Sess. (Idaho 2026) ...................................................................8

Statement of Purpose and Fiscal Note, S.B. 1448,
     68th Legis., 2d Reg. Sess. (Idaho 2026) ...................................................................8

**INTRODUCTION**

This suit challenges Idaho's Children's School and Library Protection Act ("HB 710" or "the Act"), a vague and sweeping law that prohibits public schools and libraries in Idaho from making constitutionally protected literary works available to minors.[1] Although confusing in both substance and form, the purported aim of HB 710 is to "protect" minors by creating both a public enforcement mechanism and private bounty system to ferret out schools and libraries that fail to restrict minors' access to materials that fall within the Act's unwieldy definition of "harmful to minors." Idaho Code § 18-1514(6). By this action, Plaintiffs[2] seek preliminarily and permanently to enjoin enforcement of, and declare unconstitutional and void, HB 710 as a violation of their rights under the First and Fourteenth Amendments to the United States Constitution.

As certain Idaho state prosecutors and the Idaho Attorney General have all but confirmed, HB 710 is designed to chill speech and restrict access to constitutionally protected materials without ever having to resort to the law's express enforcement provisions. (*See* Labrador's Resp.

---

[1] Idaho House Bill 710 amended Idaho Code Section 18-1514 and created Section 18-1517B. *See* H.B. 710, 67th Leg., 2d Reg. Sess. (Idaho 2024). Senate Bill 1448, signed into law in April 2026, makes further amendments to the same sections of the Idaho Code. *See* S.B. 1448, 68th Legis., 2d Reg. Sess. (Idaho 2026) ("SB 1448").

[2] Penguin Random House LLC, Hachette Book Group, Inc., HarperCollins Publishers LLC, Macmillan Publishing Group, LLC, Simon & Schuster, LLC, and Sourcebooks LLC are publishers whose books have been targeted for restricted adults-only access or outright removal from public schools and public libraries throughout Idaho in connection with HB 710. The Authors Guild ("Publisher Plaintiffs") is a professional organization of writers, including members who have been similarly targeted. Malinda Lo, David Levithan, and Dashka Slater ("Author Plaintiffs") are authors whose books have been or are likely to be targeted for restricted adults-only access or outright removal from public schools and public libraries throughout Idaho in connection with HB 710. The Donnelly Public Library District ("Public Library Plaintiff") is a small, rural library that was forced to transition to adults-only as a result of HB 710. Christie Nichols ("Public School Librarian Plaintiff") is a librarian at Rocky Mountain High School in Meridian, Idaho, who has been instructed to remove books from her library as a result of HB 710. J.E. and Olivia Lanzara ("Student Plaintiffs") are current and former high school students in Idaho who have been harmed by HB 710 by being denied the opportunity to freely access a wide range of books at both their school and local public libraries. Barbara Ersland ("Parent Plaintiff") is J.E.'s mother and next friend and wants her son to be able to access constitutionally protected materials through his school library. Melisa Cull ("Eagle Plaintiff") is a parent of three children and resident of Eagle, Idaho, where the town's public library has recently removed from circulation or relocated 23 books pursuant to private enforcement complaints made under HB 710.

to Pls.' Mot. for a Prelim. Inj. or, in the Alternative, a TRO, Consolidated Doc. 36[3] at 2 ("[T]he County Prosecutors and Attorney General all agree, no defendant has done *anything* to threaten to enforce H.B. 710 against Plaintiffs.").) The Act has been successful in this regard. Faced with the threat of costly litigation and monetary penalties for carrying books and other materials protected under the First Amendment, HB 710 has forced libraries across the State to undertake self-censorship to preempt HB 710 challenges. These measures have ranged from removing classic and influential titles from library shelves to implementing draconian adults-only library policies.

Perhaps emboldened by HB 710's success in cowing libraries and schools into various forms of self-censorship, some Idaho citizens have seized onto the Act's private enforcement mechanism to demand removal and/or restriction of materials those individuals claim are "harmful to minors." When received by those libraries that are already keen on restricting access to constitutionally protected works, such a request acts as a free pass to do so under the guise of an alleged HB 710 violation without concern for constitutional considerations.

The fear, apprehension, and confusion surrounding HB 710's substantive prohibitions have only been exacerbated by the Act's overbroad and vague language, as well as its apparent content- and viewpoint-based motivations. Although HB 710 purports to target materials "harmful to minors," its byzantine maze of interrelated definitional terms makes it impossible to identify with any degree of certainty materials that fall within its scope, leaving libraries and schools in a state of confusion as to what materials may be deemed "harmful to minors."

For instance, the Act restricts access to materials obscene for "*any* minor," unconstitutionally burdening older minors' right to access materials that are not obscene as to

---

[3] Docket numbers for filings on the now-defunct docket of *Penguin Random House LLC v. Labrador*, No. 1:25-cv-00061-AKB, will be denoted as "*Penguin* Doc." Docket numbers for filings on the now-consolidated docket of *Northwest Association of Independent Schools v. Labrador*, No. 1:24-cv-00335-AKB, will be denoted as "Consolidated Doc."

them. The Act thus fails to acknowledge the constitutional reality that what may be proscribable for the youngest of minors may nevertheless be appropriate and of significant value to the oldest of minors. HB 710 is also vague and does not put Idaho librarians on notice as to what materials should be restricted, where such materials should be put if they are restricted, and from whom those materials should be withheld. On top of all this, HB 710 expressly targets books or other materials describing "any act of . . . homosexuality," thereby imposing an egregious form of viewpoint discrimination in violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

For these reasons, and those discussed more fully herein, HB 710 cannot survive constitutional scrutiny. Absent a preliminary injunction from this Court, the self-censorship mandated by HB 710's overbroad and vague terms will continue to unconstitutionally chill the free speech rights of the Library and Librarian Plaintiffs, hamstring the ability of Publisher and Author Plaintiffs to communicate with Student Plaintiffs through their books, and restrict Student Plaintiffs' right to receive information. Additionally, the Eagle Plaintiff — and others like her across Idaho — will continue to watch her public library collection dwindle as invocation of the Act's private enforcement mechanism by self-appointed censors acting upon their own personal views invite the restriction or removal of constitutionally protected materials for everyone.

These constitutional injuries constitute the exact sort of ongoing and irreparable harm to the public interest that only immediate injunctive relief can remedy. For these reasons, Plaintiffs request that this Court grant their motion for a preliminary injunction.

## FACTUAL BACKGROUND

### I.    HB 710's Structure and Scope

HB 710 took effect on July 1, 2024. The Act prohibits public schools and libraries from making materials deemed "harmful to minors" available to any Idahoans under the age of 18. HB

3

710 can best be broken into three main components: (1) substantive prohibitions, (2) definitions, and (3) enforcement mechanisms. The substantive prohibitions and enforcement mechanisms are found in HB 710's newly created statutory section, Idaho Code Section 18-1517B, while the definitions are listed in Idaho's variable obscenity statute, Idaho Code Section 18-1514.

### A. The Substantive Prohibitions

HB 710's substantive prohibitions provide as follows:

> Notwithstanding any other provision of law, a school or public library, or an agent thereof, shall not promote, give, or make available to a minor:
>
>> **(a)** Any picture, photograph, drawing, sculpture, motion picture film, or similar visual representation or image of a person or portion of the human body that depicts nudity, sexual conduct, or sado-masochistic abuse and that is harmful to minors;
>> **(b)** Any book, pamphlet, magazine, printed matter however reproduced, or sound recording that contains any matter pursuant to paragraph (a) of this subsection or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct, or sado-masochistic abuse and that, taken as a whole, is harmful to minors; or
>> **(c)** Any other material harmful to minors.

Idaho Code § 18-1517B(2).

### B. The Definitional Provisions

The scope of HB 710's substantive prohibitions turn primarily on the following definition of "harmful to minors":

> "Harmful to minors" includes in its meaning the quality of any material or of any performance or of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse, when it:
>
>> **(a)** Appeals to the prurient interest of minors as judged by the average person, applying contemporary community standards; and
>> **(b)** Depicts or describes representations or descriptions of nudity, sexual conduct, sexual excitement, or sado-masochistic abuse which are patently offensive to prevailing standards in the adult community with respect to what is suitable material for minors

4

and includes, but is not limited to, patently offensive representations or descriptions of:

> **(i)** Intimate sexual acts, normal or perverted, actual or simulated; or
> **(ii)** Masturbation, excretory functions or lewd exhibition of the genitals or genital area. Nothing herein contained is intended to include or proscribe any matter which, when considered as a whole, and in context in which it is used, possesses serious literary, artistic, political or scientific value for minors.

Idaho Code § 18-1514(6).

The Act's definition of materials "harmful to minors" and, thus, the scope of its substantive prohibitions, must also be read in conjunction with other statutorily defined terms. For example, HB 710 defines "minor" as "*any* person less than eighteen (18) years of age." Idaho Code § 18-1514(1) (emphasis supplied). The Act also defines "sexual conduct" as follows:

> "Sexual conduct" means any act of masturbation, homosexuality, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, the breast.

Idaho Code § 18-1514(3). The Act goes on to define "material" broadly to mean "anything tangible which is harmful to minors, whether derived through the medium of reading, observation or sound." Idaho Code § 18-1514(7).

## C. The Act's Enforcement Mechanisms

To enforce the Act's ban on "material harmful to minors," HB 710 provides that a "county prosecuting attorney or the attorney general shall have a cause of action for injunctive relief against any school or public library that violates" the Act's prohibition against "promot[ing], giv[ing], or mak[ing] available to a minor" any "material harmful to minors." Idaho Code §§ 18-1517B(5), (2).

Additionally, "[a]ny minor who obtains material, or parent or legal guardian whose child obtained material" deemed "harmful to minors" from a public library or school is entitled to

5

provide written notice to that institution to relocate the allegedly "harmful" material. Idaho Code § 18-1517B(3). If, after 60 days, the "institution's library board or board of trustees failed to relocate the material harmful to minors," HB 710 grants the challenger a private right of action, allowing him or her to bring a civil lawsuit against the library or school. *Id.* If successful, the challenger will be entitled not only to injunctive relief, but also statutory and actual damages. Idaho Code § 18-1517B(3)–(4).

HB 710 provides two limited affirmative defenses to schools and libraries alleged to have violated its substantive prohibitions. Namely, schools and libraries have an affirmative defense to liability if they "[h]ad reasonable cause to believe that the minor involved" was at least 18, or if the minor was accompanied by an adult who "signed a written statement" asserting that the adult was the minor's parent or legal guardian. Idaho Code § 18-1517B(6).

## II.    Procedural History

Plaintiffs[4] filed their complaint challenging the constitutionality of HB 710 on February 4, 2025, and moved for a preliminary injunction on February 13, 2025. (Compl., *Penguin* Doc. 1; Pls.' Mot. for Prelim. Inj., *Penguin* Doc. 22.)  Defendants then filed motions to dismiss the complaint. (Defs.' MTDs, *Penguin* Docs. 27, 29–32, 36.)

Before the parties' motions were fully briefed, this Court issued a decision in *Northwest Association of Independent Schools v. Labrador* ("*Northwest Dist. Ct.*"), a separate challenge to HB 710. 776 F. Supp. 3d 837 (D. Idaho 2025). There, the Court denied the *Northwest* Plaintiffs' motion for a preliminary injunction, holding that certain of the *Northwest* Plaintiffs lacked standing and that the remaining plaintiffs failed to show a likelihood of success on the merits. *Id*. On July

---

[4] Plaintiffs in the original *Penguin Random House LLC v. Labrador* case will be referred to herein as "Plaintiffs," or, where distinction is necessary, as "*Penguin* Plaintiffs." References to the plaintiffs in *Northwest Association of Independent Schools v. Labrador* will be distinguished as the "*Northwest* Plaintiffs."

22, 2025, this Court stayed the *Penguin* case pending the *Northwest* Plaintiffs' appeal, which sought review of this Court's preliminary determination as to their overbreadth claims. (Stay Order, *Penguin* Doc. 64.)

On appeal, the Ninth Circuit reversed, holding that the *Northwest* Plaintiffs demonstrated a likelihood of success on the merits of their claim that HB 710's addition of the phrase "and in the context in which it is used" to the test for obscenity established by the Supreme Court in *Miller v. California*, 413 U.S. 15 (1973), was likely overbroad and therefore unconstitutional. *Nw. Ass'n of Indep. Schs. v. Labrador*, 166 F.4th 1148, 1168 (9th Cir. 2026) ("*Northwest 9th Cir.*"). The Ninth Circuit went on to remand the case for consideration of "the appropriate scope of a narrow preliminary injunction" sufficient to carry out the Ninth Circuit's rationale and holding. *See id.* at 1170.

After the Ninth Circuit's decision in *Northwest*, this Court lifted its stay of the instant case and consolidated this case with *Northwest*. (*See* Consolidation Order, Consolidated Doc. 66.) Defendants Labrador and Oakey subsequently filed renewed motions to dismiss the instant Complaint and Defendants Coleman and Bennetts filed answers. (*See* Consolidated Docs. 67–70.) On April 22, 2026, the *Northwest* Plaintiffs voluntarily stipulated to the dismissal of their claims. (Voluntary Dismissal Stip., Consolidated Doc. 72.)

In an effort to "respon[d] to the Ninth Circuit's [*Northwest*] opinion, as well as a recent decision from the U.S. Supreme Court addressing Texas's age-verification law for pornographic websites," the Legislature amended HB 710 to, in relevant part: (i) remove the context clause in its entirety; (ii) limit the scope of HB 710 to apply to materials deemed harmful to "adolescent minors," defined as "*any* person thirteen (13) years of age or older but less than eighteen (18) years of age"; and (iii) incorporate a newly defined term, "sexually explicit," into the Act's substantive

7

prohibition by prohibiting any school or public library from allowing any minor to access material "that is sexually explicit and, taken as a whole, is harmful to minors." *See* SB 1448 (emphasis supplied); Statement of Purpose and Fiscal Note, SB 1448, 68th Legis., 2d Reg. Sess. (Idaho 2026). The amendment, SB 1448, was signed into law in April 2026 and will take effect on July 1, 2026. *See* SB 1448.[5]

### III.     The Negative and Continuing Impacts of HB 710

#### A.  Public Library Harms

Idaho's public libraries and schools, faced with the choice of imposing the age restrictions HB 710 demands or risking litigation from public and private litigants, *see* Idaho Code § 18-1517B(3)–(5), have been forced to implement extreme measures to protect themselves and their patrons from even the appearance of violating HB 710. For instance, the Donnelly Library closed its doors to minors in May 2024 in order to avoid the risk of litigation and penalties under the Act. (Scheline Decl. ¶ 24.) The Donnelly Library operates under extremely limited financial resources and space restrictions, with only a 1,024-square foot log cabin in which to provide its services. (*Id.* ¶¶ 6–7.)

---

[5] The Legislature considered three additional bills to amend HB 710 last session, one of which passed. On March 31, 2026, the governor signed Idaho House Bill 795, which removes the phrase "and in the context in which it is used" from HB 710, but makes no other changes to the Act. *See* H.B. 795, 68th Legis., 2d Reg. Sess. (Idaho 2026).

Idaho House Bill 819 was introduced with the purported goal of recognizing that "the State of Idaho has more latitude to select the content of educational materials in public schools and libraries than in private schools." Statement of Purpose and Fiscal Note, H.B. 819, 68th Legis., 2d Reg. Sess. (Idaho 2026) ("HB 819"). In relevant part, HB 819 would have amended Sections 18-1514 and 18-1517B so that the Act's provisions would only apply to private schools, presumably leaving public schools and libraries without any constitutional protection. HB 819 was not sent to the governor for signing.

Finally, legislators introduced but did not pass Idaho House Bill 796, which would have made many of the same changes to the Act as SB 1448 and HB 819, and would have also removed "homosexuality" from the definition of "sexual conduct" in Section 18-1514(3). *See* H.B. 796, 68th Legis., 2d Reg. Sess. (Idaho 2026).

Despite the Donnelly Library's lack of resources, its single-person permanent staff nevertheless works every day to achieve the library's mission: "to serve the diverse needs of [its] patrons, foster learning, provide resources, inspire creative thinking, and assist the community in informed debate and decision-making via the provision of a wide range of information and materials." (*Id.* ¶¶ 8, 20.) With that mission in mind, the Donnelly Library has built a collection of approximately 14,000 items, arranged carefully throughout its open-floor, single-story space and — due to its small size — viewable to any building entrant. (*Id.* ¶ 9.) Given the library's mission and in accordance with best practices, the collection inevitably includes works that some Idahoans may find offensive, but that are nevertheless literary staples that speak to the diverse experiences of the Donnelly Library's patrons. (*Id.* ¶¶ 10–13 (providing examples).)

When HB 710 went into effect, the Donnelly Library weighed its options. It would cost upward of $30,000 to hire a vendor or pay staff overtime to review the entire library collection so that materials the State might consider "harmful to minors" could be identified and weeded out. (*Id.* ¶ 20.) Such an effort would by no means guarantee that the "right" materials had been identified and removed. Additionally, the Donnelly Library could not feasibly cordon off those materials in an adults-only area within its already tiny space. (*Id.* ¶ 22.) Put simply, the Donelly Library had neither the money nor the room to scour its collection and keep potentially violative works apart from the rest.

In May 2024, confused as to the meaning and scope of the Act and threatened with resource-intensive book challenges and lawsuits at even the *appearance* of non-compliance, the library was forced to take a drastic step — it became an adults-only library, barring minors from entering its building unless accompanied by a parent or guardian. (*Id.* ¶¶ 24, 27.) Though the change was ultimately necessary to avoid HB 710 liability, the adults-only policy "is [nevertheless]

antithetical to the very purpose of a public library — to provide a welcoming place for *all* patrons to effectively and freely pursue a diverse range of materials and resources." (*Id.* ¶ 25.)

The Donnelly Library provided what was, for a long time, the only after-school childcare in the entire town. (*Id.* ¶ 26.) The adults-only policy precluded children in the after-school program from entering the library building without a parent or guardian, defeating the very purpose of providing after-school childcare. (*Id.* ¶ 27.) The Donnelly Library attempted to fashion a solution by moving its after-school program to the teepees set up outside the building, but it proved too onerous. (*Id.* ¶ 28.) The library then had little choice but to implement a complicated three-part waiver program to allow certain minors to enter the library without an adult. (*Id.*)

The option of executing a waiver does little to mitigate the risk of harm imposed by HB 710, which provides no safe harbor for libraries that implement a waiver program like Donnelly's. *See* Idaho Code § 18-1517B(6) (listing just two affirmative defenses, neither of which involves a parental waiver). Moreover, by requiring these waivers, the Donnelly Library has been forced to morph from an environment welcoming of all people, regardless of age, to one that treats minors as though they are walking into a danger zone, while at the same time stigmatizing families who choose to execute the waivers. (Scheline Decl. ¶ 28.) Indeed, many parents have made the sad choice to forego executing the waivers, meaning their children are unable to access the library without adult accompaniment. (*Id.*)

Even with the waiver system in place, the Donnelly Library remains concerned that it will be subject to complaints, enforcement proceedings, and costly litigation as a result of HB 710. The law, as written, provides prosecutors and members of the public carte blanche to demand "review" of materials within the Donnelly Library and/or to initiate an enforcement action, no matter how frivolous such actions may be or the steps taken to avoid a violation. (*Id.* ¶ 31.) Additionally,

Sherry Scheline, the library's Director and a seasoned librarian herself, has been disoriented by recent amendments to HB 710 which, to her, further muddle — rather than clarify — the scope and meaning of the Act. (*Id.* ¶¶ 16–17.)

Finally, the adults-only policy and the three-part waiver program necessitated by HB 710 have had a deleterious impact on the overall output of the Donnelly Library. Since the enactment of HB 710, there have been drastic year-over-year reductions in circulation of materials. (*Id.* ¶ 29.) In calendar year 2023, circulation reached an apex at 13,774; by 2024, circulation dropped to 5,884, and last year it plummeted to 5,182. (*Id.*) Circulation reductions further squeeze the small library's already limited financial resources, since multiple grants on which the library depends award funds based, in part, on library usage. (*Id.* ¶ 30.)

At the end of the day, small rural libraries like Donnelly cannot absorb the litigation risk posed by HB 710 and continue operations unchanged. (*Id.* ¶ 19.) The cost to defend even a single challenge "could shutter the library" for good. (*Id.* ¶ 23.)

Other Idaho public libraries, like the Eagle Public Library, have already received requests from private citizens to remove or restrict books pursuant to HB 710's private enforcement mechanism. (Cull Decl. ¶ 7.) In 2024, the Eagle Public Library Board of Trustees (the "Board") received at least 23 such requests from a single individual whose identity the Board has refused to disclose. (*Id.*) In response to those requests, the Board removed three books from circulation and reshelved the remaining 20 in the adults-only area of the library. (*Id.* ¶¶ 8–10.) In the wake of the Board's decision, Melisa Cull, mother of three children and Eagle resident, watched the Eagle Public Library transform from an open public resource to a maze of censored material. (*Id.* ¶¶ 1–4, 7–11.) With the removal of these books, Cull fears that a pillar of the Eagle community has

11

undergone unnecessary and negative change, restricting access to stories that broaden and challenge young readers. (*Id.* ¶¶ 11–13.)

Cull has read one of the books that is now inaccessible to minors in Eagle absent express parental permission. *What Girls Are Made Of*, by Elana K. Arnold is a coming-of-age novel that chronicles everything from mother-daughter relationships to emotional abuse. (*See id.* ¶ 9.) Far from being "harmful" for *any* minor, *What Girls Are Made Of* does not shy away from challenging topics teenage girls confront in real life in what Cull believes is an important and impactful story for young people. (*Id.*)

### B.  Public School Library Harms

The Rocky Mountain High School library boasts a diverse 7,100-item collection, including works that some may find offensive, although never any that could be considered "obscene" or "harmful to minors" as those terms are defined by U.S. Supreme Court precedent. (Nichols Decl. ¶ 4.) Indeed, Rocky Mountain librarian Christie Nichols has voiced concern that while the entirety of the Rocky Mountain library collection is constitutionally protected, "[s]urrendering to the preferences of some Idahoans who consider certain of the library's materials 'harmful' [is] antithetical to the mission and purpose of public school libraries, which is to provide students with equitable access to a broad and diverse array of resources and materials." (*Id.* ¶ 18.)

Even so, West Ada School District librarians like Nichols have been directed by district officials to remove scores of titles from library shelves. When HB 710 first went into effect, in direct response to HB 710's vague and overbroad prohibitions, Nichols was required to remove 38 titles from her library; since then, the number has ballooned to 87 books. (*Id.* ¶¶ 13–14.) Books that Nichols has removed pursuant to district directives are shipped to district headquarters, located miles away from Rocky Mountain, where they are available only by request and with parental permission. (*Id.* ¶ 12.)

12

Despite having lived under HB 710 for nearly two years, Nichols and her library staff have still been unable to identify with any degree of certainty or consistency which materials fall within HB 710's scope. (*Id.* ¶¶ 5–6.) Recent amendments to HB 710 have not clarified the vague provisions of the Act. (*Id.* ¶ 7–9.)

As a result of the censorship required by HB 710, Rocky Mountain students have been deprived of some of the most important and impactful works in Rocky Mountain library's collection. For example, Nichols has been forced to remove *I'll Give You the Sun*, by Jandy Nelson, which Nichols often recommends to students who are interested in stories featuring gay and/or lesbian characters or who desire a more demanding literary experience. (*Id.* ¶ 21.) Notably, *I'll Give You the Sun* won the 2015 Michael L. Printz Award, awarded by the American Library Association to the year's "best book written for teens, based entirely on its literary merit." (*See id.*) Nichols similarly laments removal of Kurt Vonnegut's classic novel, *Slaughterhouse-Five*, a book with important themes that have spanned generations. (*Id.* ¶ 23.)

### C.  Harms to Students and Parents

HB 710 has also had harmful impacts on students and young people across Idaho. Olivia Lanzara was a senior at Rocky Mountain when the Act first went into effect. (Lanzara Decl. ¶ 2.) Due to school district mandates that forced the Rocky Mountain library to remove close to forty books from its collection during academic year 2024-2025, Olivia was unable to check out the titles that Christie Nichols was instructed to remove, including *I Know Why the Caged Bird Sings* by Presidential Medal of Freedom award-winner author Maya Angelou and *I'll Give You the Sun* by Jandy Nelson, which was a New York Times bestseller and Printz Award recipient. (*Id.* ¶¶ 4, 6; Nichols Decl. ¶ 21) Olivia considered the Rocky Mountain library an indispensable educational resource, so when HB 710 forced the library to remove scores of titles, she felt disadvantaged in her pursuit of personal and academic development. (Lanzara Decl. ¶¶ 7–9.)

13

J.E., a senior at Lewiston High School, has likewise experienced how HB 710 is actively stunting his personal, intellectual, and academic development. (J.E. Decl. ¶¶ 1, 6.) Living in rural Idaho, J.E. relies on his school library to help him expand his worldview and prepare him for college and life as an adult. (*Id.* ¶ 9–10.) Like Olivia, J.E. is concerned that valuable works of literature, such as *The Kite Runner*, will be subject to restriction in school libraries across Idaho as a direct result of HB 710, and that students who read, or seek access to, the book will be "othered and stigmatized." (*Id.* ¶ 13.)

### D. Harms to Publishers

HB 710 has also harmed and continues to harm each and every author and publisher whose work has been or will be cleared from public and school library shelves, despite the significant educational, artistic, literary, scientific, and other value their works contain.

Publishers such as Plaintiffs Penguin Random House, Hachette, HarperCollins, Macmillan, Simon & Schuster, and Sourcebooks, as well as professional authors' associations like The Authors Guild, have had their or their authors' books targeted for either restricted access or removal from public and school libraries or fear that such restrictions are soon to come. (Compl. ¶¶ 27–42.) Penguin Random House, for one, has long been dedicated to publishing works that ignite a universal passion for reading by creating books for everyone. (*Id.* ¶ 30.) Books that Penguin Random House publishes, such as *The Bluest Eye* by Toni Morrison, *I Know Why the Caged Bird Sings* by Maya Angelou, and *The Handmaid's Tale* by Margaret Atwood, among others, have been restricted to adults-only sections or removed wholesale from Idaho libraries as a result of HB 710. (*Id.* ¶ 29.) Such restrictions and removals undermine a core mission of the publishing house: to provide children with a gateway to the world by promoting literacy, fostering empathy, and inspiring free and open debate. (*Id.* ¶ 30.)

14

The Authors Guild, working on behalf of over 15,000 professional writers spanning numerous genres, seeks to promote its authors' rights and professional interests, including their ability to write on topics of their choosing and to have their work available in libraries. (*Id.* ¶ 42.) Hachette's publishing programs aim to reflect the broad range of backgrounds and viewpoints that shape our society; it is fundamental to Hachette's mission that its books remain accessible to students in public school classrooms and libraries. (*Id.* ¶ 33.) HarperCollins, too, seeks to deliver content that presents a diversity of voices and speaks to the global community. (*Id.* ¶ 34.) Macmillan, for its part, strives to ensure access to diverse literary works, highlighting the critical role of literacy in democracy, championing the transformative power of books in promoting understanding, and working to build an inclusive future. (*Id.* ¶ 38.) Simon & Schuster is a global leader in general interest publishing, dedicated to bringing fiction and nonfiction books to readers of all ages. (*Id.* ¶ 39.) These publishers have all had classic and beloved books relocated or removed from Idaho public and school library shelves, including *The Almost Moon* by Alice Sebold, *Water for Elephants* by Sarah Gruen, *The Poet X* by Elizabeth Acevedo, *Spinning* by Tillie Walden, and *The Perks of Being A Wallflower* by Stephen Chbosky. (*Id.* ¶¶ 32, 35, 37, 40.) Under HB 710, these entities not only face injury to their economic interests, but also to the spirit and goals that animate their advocacy for, and commitment to, the authors with whom they work.

### E. Harms to Authors

For author Malinda Lo, who has won numerous literary awards for her work, HB 710 has put her books behind a wall. (Lo Decl. ¶¶ 2–3, 16–17.) Many of Lo's readers are LGBT teen girls. (*Id.* ¶ 9.) Her novel *Last Night at the Telegraph Club* has had a profound impact on those readers, with countless sharing that the book made them feel seen, increased their understanding of lesbian history, and "fostered their empathy for LGBTQ+ people." (*Id.* ¶ 11.) *Last Night at the Telegraph Club* has been removed from regular circulation at West Ada District libraries, and has been the

15

subject of at least three censorship attempts in Idaho according to the American Library Association, preventing Lo from communicating her viewpoint to young adults in Idaho. (*Id.* ¶¶ 17–18; Nichols Decl. ¶ 22.) Importantly, too, Lo's writing is her livelihood; unable to reach an important segment of her audience, Lo's financial interests will suffer as a result of HB 710. (Lo Decl. ¶¶ 16, 18.)

Dashka Slater, a decorated author of young adult and children's literature, has also had first-hand experience with the negative consequences of HB 710. (Slater Decl. ¶¶ 3–5, 24.) Slater's *The 57 Bus* is an award-winning journalistic account that explores themes of sexual orientation, discrimination, and forgiveness, with the goal of inspiring conversations. (*Id.* ¶¶ 9–14, 18.) Even though *The 57 Bus* is popular with readers and librarians alike, over the past two years, Slater's ability to reach her target audience — young adults — has contracted, and her royalties from sales of *The 57 Bus*, which had previously remained steady for nearly a decade, sharply declined. (*Id.* ¶¶ 15, 17, 21–25.)

David Levithan, award-winning author of acclaimed titles like *Boy Meets Boy*, has also faced the threat of removal from Idaho public schools and libraries since HB 710 was enacted. (Levithan Decl. ¶¶ 3, 16.) Levithan writes to normalize the experience of being a member of the gay community and to create a universe of characters in which young adults, especially LGBT young adults, can see themselves. (*Id.* ¶ 10.) Under HB 710, Levithan and his readers face the very stigma that his books were written to combat. (*See id.* ¶ 13.) The State's censorship not only ostracizes those who seek out Levithan's books, but also, in so doing, shrinks his market. (*Id.* ¶¶ 14–15.)

## LEGAL STANDARD

In deciding whether to grant a preliminary injunction, federal district courts consider whether (1) Plaintiffs are "likely to succeed on the merits" of their challenge; (2) Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities tips in [Plaintiffs'] favor"; and (4) "an injunction is in the public interest." *Perlot v. Green*, 609 F. Supp. 3d 1106, 1115 (D. Idaho 2022) (citing *Short v. Brown*, 893 F.3d 671, 675 (9th Cir. 2018)). A preliminary injunction is warranted even when a plaintiff raises only "serious questions" on the merits, so long as "the balance of hardships tips sharply in [the plaintiff's] favor." *Puente Ariz. v. Arpaio*, 821 F.3d 1098, 1103 n.4 (9th Cir. 2016) (citation omitted). Serious questions need not promise a certainty of success, nor even present a probability of success, but must merely involve a "fair chance of success on the merits." *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir. 1985). Here, Plaintiffs readily satisfy each of these factors.

## ARGUMENT

### I.   PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS

For the reasons set forth below, Plaintiffs' constitutional challenges to the Act are likely to succeed. The Ninth Circuit's *Northwest* decision provides a roadmap of HB 710's unconstitutional overbreadth, and the passage of SB 1448 fails to adequately remedy these infirmities with respect to the eldest of minors' right to access material not obscene as to them. Put differently, the Act as amended still fails to reflect "a workable implementation for [Defendant Labrador's] proposed age-based reading of the context clause[,]" and continues to "make further distinctions between minors based on their ages where doing so impermissibly burdens Plaintiffs' constitutional rights" — exactly what the Ninth Circuit held Idaho may not do. *Northwest 9th Cir.*, 166 F.4th at 1168. Because the Act, even as amended by SB 1448, continues to burden older minors' right to access

materials not harmful or obscene as to them, Plaintiffs are likely to prevail on the merits of their overbreadth claim. Plaintiffs are also likely to succeed on the merits of their vagueness and viewpoint discrimination challenges to the Act, especially given its private right of action and continued reference to "any act of homosexuality."

### A.  The Act Is Unconstitutionally Overbroad in Violation of the First Amendment.

### 1.  Standard for Facial Challenges Under the First Amendment.

A statute is unconstitutionally overbroad if its "unconstitutional applications substantially outweigh its constitutional ones." *Moody v. NetChoice, LLC*, 603 U.S. 707, 724 (2024) ("*Moody*"). Under *Moody's* two-part test clarifying the "standard for facial challenges under the First Amendment[,] . . . courts must first examine the statute's scope and then weigh the constitutional applications of the statute against the unconstitutional applications. The 'overbreadth doctrine' is 'an even looser standard' and 'requires a plaintiff to establish only that a statute prohibits a substantial amount of protected speech,' 'relative to [its] plainly legitimate sweep.'" *Northwest 9th Cir.*, 166 F.4th at 1156–57 (citing *Moody*, 603 U.S. at 724–725 (Court's opinion); quoting *Moody*, 603 U.S. at 754–55 (Thomas, J., concurring) (alteration in original)). In *Northwest*, the Ninth Circuit applied its "sequential analysis" from *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1208 (9th Cir. 2010), to address both the *Moody* two-part test and the Idaho Supreme Court's approach to statutory interpretation: first, "examining the statute's scope"; second, "assessing whether it regulates a substantial amount of expressive activity"; and third, "ask[ing] whether H.B. 710 is readily susceptible to a limiting construction that would render it constitutional." *Northwest 9th Cir.*, 166 F.4th at 1157 (quotations and citations omitted). The same three-step analysis applies here. Pursuant to this framework, the Act is unconstitutionally overbroad on its face, even as amended by SB 1448.

**2. HB 710 is an Unjustified and Unnecessary Burden on Older Minors'
First Amendment Right to Access Materials Not Obscene as to Them.**

The First Amendment protects the right to read and distribute non-obscene materials. To be sure, "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. Jacksonville*, 422 U.S. 205, 214 (1975); *Powell's Books*, 622 F.3d at 1215 ("[T]he state may not restrict adults from sharing material with minors that is not obscene for minors."). Indeed, "[s]peech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Erznoznik*, 422 U.S. at 213–14.

Under *Miller v. California*, 413 U.S. 15 (1973), and its progeny, a State may prevent minors from accessing works which are obscene to them only where all three of the following conditions are met: "(a) [the work,] taken as a whole, and under contemporary community standards, appeal[s] to the prurient interest of minors; (b) [the work] depict[s] or describe[s] specifically defined sexual conduct in a way that is patently offensive for minors; and (c) [the work] taken as a whole, lack[s] serious literary, artistic, political, or scientific value for minors." *Northwest 9th Cir.*, 166 F.4th at 1158–59 (citing *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 474 (2025)). This "*Miller* for minors" test addresses the possibility that material not obscene as to adults may nevertheless be obscene as to minors. *See Powell's Books*, 622 F.3d at 1212 (explaining that states "may restrict the access of minors to obscene material," and those restrictions may be permissible "even if the material at issue is not obscene to adults" (citing *Ginsberg v. New York*, 390 U.S. 629, 641 (1968))).

As this court, the Ninth Circuit, and the State of Idaho, via its Attorney General, have all acknowledged, the same is true as to minors of different ages, maturities, or abilities.[6] Put another way, materials arguably obscene as to the youngest of minors may not be obscene to the eldest. It follows, then, that obscenity statutes like HB 710 that, by their plain language, define and regulate obscenity as to "any minor" — as opposed to "all minors" — ignore this reality and, in doing so, unjustifiably burden older minors' right to access materials not obscene or harmful as to them. Such a burden represents a severe constitutional infirmity, signaling an overbroad restriction in violation of the First Amendment. *See, e.g.*, *Fayetteville Pub. Libr. v. Crawford Cnty.*, 760 F. Supp. 3d 811, 825 (W.D. Ark. 2024)[7] (permanently enjoining Arkansas law similar to HB 710, finding "there is no doubt that [the law] is overbroad because [the applicable] definition of 'harmful to minors' is *the opposite* of" the narrow definition which the Supreme Court has held can pass constitutional muster, noting that "librarians and booksellers[,] as the agents of censorship . . . [were] likely [to] shelve only books for young children and segregate or discard the rest" due to the law's application to any minor, rather than all minors (emphasis in original)). *See also Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 394–95 (1988) (noting state laws that apply broadly to restrict minor access to "a huge number of works" otherwise acceptable to older minors "would raise correspondingly greater First Amendment" concerns).

---

[6] *See Northwest Dist. Ct.*, 776 F. Supp. 3d at 863 ("The Savings Clause's consideration of 'context,' however, *enables the state to consider the age of the minor*, consistent with the same case law Plaintiffs cite." (citations omitted) (emphasis supplied)); *Northwest*, 66 F.4th at 1168 ("Indeed, the statute does not contemplate the treatment of content that, applying Defendants' age-based construction of the context clause, *might be obscene for younger minors but not their older counterparts*. Rather, the statute itself draws a single distinction between adults and minors as a class. . . . *Ginsberg*'s adaptation of the adult obscenity test certainly allows states like Idaho to draw that line. But Idaho may not make further distinctions between minors based on their ages where doing so *impermissibly burdens Plaintiffs' constitutional rights*." (emphases supplied)); Labrador Resp. to Pls.' Mot. for Prelim. Inj., Penguin Doc. 41 at 14 ("[U]nder *Erznoznik* and *Pope*, a fact finder using a reasonable person standard must consider whether the matter has serious value *as to the specific minor to whom the matter is presented*." (emphasis supplied)).

[7] As of the date this brief is filed, this decision is fully briefed on appeal and oral argument is set for June 11, 2026, before the Eighth Circuit (Appeal No. 25-1146).

Applying the *Powell* sequential analysis, this Court should begin by "examining the [Act's] scope" and "assessing whether it regulates a substantial amount of expressive activity," then "ask whether H.B. 710 is readily susceptible to a limiting construction that would render it constitutional." *Northwest 9th Cir.*, 166 F.4th at 1157 (quotations and citations omitted). The Act, both in current form and as amended pursuant to SB 1448, extends far beyond the State's permissible reach in restricting older minors' access to material not obscene as to them, and it cannot be saved from overbreadth given its plain language.

As Plaintiffs asserted in their Complaint and as detailed in their initial preliminary injunction briefing, by defining "minor" to mean "*any* person less than eighteen (18) years of age," HB 710, in its currently applicable form, requires that obscenity be defined as to the youngest of minors, thereby failing to acknowledge that what may be harmful or obscene to the youngest of minors will not be harmful or obscene to the eldest of minors. Idaho Code § 18-1514(1) (emphasis supplied). HB 710 is thus overbroad on its face and burdens older minors' right to access materials not harmful or obscene as to them. *Northwest 9th Cir.*, 166 F.4th at 1168 ("The context clause likely burdens Plaintiffs' right to provide non-obscene material to older minors who wish to access material that, pursuant to H.B. 710, the school or library has relegated to 'a section dedicated for adults only." (citation omitted)); *id.* at 1168 n.11 (noting that, under HB 710, "[a]bsent an accompanying adult, . . . [an] older minor remains unable to access content that might not be obscene as to them but could be as to younger minors."). Indeed, HB 710 runs afoul of the Supreme Court's warning that broad restrictions on minors' access to "a huge number of works" otherwise acceptable to older minors raise serious First Amendment concerns. *American Booksellers Assoc.*, 484 U.S. at 394–95.

Although the State of Idaho, via its Attorney General, has repeatedly recognized the constitutional problem inherent in defining harmful or obscene for purposes of HB 710's prohibition via the youngest of minors, it has consistently taken the position that HB 710's inclusion of the context clause permits evaluating a work's serious value, and therefore obscenity, with respect to "the specific minor to whom the matter is presented." (Labrador Resp. to Pls.' Mot. for Prelim. Inj., *Penguin* Doc. 41 at 14.) Such contextual analysis, according to Labrador, allows "the trier of fact [to] consider the individual age of the minor in determining whether the statutes are violated." (*Id.* at 11 ("[T]he requirement that a matter be considered 'in context in which it is used' requires that the trier of fact consider the individual age of the minor in determining whether the statutes are violated. Idaho Code § 18-1514(6)(b)(ii). If a matter is not harmful to the minor to whom the matter is promoted, given, or made available, the statute has not been violated. Idaho Code § 18-1517B(2).").)

In *Northwest*, the Ninth Circuit acknowledged both the burden the Act places on older minors' right to access materials not obscene as to them and Attorney General Labrador's attempt to resolve that constitutional error via an age-based construction of HB 710's context clause. *See Northwest 9th Cir.*, 166 F.4th at 1168–69. The Ninth Circuit, however, found that without establishment of "an objective standard by which 'context' can be measured," "a workable implementation for [Attorney General Labrador's] proposed age-based reading of the context clause," and "guardrails" or "safeguards" on its use, the context clause invites and encourages "the reviewer's subjective assessment of the time, place, and circumstance in which the work 'is used' in determining whether the work has serious value for minors of particular ages." *Id.* (citation omitted). For this reason, the Ninth Circuit found the context clause likely overbroad, particularly "against the background of H.B. 710's analytical framework and enforcement regime." *Id.* at 1169.

22

Rather than attempt to construct a workable and not overbroad implementation for the Attorney General's age-based construction of the context clause, the Idaho Legislature simply struck the clause in its entirety via SB 1448. This misses the point. As Plaintiffs stated in their supplemental brief regarding the scope of the "narrow preliminary injunction" directed by the Ninth Circuit in *Northwest*, the State's decision to use a hatchet where the Ninth Circuit urged a scalpel only reinforces and reengages the original constitutional problem plaguing HB 710 — that the Act's definition of minor requires that proscribed materials need only be obscene as to the youngest of minors, thereby burdening older minors' right to access material that has literary, artistic, political, and scientific value as to them. (*Penguin* Pls.' Inj. Suppl. Br., Consolidated Doc. 73.)

SB 1448's addition of the defined term "adolescent minor" and incorporation of that term into the definition of material "harmful to minors" does not save HB 710 from overbreadth. *See* SB 1448. Although the "adolescent minor" designation does, in theory, help ease the burden placed on older minors' right to access material not obscene as to them, it does not eliminate the burden entirely or even materially. Rather, even under SB 1448's new definition of "harmful to minors" — and without any ability to consider the individual age of particular minors via the now struck context clause — seventeen-year-olds will be beholden to a definition of obscenity as to thirteen-year-olds. *See id.* As the Ninth Circuit observed, "Defendants' proposed narrowing construction of the context clause is belied by the requirements H.B. 710 places on schools and libraries to physically remove offending content to restricted 'adult' areas and by the statute's enforcement mechanisms." *Northwest 9th Cir.*, 166 F.4th at 1169 (citation omitted). The eldest of minors' right to access material not obscene as to them will thus continue to be burdened.

23

Because, under the amended Act, any material deemed obscene as to children as young as thirteen must be removed or otherwise restricted to "adults only" sections of libraries, the amended Act does not restore access to constitutionally protected works for the oldest minors. HB 710 thus remains unconstitutionally overbroad.

## B. The Act is Void for Vagueness.

### 1. HB 710 Fails to Satisfy the Stringent Vagueness Test Applicable to Laws that Threaten Constitutionally Protected Rights.

Plaintiffs are also likely to succeed on the merits of their claim that the Act is unconstitutionally vague. The Due Process Clause of the Fourteenth Amendment prohibits statutes that are so vague that an ordinary person would not understand what conduct the statute proscribes, or that are so standardless as to invite arbitrary enforcement. *See F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Imprecise statutory terms that leave "grave uncertainty" as to how their scope is to be understood are void for vagueness, even if some parts of what the terms encompass might be "straightforward" exercises of government power. *Johnson v. United States*, 576 U.S. 591, 597, 602 (2015) ("[O]ur holdings squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp.").

When a law, such as HB 710, "interferes with the right of free speech . . . a more stringent vagueness test should apply." *Northwest Dist. Ct.*, 776 F. Supp. 3d at 866 (citation and quotation marks omitted). *See also Reno v. Am. C.L. Union*, 521 U.S. 844, 871–72 (1997) (holding that where vagueness arises amidst a "content-based regulation of speech[,] [t]he vagueness of such a regulation raises special First Amendment concerns because of its obvious chilling effect on free speech.").

24

HB 710's vague language and structure come nowhere close to providing the clarity the Constitution requires, encouraging precisely what the void-for-vagueness doctrine is meant to avoid: meritless, arbitrary, or even viewpoint-based enforcement.

### a. The Act's Definitions of "Minor" and "Adolescent Minor" are Unduly Vague.

As noted *supra*, HB 710 defines "minor" as *any* Idahoan under the age of 18, Idaho Code § 18-1514(1), resulting not only in an overbroad law that unjustifiably burdens older minors' right to access constitutionally protected materials, but also in an unconstitutionally vague law that fails to provide guidance on how to handle materials that may be obscene for some, but not all, minors. And just as SB 1448's addition of the defined term "adolescent minor" and incorporation of that term into the definition of material "harmful to minors" fails to solve HB 710's overbreadth, it also does not remedy the Act's vagueness.

### b. The Act's Definition of "Sexual Conduct" is Unduly Vague.

The Act's definition of "sexual conduct" is similarly vague, particularly with respect to its inclusion of "any act of . . . homosexuality" and any "physical contact with a person's clothed or unclothed genitals, pubic area, buttocks, or . . . [female] breast." Idaho Code § 18-1514(3). As the Ninth Circuit recognized in *Northwest*, these aspects of the term "sexual conduct" invite challenge based on unquestionably non-obscene and non-harmful references to, for example, non-sexual depictions of same-sex relationships and physical touch not obscene as to minors under the *Miller* test. *See* 166 F.4th at 1163 ("On its face, the phrase 'any act of . . . homosexuality' could therefore reach a spacious field of conduct, so long as that conduct relates to the quality of sexual or romantic attraction to someone of the same sex. That may well sweep up depictions of conduct like holding hands or kissing by individuals of the same sex.").

Although the Ninth Circuit ultimately found the Act's definition of "sexual conduct" likely saved from overbreadth, it did so only by application of what it coined the Act's "analytical thicket" — a multi-step statutory analysis that, after working through each of four separate steps, would likely exclude "innocuous, non-sexual conduct" from the definition of "sexual conduct." *Id.* at 1164–65. While this "analytical thicket" may "minimize[] the risk that non-sexual or non-erotic content would ultimately fall within the statute's regulatory ambit," it nevertheless remains, as the Ninth Circuit's language suggests, a dense and thorny statutory labyrinth likely impenetrable by the average Idahoan. *Id.* at 1164. While such vagueness may thus be forgivable where enforcement is left to professional state prosecutors, the Act's private right of action invites confusion and arbitrary enforcement attempts from ordinary Idahoans ill-equipped to properly limit their enforcement efforts by application of the Act's multi-step "analytical thicket." *See id.* at 1167 (explaining that "the statute's primary enforcement mechanism, a private right of action, doubles down on the risks" posed by the Act). Indeed, it is for scenarios such as this that "'[a] law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process.'" *Northwest Dist. Ct.*, 776 F. Supp. 3d at 866 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982)).

### c. The Act's Definition of "Sexually Explicit" is Unduly Vague.

Although SB 1448 purports to clarify the Act's incorporation of the "*Miller* for minors" test to determine what material is "harmful to minors," its introduction of an entirely new defined term — "sexually explicit" — only underscores the Act's constitutionally infirm invitation to arbitrary enforcement:

> 'Sexually explicit' means the quality of any material when it contains erotic depictions of nudity, depicts sexual conduct or sado-masochistic abuse, or contains any explicit and detailed description or narrative account of sexual excitement,

26

> sexual conduct, or sado-masochistic abuse. 'Sexually explicit' shall not include diagrams about anatomy for scientific education, religious books such as the Bible and the Torah, or content relating to classical works of art.

SB 1448 (creating Idaho Code § 18-1514(12)).

Not only is the definition of "sexually explicit" unwieldy and confusing, particularly with respect to its internally inconsistent incorporation of the defined term "sexual conduct," but the Act's enforcement provisions now, in turn, apply to "any material that is *sexually explicit and, taken as a whole, is harmful to minors*." *Id.* (amending Idaho Code § 18-1517B(2) (emphasis supplied)). It is entirely unclear whether or how the already cumbersome term "sexually explicit" limits the definition of harmful to minors. The term's carveouts only amplify its vagueness. Even putting aside the Act's remarkable failure to provide definitions of "scientific education," "religious books," or "classical works of art,"[8] *Miller* does not contemplate a hierarchy of literary, artistic, political, or scientific value.

### 2.   The Act Fails to Provide Minimal Guidelines to Govern Enforcement.

As the Supreme Court has made clear, although constitutional prohibitions on vague laws "focus[] both on actual notice to citizens and arbitrary enforcement, . . . the more important aspect of the vagueness doctrine is not actual notice, but the other principal element of the doctrine — the requirement that a legislature establish minimal guidelines to govern . . . enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983) (internal quotations and citations omitted). "Where the legislature fails to provide such minimal guidelines, a . . . statute may permit a standardless sweep [that] allows [those tasked with enforcing the law] to pursue their personal predilections." *Id.* at 358 (internal quotations and citations omitted).

---

[8] By including these carveouts, the definition of "sexually explicit" also begs the question of whether and how HB 710 and the definition of "sexually explicit" apply to nonfiction books covering important historical events like the Holocaust or the Rape of Nanjing, details of which are likely to include "explicit and detailed description[s] or narrative account[s] of . . . sexual conduct, or sado-masochistic abuse." *See id.*

HB 710's vague language fails to provide sufficient guidelines or standards to determine what materials should be deemed "harmful to minors" and thus restricted under its terms. The Act similarly fails to provide librarians or library boards with guidelines as to how they should go about "relocat[ing] . . . material [harmful to minors] to a section designated for adults only," Idaho Code § 18-1517B(3)(b), in order to satisfy the requirements of the law. Specifically, the Act fails to offer definitions for either "relocation" or "adults only," leaving librarians to guess as to what actions would be sufficient to avoid violating the Act's substantive prohibitions. *See Fayetteville Pub. Libr.*, 760 F. Supp. 3d at 827, 833 (Where "libraries . . . have to guess what level of security would be necessary to satisfy the law's 'inaccessibility' requirements" or what constitutes "appropriateness" of books, and legislators "provide no clarity on what affirmative steps a . . . librarian must take to avoid a violation," such a law unconstitutionally "interferes with access to free speech." (cleaned up)). As such, the Act "vests virtually complete discretion," *Kolender*, 461 U.S. at 358, in the hands — and at the whims — of prosecutors to determine whether a public library or school has violated its terms, inviting personal predilection and bias to motivate enforcement and arbitrarily suppress First Amendment liberties.

The risk of arbitrary enforcement, and its attendant chilling effect on free speech, is only exacerbated by HB 710's private enforcement mechanism, which vests ordinary citizens — the vast majority of whom lack any experience, let alone expertise, in enforcement, statutory interpretation, or constitutional principles — with the power to enforce HB 710's terms. *Imperial Sovereign Ct. v. Knudsen*, 699 F. Supp. 3d 1018, 1047 (D. Mont. 2023) (explaining that where, as here, a vague statute's "liability scheme[] includ[es] a private right of action," the risk of arbitrary enforcement based on individual and subjective judgments is "significant"); *cf. Northwest 9th Cir.*, 166 F.4th at 1167–68 (noting that, rather than "temper the subjectivity encouraged by [HB 710's]

28

context clause[,] . . . the statute's . . . private right of action[] doubles down on the risks the context clause poses" (citation omitted)). In this manner, the Act is not only unconstitutionally — but dangerously — vague.

### 3. Plaintiffs' Vagueness Challenge is Not Speculative or Hypothetical.

Unlike *Northwest*, where this Court found mere "'speculation about possible vagueness in hypothetical situations'" likely insufficient to support a finding of vagueness, 776 F. Supp. 3d at 866 (citation omitted), Plaintiffs' vagueness challenge is supported by declarations from library and school professionals with years of relevant industry-specific training and experience, each of which details the declarants' reasonable confusion as to what materials may be deemed "harmful to minors" under the Act. (*See, e.g.*, Scheline Decl. ¶¶ 14–15; Nichols Decl. ¶¶ 5–6.) New amendments to HB 710 have only further complicated librarians' efforts to comply with the Act. (*See, e.g.*, Scheline Decl. ¶ 17; Nichols Decl. ¶¶ 7–9.) Such reasonable confusion as to the Act's scope, together with the need to limit risk of enforcement, has resulted in an unconstitutional chilling effect on First Amendment speech.

The mere fact that the Attorney General may "read[] the statute according to *Miller*" is of no moment. *Northwest Dist. Ct.*, 776 F. Supp. 3d at 866. The vague nature of the Act has already resulted in constitutional harm, notwithstanding any suggestion from Defendant Labrador that his office may limit enforcement of the Act in line with constitutional requirements. In any event, any policy of forbearance in which the Attorney General might engage does not resolve the issue of vagueness. As the Supreme Court has explained, "due process protection against vague regulations does not leave regulated parties at the mercy of *noblesse oblige*." *See Fox Television Stations, Inc.*, 567 U.S. at 255 (cleaned up). This rule finds particular significance in this case, where enforcement authority is not limited to the Attorney General, but extends to all 44 county prosecutors across the State, as well as private individuals. No matter what the Attorney General may, or may not,

29

promise as to enforcement, he cannot speak for individual Idahoans, at least one of whom has already appeared to interpret the Act's vague, confusing, and overbroad nature as an invitation to bring challenges based on his or her own whims or personal predilections. (*See* Cull Decl. ¶ 7.)

### C. HB 710 Targets Materials that Depict Any Act of Homosexuality and Thus Discriminates Based on Viewpoint in Violation of the First Amendment.

Plaintiffs are also likely to succeed on the merits of their claim that HB 710's inclusion of "any act of homosexuality" in its definition of "sexual conduct" amounts to impermissible viewpoint discrimination in violation of the First Amendment. In limited purpose public forums like public libraries and public school libraries, content-based limitations are unconstitutional unless they are (1) reasonable in light of the purpose of the forum; and (2) viewpoint neutral. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (citation omitted). Regulation that "targets not subject matter, but particular views taken by speakers on a subject" amount to viewpoint discrimination — an "egregious form of content discrimination" in violation of the First Amendment. *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Particularly relevant here, the Supreme Court has clarified that viewpoint discrimination is to be construed broadly, going so far as to include in its ambit reasonable limitations on speech that are in reality "façades" for viewpoint discrimination. *See Cornelius*, 473 U.S. at 811–12 (explaining that a reasonable limitation on speech will still be struck down if it "is in reality a façade for viewpoint-based discrimination.").

HB 710's definition of "harmful to minors" includes, *inter alia*, materials that represent or depict "sexual conduct." Idaho Code § 18-1514(6). The Act, in turn, defines "sexual conduct" as "*any act of* masturbation, *homosexuality*, sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, the breast." Idaho Code § 18-1514(3) (emphasis supplied). "Any act of heterosexuality" is notably absent from the

30

Act's definition of "sexual conduct," leaving reasonable and appropriate room to conclude that certain "acts of heterosexuality" do not, by their very nature or within context, constitute "sexual conduct." An act of heterosexuality would constitute "sexual conduct," and thus invite enforcement, only if such act constituted an act of "masturbation . . . sexual intercourse, or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be a female, the breast." *See id.* By contrast, however, by including "any act of . . . homosexuality" in the list of conduct deemed sexual by operation of this definition, "any act of homosexuality" — no matter how innocuous, non-sexual, or non-obscene in nature — is necessarily captured in the definition of "sexual conduct." *See id.* Given this definition, a book that references a married same-sex couple, describes a young same-sex couple hugging or walking down the street arm in arm, or simply mentions that a character has two mothers, would be deemed to describe "sexual conduct" under the provision's plain language and, as such, invite enforcement under the Act. Books or other materials referencing or describing the heterosexual counterparts to those acts would not constitute "sexual conduct." The Ninth Circuit agreed with this reading, finding the phrase "any act of homosexuality," as used in the definition of "sexual conduct," unambiguous and capable of "reach[ing] a spacious field of conduct" beyond sexual acts. *See Northwest 9th Cir.*, 166 F.4th at 1163.

Both this Court and the Ninth Circuit have recognized the troubling and plainly discriminatory nature of the Act's definition of "sexual conduct." This Court sympathized with the *Northwest* Plaintiffs' concerns regarding the Act's "archaic language," finding those concerns to be "genuine" and noting the inclusion of "any act of homosexuality" within the definition of "sexual conduct" "may isolate a particular class." *Northwest Dist. Ct.*, 776 F. Supp. 3d at 863. The Ninth Circuit held that the *Northwest* Plaintiffs had "persuasively argued that [the inclusion of

'any act of . . . homosexuality' in the Act's definition of 'sexual conduct'] may sweep up non-sexual, non-erotic content," refusing to apply *noscitur a sociis* to limit the phrase's meaning and concluding "any act of homosexuality" by its plain terms "spotlights the participants" rather than the conduct. *Northwest 9th Cir.*, 166 F.4th at 1164.

Despite these expressions of judicial concern and admonishment, the Legislature has refused to clarify its definition of "sexual conduct," notwithstanding at least two glaring opportunities to do so. First, the Legislature could have easily amended the definition of "sexual conduct" in 2024 when it implemented other amendments to those very definitional provisions as part of HB 710. Its failure to do so was no oversight. The Legislature was aware of the definition, as well as concerns regarding its discriminatory nature. As legislative meeting minutes reflect, legislators were presented with testimony and written comments from school and library professionals, other constituents, and the ACLU of Idaho, calling out HB 710's use of the phrase "any act of homosexuality" as vague and viewpoint discriminatory. (Decl. of Michael J. Grygiel in Supp. of Pls.' Opp. to Defs.' MTDs and in Supp. of Pls.' Mot. for Prelim. Inj., *Penguin* Doc. 49-1, Ex. A, Attachment 1 (Written Testimony on HB 710), 1–41.)

Second, the Legislature could have clarified the definition of "sexual conduct" as part of SB 1448, which amended HB 710 following the Ninth Circuit's *Northwest* Opinion. In fact, the Ninth Circuit all but invited the Legislature to do so, emphasizing that HB 710's original amendments to the definition of "harmful to minors" left the definition of "sexual conduct" "untouched" notwithstanding its overbroad meaning. *Northwest 9th Cir.*, 166 F.4th at 1164 n.3. The Legislature, yet again, declined to do so, leaving the Act's reference to "any act of homosexuality" untouched while amending other portions of the Act through SB 1448. *See* SB 1448.

As the Supreme Court has explained, "[w]hen Congress amends one statutory provision but not another, it is presumed to have acted intentionally." *See Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 174 (2009) (citation omitted). Here, the intention is obvious. While the Act's definition of "sexual conduct" may be saved from overbreadth by application of the Act's "analytical thicket," *Northwest 9th Cir.*, 166 F.4th at 1165, deliberate legislative inaction has preserved explicit reference to at least one of the Act's targets — materials that depict "any act of homosexuality," sexual or not — via what the Ninth Circuit recognized is unambiguously clear language. *See id.* at 1163–64. The potential discriminatory effect of such reference is particularly troubling here, where the Act's "primary enforcement mechanism" is not public enforcement by state prosecutorial bodies but, rather, a private right of action encouraged by the promise of statutory damages. *Id.* at 1167. Put another way, the Act's definition of "sexual conduct" openly invites viewpoint discrimination by soliciting private actors to target materials that, in no uncertain terms, depict "any act of homosexuality." *See Marshall v. Amuso*, 571 F. Supp. 3d 412, 424 (E.D. Pa. 2021) (holding that vague and confusing rules "openly invite[] viewpoint discrimination").

## II.   PLAINTIFFS HAVE SUFFERED AND WILL CONTINUE TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION

As established *supra*, Plaintiffs have suffered irreparable harm as a result of HB 710 and are likely to continue to suffer irreparable harm in the absence of injunctive relief. Where a preliminary injunction is sought in the First Amendment context, "'[i]rreparable harm is relatively easy to establish,'" as a plaintiff "'need only demonstrate the existence of a colorable First Amendment claim.'" *Northwest 9th Cir.*, 166 F.4th at 1169 (quoting *Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468, 482 (9th Cir. 2022)). This is because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Planned Parenthood Greater Nw. v. Labrador*, 684 F. Supp. 3d 1062, 1094

(D. Idaho 2023) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). As the Ninth Circuit recognized of the *Northwest* Plaintiffs, because Plaintiffs here have established a likelihood of success on the merits of their First Amendment claims, they have *ipso facto* established irreparable injury. *See Northwest 9th Cir.*, 166 F.4th at 1169 ("Because Plaintiffs have presented a colorable First Amendment claim with respect to H.B. 710's context clause, the district court erred in finding that Plaintiffs failed to show irreparable harm."). This factor therefore weighs heavily in favor of granting the requested preliminary injunction.

The damage of HB 710 has already materialized, and it threatens to continue with every passing day that public and public school libraries remain in the crosshairs of the government and private citizens alike. Absent an injunction, Plaintiffs will have no choice but to continue self-censoring in service of a law that is vague, overbroad, viewpoint discriminatory, and ultimately unconstitutional.

## III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST BOTH FAVOR AN INJUNCTION

Both the balance of equities and the public interest also weigh in favor of enjoining HB 710. These two factors "merge into one inquiry when the government opposes a preliminary injunction." *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021) (citing *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014)). "The fact that Plaintiffs have raised serious First Amendment questions compels a finding that the balance of hardships tips sharply in Plaintiffs' favor." *Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 758 (9th Cir. 2019) (cleaned up). An injunction would merely be preserving the status quo as it stood prior to the Act's effective date, imposing no burden on the State or negative impact on the public. Moreover, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (citation and quotation marks omitted). On the other

hand, allowing HB 710 to stand pending resolution of this litigation will continue to threaten the existence of public libraries and school libraries across the State while disrupting the First Amendment rights of Idahoans to access non-obscene books and other materials their librarians have deemed appropriate and of value.

## **CONCLUSION**

For these reasons, Plaintiffs respectfully request that this Court grant their motion and enjoin enforcement of the Act pending resolution of this litigation.

Dated: May 11, 2025

Respectfully submitted,


By: /s/Deborah A. Ferguson

Deborah A. Ferguson
Craig Durham
FERGUSON DURHAM, PLLC

Michael J. Grygiel
Daniela del Rosario Wertheimer
CORNELL LAW SCHOOL FIRST
AMENDMENT CLINIC

Kelly L. McNamee
Christina N. Hernsdorf
FOLEY HOAG LLP

*Attorneys for Plaintiffs*
