Deborah A. Ferguson, Bar No. 5333
Craig Durham, Bar No. 6428
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, ID 83702
Tel.: (208) 484-2253
daf@fergusondurham.com
chd@fergusondurham.com

Michael J. Grygiel (*pro hac vice*)
Daniela Del Rosario Wertheimer (*pro hac vice*)
CORNELL LAW SCHOOL
FIRST AMENDMENT CLINIC
Myron Taylor Hall
Ithaca, NY 14853
Tel.: (607) 255-8518
mjg395@cornell.edu
ddw83@cornell.edu

Kelly L. McNamee (*pro hac vice* pending)
Christina N. Hernsdorf (*pro hac vice* pending)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
Tel.: (212) 812-0400
Fax: (212) 812-0399
KMcNamee@FoleyHoag.com
CHernsdorf@FoleyHoag.com

*Attorneys for Penguin Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **NORTHWEST ASSOCIATION OF INDEPENDENT SCHOOLS,** *et al.*,<br>                              Plaintiffs,<br>        v.<br>**RAÚL LABRADOR,** in his official capacity as the Attorney General of the State of Idaho, *et al.*,<br>                              Defendants. | Lead Case No. 1:24-cv-00335-AKB (Consolidated Action) |
| **PENGUIN RANDOM HOUSE LLC**, *et al.,*<br>                              Plaintiffs,<br>        v.<br> **RAÚL LABRADOR**, in his official capacity as the Attorney General of the State of Idaho, *et al.*,<br>                              Defendants. | **DECLARATION OF CHRISTIE NICHOLS**<br><br><br><br>Case No. 1:25-cv-00061-AKB (Member Case) |

I, Christie Nichols, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge and belief:

1.      I am currently employed by the West Ada School District (the "District") as a Teacher Librarian, also known as a school librarian, for Rocky Mountain High School ("Rocky Mountain") located in Meridian, Idaho.  I have served in this role in West Ada since 2007 and at Rocky Mountain since 2014.

2.      As the name suggests, Teacher Librarians play a dual role in schools by offering both librarianship and teaching.  In this role, my responsibilities include, but are not limited to, providing access to information resources through efficient and well-guided systems for organizing, retrieving, and circulating resources; developing policies, procedures, and criteria for selecting resources which meet curricular, informational, and student recreational needs; and ensuring the effective integration of information resources and technologies into student learning. As a Teacher Librarian, I am also tasked with staying abreast of applicable laws that may impact Rocky Mountain's library collection, including HB 710.

3.      Notably, in my role as Teacher Librarian at Rocky Mountain, I aim to create a safe and engaging school environment for students to allow them to reach their personal and academic development goals.  A broad and diverse library collection that embraces, rather than ignores, diversity in viewpoints and experiences is essential to meeting this objective.  As I view it, the Rocky Mountain library program exists to provide a friendly and welcoming place for students to effectively and freely pursue a diverse array of materials and resources to enable students to be critical thinkers and enthusiastic life-long readers.

4.      The Rocky Mountain library maintains a collection of over 7,100 items that have been acquired to serve the library's purpose.  The library's collection has never included any

materials that are "obscene" or "harmful to minors" as those terms are defined in *Miller v. California*, 413 U.S. 15 (1973), and its progeny. Given the purposes and policies I described above, Rocky Mountain's library collection does include certain constitutionally protected, non-obscene materials that the state or some Idahoans may find offensive.

5.      Although I understand the stated purpose of HB 710 is to "protect" minor children by prohibiting public schools and libraries in Idaho from making materials deemed "harmful to minors" available to anyone under the age of 18, its vague and overbroad language makes it impossible to identify with any degree of certainty materials within its scope.

6.      For example, HB 710's definition of "harmful to minors" is confusing, both as to form and substance, leaving me and my staff without guidance as to whether any of the materials currently included in the Rocky Mountain library collection could potentially fall within the law's undefined scope.

7.      The recent amendments to HB 710, which I understand were passed in response to the Ninth Circuit's decision in *Northwest v. Labrador*, do not clear up HB 710's vague provisions.

8.      The first version of the law originally defined materials "harmful to minors" as materials harmful to *any* minor, meaning that materials arguably harmful even to the youngest of minors could be subject to the HB 710's prohibition. These materials would be restricted without regard to the fact that material not appropriate for the youngest of minors may be appropriate and of significant value to older minors. Given the amendments, HB 710 now defines materials "harmful to minors" as material harmful to "adolescent minors" — meaning *any* minor between the ages of 13 and 17. This change is not helpful. In the high school library setting, restricting access to books that may be harmful to the youngest of "adolescent minors" poses an unnecessary

2

and unjustified burden on high school students whose age, maturity, and reading levels generally far exceed that of a seventh grader.

9.    Another point of confusion stemming from the amendment language is the new term "sexually explicit," which appears to add a new requirement alongside "harmful to minors." The definition itself is unwieldy, internally inconsistent, and provides a baseless and arbitrary set of carveouts for otherwise "sexually explicit" depictions.

10.    Although the vague language of the law makes adherence to its terms a nearly impossible task, HB 710 provides significant penalties for those who violate it.  The law provides county prosecuting attorneys and the attorney general with a cause of action for injunctive relief against any school or public library that violates its substantive provision.  It also provides the general public with license to subject public libraries and schools to onerous book challenge review procedures and monetary penalties for carrying books and other materials.

11.    Given Rocky Mountain's broad and diverse collection, coupled with HB 710's vague language and enforcement provisions, materials in Rocky Mountain's library are at serious risk of being challenged by state officials or private citizens under HB 710.  To mitigate that risk for libraries within the West Ada School District, District administrators directed a review of the District's library collections to identify books and materials believed most likely to trigger "review" or enforcement under HB 710.

12.    In the six months after HB 710 became law, the District identified nearly sixty books for review.  District officials instructed school librarians within the District, including myself, to remove the identified books from library shelves and send them to District headquarters. Students who wish to access any of the books on the District list must submit a written request along with proof of parent or guardian permission.

13.     At the time that my original declaration in this case was filed, I determined that the Rocky Mountain library collection included 38 of the books on the District list.  As a direct result of HB 710, I removed those books from my library's shelves.

14.     Since then, the number books removed due to HB 710 has increased to 87.

15.     Per District directive, I am also unable to fulfill student requests to acquire or receive via inter-library loan any of the titles on the District list unless the student requestor first obtains written parent or guardian permission.  Such written permission is required each time a student requests a book from the District list, without regard to any prior permissions received. Although I understand the inclination to do whatever possible to mitigate the risks posed by HB 710, I respectfully disagree with the District's approach for at least three reasons.

16.     First, as I noted, HB 710's definition of materials "harmful to minors" is vague and confusing and, as such, fails to provide the guidance necessary to identify with any degree of certainty books that fall within its scope.  Attempting to identify books most likely to trigger HB 710's review and enforcement provisions thus amounts to a fool's errand.

17.     Second, given the lack of guidance as to what materials fall within the law's scope, the District's approach to mitigating the risk posed by HB 710 does not come close to eliminating that risk altogether.  I thus remain concerned that Rocky Mountain will be subject to complaints, enforcement proceedings, and costly litigation as a result of HB 710, notwithstanding the District's attempts at preemptive self-censorship.

18.     Third, as noted, the Rocky Mountain library has never included obscene materials in its collection, and I believe the same to be true of all other public school libraries within the District.  The entire collection is therefore constitutionally protected.  Surrendering to the preferences of some Idahoans who consider certain of the library's materials "harmful" would be

4

antithetical to the mission and purpose of public school libraries, which is to provide students with equitable access to a broad and diverse array of resources and materials.

19.    Although District administrators are aware of and sensitive to these and similar points, the District has made the difficult decision to put fundamental public school library policy considerations aside in an attempt to avoid challenge, litigation, and potential penalties under HB 710.

20.    Even a cursory review of the materials included on the District's list reveals just how extreme and problematic efforts to avoid HB 710 enforcement have become.

21.    The book that has been, personally, the most upsetting to remove was *I'll Give You the Sun* by Jandy Nelson.  This book won the Michael L. Printz Award in 2015 and is a beautifully written novel that addresses family tragedy and betrayal, complicated relationships, and discovering one's sexuality.  I frequently recommended this book to students who were looking for a story with LGBTQ characters or who wanted something a bit more challenging to read and think about.  The book is also a wonderful introduction to magical realism.  *The Perks of Being a Wallflower* by Stephen Chbosky is another title that was difficult to remove because of its enduring popularity with students.  When I asked a student recently why the book was so important to her, she replied that it "was the book that saved me when I was being bullied in middle school.  To know that other students can't read it because it has been removed from the library shelves honestly breaks my heart."

22.    I have also had to pull *Last Night at the Telegraph Club* by Malinda Lo, even though it is a wonderful, moving book that is not "harmful" to high-school aged readers in the slightest.

23.    I am sad and, frankly, embarrassed that I had to remove *Slaughterhouse-Five* by Kurt Vonnegut from my library's collection.  An American classic, this book was frequently

5

recommended to students by several male members of our faculty. Male students tend to visit the library less than their female counterparts, so it was particularly sad to me to lose this book that had been sought out by students after having it recommended to them. I asked my husband, who also happens to be my colleague, why this book resonates with students. He replied that "*Slaughterhouse-Five* is a unique book in that it appeals to those readers who have never connected with literature. It immediately confronts a young reader with the relative value of being the last person to die in a just war, and then through absurdity and humor, to explore what, if anything, is just about war itself. Simple in its structure, and easy to read, it also shows how an author creates a work with intent, as the book is, itself a narrative about how and why Vonnegut writes it. *Slaughterhouse-Five* somehow hilariously blends humanism, illustration, a first-hand account of the Dresden bombing, and science fiction into a work that has had unique appeal to students who have never considered themselves readers."

24.     Other classics we have had to remove include *The Handmaid's Tale* by Margaret Atwood and *The Bluest Eye* by Toni Morrison.

I declare under penalty of perjury pursuant to the laws of the United States that the foregoing is true and correct, to the best of my knowledge and belief.

Dated: <u>May 10, 2026</u>                                              /s/      Christie      Nichols
      Meridian, Idaho                                                        Christie Nichols