Deborah A. Ferguson, Bar No. 5333
Craig H. Durham, Bar No. 6428
FERGUSON DURHAM, PLLC
223 N. 6th Street, Suite 325
Boise, ID 83702
Tel.: (208) 484-2253
daf@fergusondurham.com
chd@fergusondurham.com

Michael J. Grygiel (*pro hac vice*)
Daniela Del Rosario Wertheimer (*pro hac vice*)
CORNELL LAW SCHOOL
FIRST AMENDMENT CLINIC
Myron Taylor Hall
Ithaca, NY 14853
Tel.: (607) 255-8518
mjg395@cornell.edu
ddw83@cornell.edu

Kelly L. McNamee (*pro hac vice*)
Christina N. Hernsdorf (*pro hac vice*)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
Tel.: (212) 812-0400
Fax: (212) 812-0399
KMcNamee@FoleyHoag.com
CHernsdorf@FoleyHoag.com

*Attorneys for Penguin Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| **NORTHWEST ASSOCIATION OF INDEPENDENT SCHOOLS,** *et al.*,<br>　　　　　　Plaintiffs,<br>　　v.<br>**RAÚL LABRADOR,** in his official capacity as the Attorney General of the State of Idaho, *et al.*,<br>　　　　　　Defendants. | Lead Case No. 1:24-cv-00335-AKB (Consolidated Action)<br><br>***PENGUIN* PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |
| **PENGUIN RANDOM HOUSE LLC**, *et al.,*<br>　　　　　　Plaintiffs,<br>　　v.<br>　**RAÚL LABRADOR**, in his official capacity as the Attorney General of the State of Idaho, *et al.*,<br>　　　　　　Defendants. | Case No. 1:25-cv-00061-AKB (Member Case) |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................................. ii

INTRODUCTION ..........................................................................................................................1

LEGAL STANDARD.....................................................................................................................2

ARGUMENT ..................................................................................................................................2

I.   PLAINTIFFS HAVE ARTICLE III STANDING TO BRING THIS CHALLENGE ..............3

   A.   The Publisher Plaintiffs and Author Plaintiffs Have Standing Against All Defendants .....4

      1.   *Driehaus* Prong 1: Intention to Engage in a Course of Conduct Arguably Affected with a Constitutional Interest .................................................................................5

      2.   *Driehaus* Prong 2: Future Proscribed Conduct ..........................................................6

      3.   *Driehaus* Prong 3: Threat of Enforcement.................................................................7

      4.   Traceability and Redressability.................................................................................10

   B.   The Public School Librarian Plaintiff Has Standing.............................................................11

   C.   The Student and Parent Plaintiffs Have Standing.................................................................13

   D.   The Donnelly Public Library Plaintiff May, and Should, Remain as a Plaintiff Regardless of the Political Subdivision Rule....................................................................16

II.  PLAINTIFFS STATE A CLAIM AS TO OVERBREADTH, VAGUENESS, AND VIEWPOINT DISCRIMINATION ..........................................................................................17

III. NEITHER THE GOVERNMENT SPEECH DOCTRINE NOR THE CURRICULUM DOCTRINE APPLY HERE .....................................................................................................20

   A.   There Is No Government Speech at Issue in this Case .....................................................20

   B.   This Case is Not Controlled by *Hazelwood*...................................................................22

CONCLUSION.............................................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arce v. Douglas*,
793 F.3d 968 (9th Cir. 2015) ...................................................................................9, 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..................................................................................................2, 17

*Board of Education, Island Trees Union Free School District No. 26 v. Pico*,
457 U.S. 853 (1982)........................................................................................................23

*Campbell v. St. Tammany Parish School Board*,
64 F.3d 184 (5th Cir. 1995) ...........................................................................................26

*Case v. Unified School District No. 233, Johnson County, Kansas*,
895 F. Supp. 1463 (D. Kan. 1995)..................................................................................26

*City of South Lake Tahoe v. California Tahoe Regional Planning Agency*,
449 U.S. 1039 (1980) .....................................................................................................16

*City of San Juan Capistrano v. California Public Utilities Commission*,
937 F.3d 1278 (9th Cir. 2019) .......................................................................................16

*Crookshanks as next friend of C.C. v. Elizabeth School District*,
775 F. Supp. 3d 1160 (D. Colo. 2025)......................................................................21, 26

*Downs v. Los Angeles Unified School District*,
228 F.3d 1003 (9th Cir. 2000) .......................................................................................24

*E.K. by & through Keeley v. Department of Defense Educational Activity*,
807 F. Supp. 3d 517 (E.D. Va. 2025) ........................................................................21, 26

*Esquivel v. San Francisco Unified School District*,
630 F. Supp. 2d 1055 (N.D. Cal. 2008) ..........................................................................23

*Fayetteville Public Library v. Crawford County*,
684 F. Supp. 3d 879 (W.D. Ark. 2023)...........................................................................17

*Fayetteville Public Library v. Crawford County*,
760 F. Supp. 3d 811 (W.D. Ark. 2024)...........................................................................22

*Free Speech Coalition, Inc. v. Paxton*,
606 U.S. 461 (2025)........................................................................................................19

*GLBT Youth in Iowa Schools Task Force v. Reynolds*,
114 F.4th 660 (8th Cir. 2024) ........................................................................................21

*Hazelwood School District v. Kuhlmeier*,
484 U.S. 260 (1988)................................................................................................ *passim*

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010).............................................................................................................6

*Hunt v. Washington Apple Advertising Commission*,
432 U.S. 333 (1977).........................................................................................................4

*Hynes v. Mayor & Council of Borough of Oradell*,
425 U.S. 610 (1976).........................................................................................................9

*Idaho Organization of Resource Councils v. Labrador*,
780 F. Supp. 3d 1013 (D. Idaho 2025) ...........................................................................3

*Kingdomware Technologies, Inc. v. United States*,
579 U.S. 162 (2016).......................................................................................................14

*Legal Services Corporation v. Velazquez*,
531 U.S. 533 (2001).......................................................................................................20

*Little v. Llano County*,
138 F.4th 834 (5th Cir. 2025) ...................................................................................21, 22

*LSO, Limited v. Stroh*,
205 F.3d 1146 (9th Cir. 2000) .........................................................................................3

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)............................................................................................2, 3, 13, 14

*Matal v. Tam*,
582 U.S. 218 (2017).......................................................................................................20

*Matsumoto v. Labrador*,
122 F.4th 787 (9th Cir. 2024) ................................................................................. *passim*

*National Association of Optometrists & Opticians LensCrafters, Inc. v. Brown*,
567 F.3d 521 (9th Cir. 2009) ...........................................................................................3

*Northwest Association of Independent Schools v. Labrador*,
166 F.4th 1148 (9th Cir. 2026) .....................................................................................18

*Northwest Association of Independent Schools v. Labrador*,
776 F. Supp. 3d 837 (D. Idaho 2025) ...................................................................... *passim*

iii

*Palomar Pomerado Health System v. Belshe*,
  180 F.3d 1104 (9th Cir. 1999) ...............................................................................16

*Parnell v. School Board of Lake County, Florida*,
  731 F. Supp. 3d 1298 (N.D. Fla. 2024) .............................................................21, 26

*Peace Ranch, LLC v. Bonta*,
  93 F.4th 482 (9th Cir. 2024) ..................................................................... *passim*

*PEN American Center, Inc. v. Escambia County School Board*,
  711 F. Supp. 3d 1325 (N.D. Fla. 2024) .............................................................22, 26

*Penguin Random House LLC v. Gibson*,
  796 F. Supp. 3d 1052 (M.D. Fla. 2025) ...................................................................21

*Penguin Random House LLC v. Gibson*,
  No. 6:24-cv-1573-CEM-RMN, 2025 WL 902041 (M.D. Fla. Feb. 28, 2025) ....................9, 21

*Penguin Random House LLC v. Robbins*,
  172 F.4th 581 (8th Cir. 2026) ...............................................................................25

*Planned Parenthood of South Nevada, Inc. v. Clark County School District*,
  941 F.2d 817 (9th Cir. 1991) ...............................................................................24

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009)............................................................................................21

*Preminger v. Peake*,
  552 F.3d 757 (9th Cir. 2008) ..................................................................................3

*Reniger v. Hyundai Motor America*,
  122 F. Supp. 3d 888 (N.D. Cal. 2015) ......................................................................4

*Riley's American Heritage Farms v. Elsasser*,
  32 F.4th 707 (9th Cir. 2022) ................................................................................21

*Roe v. Rutherford County Board of Education*,
  No. 3:25-CV-00429, 2025 WL 3205703 (M.D. Tenn. Nov. 17, 2025)................................26

*Safe Air for Everyone v. Meyer*,
  373 F.3d 1035 (9th Cir. 2004) ...............................................................................2

*Shurtleff v. City of Boston*,
  596 U.S. 243, 252 (2022)....................................................................................20

*Silano v. Sag Harbor Union Free School District Board of Education*,
  42 F.3d 719 (2d Cir. 1994)...............................................................................23, 24

iv

*South Lake Tahoe v. California Tahoe Regional Planning Agency*,
625 F.2d 231 (9th Cir. 1980) ......................................................................12, 16

*Spencer v. Kemna*,
523 U.S. 1 (1998)........................................................................................14

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ........................................................................2

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)................................................................... *passim*

*Thornburgh v. Abbott*,
490 U.S. 401 (1989) .......................................................................................5

*Tohono O'Odham Nation v. United States Department of the Interior*,
138 F.4th 1189 (9th Cir. 2025) ......................................................................17

*Virginia. State Board of Pharmacy v. Virginia Citizens Consumer Council*,
425 U.S. 748 (1976)........................................................................................9

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982)......................................................................................19

*Virden v. Crawford County, Arkansas*,
No. 2:23-CV-2071, 2024 WL 4360495 (W.D. Ark. Sept. 30, 2024) ....................................21

**Statutes**

Idaho Code § 18-1517B ................................................................................7

Idaho Code § 33-2702...................................................................................16

Idaho Code § 33-2715...................................................................................16

**Rules**

Fed. R. Civ. P. 12(b)(1)................................................................................2

Fed. R. Civ. P. 12(b)(6)................................................................................2

**Other Authorities**

Idaho House Bill 710 ................................................................. *passim*

Idaho Senate Bill 1196...................................................................................8

Idaho Senate Bill 1448.............................................................................6, 7, 8

Plaintiffs submit this brief in collective opposition to the renewed motions to dismiss filed by Defendants Raúl Labrador (Consolidated Doc. 67 ("Labrador Renewed MTD")) and the Valley County Prosecuting Attorney (Consolidated Doc. 70 ("Valley Cnty. Renewed MTD")) (together, "Moving Defendants") for lack of standing (both Moving Defendants) and failure to state a claim (Defendant Labrador only).[1,2]

**INTRODUCTION[3]**

By identifying concrete examples of actual book restrictions and removals directly resulting from HB 710's overbroad, vague, and viewpoint discriminatory provisions, Plaintiffs have stated claims under the First and Fourteenth Amendments and established that they have standing to seek redress for these constitutional violations.  For example:  a small rural library has been forced to implement a draconian adults-only policy; a high school librarian has been directed by her school district to remove nearly 90 titles from her library shelves; and another library has removed from circulation or restricted in adults-only sections a total of 23 books after receiving challenges from an unnamed individual pursuant to HB 710's private enforcement provision.

Nearly two years after the enactment of HB 710, Plaintiffs' fear of enforcement under the Act — and the restricted access to material not obscene as to the oldest of minors as a direct result

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in *Penguin* Plaintiffs' Complaint (*Penguin* Doc. 1) and memorandum of law in support of their renewed motion for preliminary injunction (Consolidated Doc. 82-1 ("Pls.' Renewed PI Mot.")).

[2] Rather than submitting two separate memoranda of law responsive to Moving Defendants' motions to dismiss, Plaintiffs submit this 27-page combined memorandum of law in opposition to the motions in accordance with Local Civil Rule 7.1(c)(1).

[3] Plaintiffs respectfully refer to their Complaint (*Penguin* Doc. 1) and memorandum of law in support of their renewed motion for preliminary injunction (Consolidated Doc. 82-1) for a more comprehensive factual background.

1

of this threat of enforcement — continues to be a daily reality for students, parents, and librarians across Idaho, as well as the authors and publishers who seek to supply a diverse range of books to readers in Idaho. Recent legislative amendments to the Act only confirm its continued constitutional infirmities as to the burden it places on the oldest of minors, its unconstitutional vagueness, and its viewpoint discrimination.

For the reasons set forth below, Moving Defendants' renewed motions to dismiss should be denied.

## LEGAL STANDARD

Under Rule 12(b)(1), the motions to dismiss must be denied unless Plaintiffs' allegations, even when taken as true, "are insufficient on their face to invoke federal jurisdiction." *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Under Rule 12(b)(6), Plaintiffs survive the motions to dismiss as long as their Complaint "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). A claim is plausible on its face when plaintiffs "plead[] factual content that allows the court to draw the reasonable inference that the defendant[s are] liable for the misconduct alleged." *Id.* "Plaintiffs['] complaint may be dismissed only when defendants['] plausible alternative explanation is so convincing that plaintiffs['] explanation is *implausible*. The standard at this stage of the litigation is not that plaintiffs['] explanation must be true or even probable." *Starr v. Baca*, 652 F.3d 1202, 1216–17 (9th Cir. 2011) (citing *Iqbal*, 556 U.S. at 680) (emphasis in original).

## ARGUMENT

## I.  PLAINTIFFS HAVE ARTICLE III STANDING TO BRING THIS CHALLENGE.

Plaintiffs establish standing when they show "injury in fact, causation, and a likelihood that a favorable decision will redress [their] alleged injury." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 486–87 (9th Cir. 2024) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)). Plaintiffs satisfy the injury prong in this pre-enforcement challenge by alleging:  (1) an "intention to engage in a course of conduct arguably affected with a Constitutional interest;" (2) that their intended conduct is "arguably proscribed by the statute;" and (3) a "substantial threat of enforcement" which "rises or falls with the enforcing authority's willingness to disavow enforcement." *Id.* at 488–90 (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014)); *see also Nw. Ass'n Indep. Schs. v. Labrador*, 776 F. Supp. 3d 837, 854–55 (D. Idaho 2025) ("*Northwest Dist. Ct.*").  "[W]hen," as here, "the threatened enforcement effort implicates First Amendment rights, the inquiry tilts dramatically toward a finding of standing." *LSO*, *Ltd. v. Stroh*, 205 F.3d 1146, 1155 (9th Cir. 2000); *see also Northwest Dist. Ct.*, 776 F. Supp. 3d at 855.

To proceed past the standing inquiry — both at this early procedural stage, and ultimately on the merits — this Court need only find that a *single* Plaintiff has made the showing required under *Driehaus* for each claim asserted against each Defendant.  Once the Court is satisfied that Plaintiffs have met this threshold, the Court need not inquire into the standing of the remaining Plaintiffs; all Plaintiffs may remain and proceed.  "As a general rule, in an injunctive case [a] court need not address standing of each plaintiff if it concludes that one plaintiff has standing." *Nat'l Ass'n of Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) (citation omitted); *see also Preminger v. Peake,* 552 F.3d 757, 764 (9th Cir. 2008) ("Because we conclude that [one plaintiff] has direct standing . . . , we need not and do not consider whether the [other plaintiff] has standing[.]" (citation omitted)); *Idaho Org. of Res. Councils v. Labrador*, 780

3

F. Supp. 3d 1013, 1037 (D. Idaho 2025) ("In a suit with multiple plaintiffs, generally only one plaintiff needs to have standing for the suit to proceed at the preliminary injunction phase." (Brailsford, J.) (citation omitted)). Put differently, "it is proper to summarily find that Article III standing exists where a single named plaintiff is found to have standing[.]" *Reniger v. Hyundai Motor Am.*, 122 F. Supp. 3d 888, 895 (N.D. Cal. 2015).

Under this "One Good Plaintiff Rule," the issue of standing in this case is an easy one: as long as this Court finds that a least one Plaintiff has standing against each Defendant — and, as explained below, Publisher Plaintiffs and Author Plaintiffs easily have standing against all Defendants — Article III standing exists and this Court may proceed to the merits of Plaintiffs' claims.

### A. The Publisher Plaintiffs and Author Plaintiffs Have Standing Against All Defendants.

Publisher Plaintiffs and Author Plaintiffs have standing against all Defendants.[4] As such, given the One Good Plaintiff Rule, this Court's standing inquiry can begin and end with these Plaintiffs.

---

[4] The Publisher Plaintiffs consist of Penguin Random House LLC, Hachette Book Group, Inc., HarperCollins Publishers LLC, Macmillan Publishing Group, LLC, Simon & Schuster, LLC, Sourcebooks LLC, and the Authors Guild. The Author Plaintiffs are Malinda Lo, David Levithan, and Dashka Slater.

The Authors Guild has associational standing on behalf of its members. (*See* Compl. ¶ 42; Pls.' Renewed PI Mot. 15.) As the Guild's members include Author Plaintiffs Malinda Lo and David Levithan, (*see* Compl. ¶ 42) — who themselves have standing, as explained herein — its members would "otherwise have standing to sue in their own right." *See Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Northwest Dist. Ct.*, 776 F. Supp. 3d at 857–58. The "interests [the Guild] seeks to protect" — safeguarding its members' ability to write on topics of their choosing and distribute their work through bookstores and libraries — is "germane to the organization's purpose" of promoting the rights and professional interests of authors. *See Northwest Dist. Ct.*, 776 F. Supp. 3d at 858. Finally, the Guild's participation in the lawsuit does

1.    Driehaus *Prong 1: Intention to Engage in a Course of Conduct Arguably Affected with a Constitutional Interest.*

The Publishers and Authors satisfy the first prong of the *Driehaus* framework because they indisputably have "'an intention to engage in a course of conduct arguably affected with a constitutional interest.'"  *Peace Ranch*, 93 F.4th at 488 (quoting *Driehaus*, 573 U.S. at 161). Publisher and Author Plaintiffs write and publish books that have been targeted for restricted access or removal from public and school libraries in Idaho in connection with HB 710, or are likely to be targeted in the future based on their subject matter and content.  (*See, e.g.*, Pls.' Renewed PI Mot. 14–16; Compl. ¶¶ 29, 32, 35, 37, 40, 42, 45, 47, 58; Consolidated Doc. 82-5, Lo Decl. ¶¶ 17–18; Consolidated Doc. 82-6, Levithan Decl. ¶¶ 8–9, 13–16; Consolidated Doc. 82-2, Slater Decl. ¶¶ 16–18, 24.)  They intend to persist in their efforts to write and distribute similar books in the future to be read by minors in Idaho.  (*See, e.g.*, Pls.' Renewed PI Mot. 14–16; Compl. ¶¶ 30, 33, 38, 42.)  HB 710 will, unless enjoined, continue to stymie Publisher and Author Plaintiffs' efforts to reach their core audience.

Writing and distributing non-obscene books to minors in Idaho clearly fall within the core of protected First Amendment rights.  *See Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989) ("[T]here is no question that publishers who wish to communicate with those who . . . willingly seek their point of view have a legitimate First Amendment interest in access to prisoners.").  (*See also* Compl. ¶¶ 3–4, 19, 164.)  Writing and publishing books is more than "arguably affected with a constitutional interest" — the constitutional interest at stake is central to this conduct.  *See Peace Ranch*, 93 F.4th at 488 (citing *Driehaus*, 573 U.S. at 161).

---

not require each of its individual members' participation, particularly given the participation of Guild members Lo and Levithan as Author Plaintiffs.  *See id.*

> 2.      Driehaus *Prong 2: Future Proscribed Conduct.*

At the second step of the *Driehaus* framework, Plaintiffs must show that their intended future conduct is "arguably proscribed" by HB 710.  *Id.* at 489 (citing *Driehaus*, 573 U.S. at 162). Here, as discussed above, books written and distributed by Author and Publisher Plaintiffs — including, for example, Author Plaintiff Malinda Lo's *Last Night at the Telegraph Club* and Publisher Plaintiff Penguin Random House's *The Bluest Eye* by Toni Morrison, *I Know Why the Caged Bird Sings* by Maya Angelou, and *The Handmaid's Tale* by Margaret Atwood — have been targeted for restricted access or removal from public and school libraries in Idaho in connection with HB 710, despite none of the targeted books being obscene under the *Miller* test as applied to the oldest of minors.  HB 710 therefore arguably proscribes the Author and Publisher Plaintiffs' continued writing and distribution of books for minors in Idaho to read through public schools and libraries.  *See id.*

Defendant Labrador insists that HB 710 "do[es] not require removal of any material." (Labrador Renewed MTD 8–9.)  In Defendant Labrador's view, it seems, all libraries across the state should be capable of maintaining an entirely locked-down adults-only section for which age verification or parental permission is necessary to enter.  Or, perhaps Defendant Labrador believes that shipping books to an offsite location (or even hiding them behind a circulation desk) — where they can only be accessed upon specific request and with parental permission — is functionally the same as being able to browse the same titles for immediate checkout from a library shelf. Either view ignores the basic reality of how a library functions.[5]  In any event, the question of the

---

[5] Even with the passage of SB 1448, Defendant Labrador still refuses to admit that none of the specific books Plaintiffs have identified as targeted for restriction or removal are obscene under the *Miller* test as applied to the oldest of minors.  Defendant Labrador's continued refusal to make this commitment only further underscores the vagueness (and overbreadth) of the Act and the very real threat of its enforcement.  *See Holder v. Humanitarian L. Project*, 561 U.S. 1, 16 (2010) ("The

exact contours of compliance with the Act would require this Court to "unavoidably tangle standing with the merits," from which it should refrain as part of its standing inquiry. *See Peace Ranch*, 93 F.4th at 489; *Northwest Dist. Ct.*, 776 F. Supp. 3d at 855. And, as discussed further below, the text and legislative history of HB 710 make clear that its reach — and, at a minimum, the reach of its intended chilling effect — extends well beyond the outer limits of *Miller*'s definition of obscenity as applied to minors.

       3.       Driehaus *Prong 3: Threat of Enforcement.*

Third, and finally, Plaintiffs "must demonstrate a 'substantial threat of enforcement'" of HB 710. *Peace Ranch*, 93 F.4th at 489–90 (quoting *Driehaus*, 573 U.S. at 164). "This final prong often rises or falls with the enforcing authority's willingness to disavow enforcement." *Id.* at 490 (citation omitted); *see also Northwest Dist. Ct.*, 776 F. Supp. 3d at 856. "In challenging a new law whose history of enforcement is negligible or nonexistent, either a 'general warning of enforcement' or a 'failure to *disavow* enforcement' is sufficient to establish a credible threat of prosecution in pre-enforcement challenges on First Amendment grounds." *Matsumoto v. Labrador*, 122 F.4th 787, 797 (9th Cir. 2024) (citations omitted) (emphasis in original).

Just as in *Northwest*, Publisher and Author Plaintiffs here — and all Plaintiffs — have shown that a substantial threat of enforcement exists. The Act charges the Attorney General and county prosecutors throughout the State with enforcing its provisions through seeking injunctive relief against public libraries and schools that violate the statute. *See* Idaho Code § 18-1517B(5) (providing that any "county prosecuting attorney or the attorney general shall have a cause of action for injunctive relief against any school or public library that violates" the Act). Neither

---

Government has not argued to this Court that plaintiffs will not be prosecuted if they do what they say they wish to do.").

Defendant Labrador, nor any of the county prosecutors named as Defendants in this action, have disavowed enforcement of the Act.  Although Defendant Labrador indicated in his renewed motion to dismiss that he "completely disavows any intent to enforce the statute as it previously existed" prior to the July 1, 2026, effective date of SB 1448, this commitment only confirms Defendant Labrador's intention to enforce the Act as amended by SB 1448 — which, as explained in Plaintiffs' renewed motion for preliminary injunction and below — is still constitutionally infirm with respect to the oldest of minors.  (*See* Labrador Renewed MTD 2 n.1.)[6]  In any event, it matters little what the Attorney General may, or may not, promise as to enforcement, as he cannot speak for the 44 county prosecutors across the State with their own injunctive enforcement power or for individual Idahoans who may bring private enforcement actions under the Act.

Instead, the State has consistently obfuscated and refused to clarify the meaning and scope of HB 710, leaving all to guess as to how it may be enforced — and leaving wide discretion to Idaho's Attorney General, dozens of county prosecutors, and any citizen seeking to bring a private right of action over any book he or she personally believes to be harmful to children.[7]  (*See, e.g.,*

---

[6] Moreover, last year, the Idaho Legislature appeared to double down on its intention to strictly enforce HB 710 by passing a bill requiring public and school libraries to confirm by means of affidavit their compliance with HB 710.  *See* S.B. 1196, 68th Leg., 1st Reg. Sess. (Idaho 2025).

[7] It is of no moment that Plaintiffs have not named — in fact, *could* not name — every possible enforcer of HB 710 as a Defendant in this action.  (*See* Valley Cnty. Renewed MTD 7 ("If the remaining Plaintiffs believed they had standing against individual prosecuting attorneys, without involvement from plaintiffs residing in the named county, they would have listed the remaining forty-one prosecuting attorneys in Idaho as defendants.").)  Plaintiffs' "standing is not short-circuited by the fact that there are multiple authorized enforcers of the statute." *Matsumoto*, 122 F.4th at 798.  Rather, "when a statute distributes enforcement authority across multiple actors, and a plaintiff brings a pre-enforcement challenge, the threat of that enforcement is properly analyzed as a collective assessment of the threat posed by *all* the potentially enforcing authorities, together." *Id.* (citing *Driehaus*, 573 U.S. at 164) (emphasis in original).

Thus, this Court need not look at, for example, the threat of imminent enforcement action by a single prosecutor in a vacuum but instead must engage in "a collective assessment of the threat

Compl. ¶ 127; Pls.' Renewed PI Mot. 28–30, 33.)  *See also Matsumoto*, 122 F.4th at 798 ("Nor has Idaho attempted to prevent county attorneys from enforcing the statute . . . .  Quite the opposite — Idaho is vigorously defending the constitutionality of the statute and its broad coverage." (citations and quotation marks omitted)); *Northwest Dist. Ct.*, 776 F. Supp. 3d at 856.

Defendant Labrador takes issue with the fact that HB 710 does not directly regulate Publisher and Author Plaintiffs and therefore cannot be enforced against them.  (*See* Labrador Renewed MTD 8–10.)  But federal courts consistently entertain constitutional challenges in this context — that is, when a statute incidentally impacts the First Amendment rights of plaintiffs whose actions the challenged statute does not directly regulate.  *See, e.g.*, *Arce v. Douglas*, 793 F.3d 968, 987–88 (9th Cir. 2015) (finding student and parent plaintiffs had standing to challenge state law which regulated school district, but "ha[d] a direct impact on plaintiffs' [First Amendment] right to receive information"); *see also Hynes v. Mayor & Council of Borough of Oradell*, 425 U.S. 610, 611, 621 n.5 (1976) (allowing voters to pursue challenge to local ordinance regulating door-to-door canvassers, noting that plaintiffs "alleged that their right to receive information would be infringed because persons canvassing for political causes would be uncertain whether the ordinance covered them"); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council*, 425 U.S. 748, 753–54 (1976) (allowing challenge to statute regulating pharmacists, "not by one directly subject to its prohibition, that is, a pharmacist, but by prescription drug consumers who claim that they would greatly benefit if the prohibition were lifted," based on First Amendment right to receive information); *Penguin Random House LLC v. Gibson*, No. 6:24-cv-

---

posed by *all* the potentially enforcing authorities."  *Id*.  This includes the collective threat by potential private enforcers, as well, given that John or Jane Doe is named as a Defendant (even if this Court cannot enjoin other potential private enforcers not named as Defendants in this action).

1573-CEM-RMN, 2025 WL 902041, at *4 (M.D. Fla. Feb. 28, 2025)[8] (finding that, where author and publisher plaintiffs sought "to provide students access to books in a public school library that may be removed under the challenged statute, and parent [p]laintiffs want[ed] their children to have access to those books," both had standing to bring pre-enforcement First Amendment challenge).

Here, Publisher and Author Plaintiffs have alleged that public schools and libraries have indeed restricted access to books in response to HB 710, and named one such entity, the Eagle Public Library, as a Defendant.  Thus, unlike the parent plaintiffs in *Northwest*, *see Northwest Dist. Ct.*, 776 F. Supp. 3d at 859, Publisher and Author Plaintiffs in this action (as well as Student and Parent Plaintiffs, as discussed below) have shown that Defendants have inflicted and threaten to inflict First Amendment injuries that are directly traceable to the threatened enforcement of HB 710.  Because the threatened enforcement of the Act across Idaho infringes upon the First Amendment rights of Publisher and Author Plaintiffs to share their written words with the audience of their choosing, they have standing against all Defendants.

     4.     *Traceability and Redressability.*

Publisher and Author Plaintiffs' satisfaction of the *Driehaus* pre-enforcement standing framework also establishes that their injuries are traceable to Defendants and that an injunction would redress the harm they have suffered and continue to face because of HB 710.  *See Matsumoto*, 122 F.4th at 799 ("link" between challenged statute and threat to plaintiffs' First Amendment rights "suffices to meet their burden of showing causation and traceability," as "[t]he statute supplies all the trace needed").  The looming threat of HB 710's enforcement is the direct

---

[8] As of the date this brief is filed, this decision is fully briefed on appeal and oral argument took place on April 22, 2026, before the Eleventh Circuit (Appeal No. 25-13181).

cause of Publisher and Author Plaintiffs' injuries to their First Amendment rights — but for this threat, Publisher and Author Plaintiffs' books would not face actual and threatened removal from library shelves.   Enjoining Defendant Labrador and county prosecutor Defendants would eliminate — at least temporarily — the threat of HB 710's injunctive enforcement against public libraries and schools throughout Idaho.

As to the law's private cause of action, although Plaintiffs cannot obtain an injunction preventing private individuals other than Defendant John or Jane Doe from bringing their own private rights of action under the law, a decision finding HB 710 unconstitutional would at least provide public libraries and schools — and their insurers, (*see* Compl. ¶ 116; Consolidated Doc. 82-3, Scheline Decl. ¶ 21) — some level of assurance that any such actions would be meritless. What is more, such a decision in Plaintiffs' favor on the merits against Defendant Doe should dissuade other would-be "private attorneys general" from bringing meritless challenges or lawsuits over materials that are not obscene under the *Miller* standard as to the oldest of minors.

As such, the injunction Plaintiffs seek against Defendants would at least "[p]artial[ly] ameliorat[e]" the threat of enforcement of HB 710 to the extent possible through the courts.  *See Matsumoto*, 122 F.4th at 801.  By extension, this relief would restore Publisher and Author Plaintiffs' abilities to share their work with young Idahoans through school and public libraries free from restriction or stigma.  Thus, Publisher and Author Plaintiffs' injuries are both traceable and redressable.

### B.  The Public School Librarian Plaintiff Has Standing.

Public School Librarian Plaintiff Christie Nichols has established standing as to Defendant Labrador and Defendant Bennetts, the county prosecuting attorney for Ada County where Nichols works and lives (even though, under the One Good Plaintiff Rule discussed above, *supra* Section

11

I, this Court need not individually examine Nichols' standing). Nichols has sufficiently alleged that she intends to engage in a course of conduct which is arguably both affected with a constitutional interest and proscribed by HB 710. *See Peace Ranch*, 93 F.4th at 488–89 (citing *Driehaus*, 573 U.S. at 161–62). (*See* Pls.' Renewed PI Mot. 12–14.) Nichols' ongoing conduct as a Teacher Librarian at Rocky Mountain High School — the materials she curates for the library's collection, the tailored reading recommendations she makes for students and teachers, and her other efforts to "enable students to be critical thinkers and enthusiastic life-long readers," (*see* Consolidated Doc. 82-4, Nichols Decl. ¶¶ 2–3, 18, 21, 23) — implicates her own First Amendment right to provide non-obscene reading material to her students. *See Northwest Dist. Ct.*, 776 F. Supp. 3d at 855 ("the Private School Plaintiffs sufficiently allege a constitutional interest — a First Amendment right to provide non-obscene reading material").[9]

HB 710, however, arguably proscribes this conduct. In direct response to the risk of enforcement of HB 710, the West Ada School District has ordered school librarians within the District, including Nichols, to restrict students' access to scores of titles, requiring Nichols to remove 87 titles from the Rocky Mountain library and restrict students' access to these books, including at least one book Nichols frequently recommends to students. (*See* Nichols Decl. ¶¶ 12–14, 21–24; Consolidated Doc. 82-7, Lanzara Decl. ¶ 4; Compl. ¶¶ 60–63.) Pursuant to this directive, Nichols was required to remove 87 titles from the Rocky Mountain library. (*See* Nichols

---

[9] Given the Act's concrete impact on Nichols' ability to recommend and provide age-appropriate reading material to her students pursuant to her own First Amendment rights, Nichols' alleged injury is more than, as Defendant Labrador contends, mere "abstract outrage at the enactment of an unconstitutional law" by an employee of a political subdivision which itself lacks standing. (Labrador Renewed MTD 10 (quoting *S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 625 F.2d 231, 237 (9th Cir. 1980)).) Moreover, to the extent Defendant Labrador contends that Nichols' provision of non-obscene reading materials to students amounts to government speech, this view is mistaken, as explained below in Section III(A), *infra*.

12

Decl. ¶¶ 13–14, 21–24; Compl. ¶¶ 60–63.)  Given Rocky Mountain's broad and diverse collection, coupled with HB 710's vague language and enforcement provisions, Nichols has also "demonstrate[d] a 'substantial threat' of enforcement" of HB 710.  *See Peace Ranch*, 93 F.4th at 489–90 (citing *Driehaus*, 573 U.S. at 164).  (*See also* Nichols Decl. ¶¶ 16–18.)  As with the Publisher and Author Plaintiffs, Nichols' satisfaction of the *Driehaus* framework also establishes that her injuries are both traceable and redressable.  *See Lujan*, 504 U.S. at 590; *Matsumoto*, 122 F.4th at 799.

### C.  The Student and Parent Plaintiffs Have Standing.

The Student and Parent Plaintiffs[10] independently satisfy the injury in fact, causation, and redressability requirements of Article III standing (even though, as discussed, they need not under the One Good Plaintiff Rule).  *See Lujan*, 504 U.S. at 560–61.  Plaintiffs challenging a statute that imperils their "liberty interest[,] grounded in their First Amendment right to receive information" may challenge the statute even if those plaintiffs are not directly regulated by the statute.  *Arce*, 793 F.3d at 987; *see also supra* Section I(A)(3).  As this Court noted in *Northwest*, standing in such a case requires that the defendant "inflicted or threatened to inflict an injury . . . traceable to the defendant's conduct."  *Northwest Dist. Ct.*, 776 F. Supp. 3d at 858.  Here — where schools and libraries have begun restricting access to books in response to the threat of HB 710's enforcement — Student and Parent Plaintiffs have satisfied this requirement:  that is, they have suffered injuries to their First Amendment right to receive information, traceable to a substantial threat of enforcement under HB 710.  *See id.* at 859 (finding that, by contrast, the parent plaintiffs in *Northwest* did not have standing because they "ha[d] not alleged that any school or public library

---

[10] The Student Plaintiffs are Olivia Lanzara and J.E.  The Parent Plaintiffs are Barbara Ersland, J.E.'s mother, and Melisa Cull, a resident of Eagle, Idaho and patron of the Eagle Public Library, whose Board is a Defendant in this suit.

is withholding non-obscene materials from them or named any such entity as a defendant" or had

not shown their fear of enforcement was "traceable to their alleged anticipated injury").  As such,

Student and Parent Plaintiffs have standing.

Student and Parent Plaintiffs intend to "engage in a course of conduct . . . affected with a

[First Amendment] interest" — receiving information through their public and school libraries —

that has arguably been proscribed by HB 710.  *See Peace Ranch*, 93 F.4th at 488 (citing *Driehaus*,

573 U.S. at 161).  Student and Parent Plaintiffs present far more than a "generalized grievance"

that "H.B. 710 impedes on the general public's right to information."  *See Northwest Dist. Ct.*, 776

F. Supp. 3d at 859.  Student Plaintiffs wanted to check out non-obscene materials protected by the

First Amendment from public and school libraries[11]; Parent Plaintiffs wish for their children to be

able to do the same.  (Compl. ¶¶ 66, 73, 75–78; Lanzara Decl. ¶ 6; Consolidated Doc. 82-9, Cull

---

[11] Defendant Labrador contends that Student Plaintiffs' age and graduation status impacts their standing.  (Labrador Renewed MTD 10–11.)  It does not, for several reasons.  First, "standing is to be determined as of the commencement of suit."  *Lujan*, 504 U.S. at 570 n.5.  It is thus immaterial that, since commencement of this suit, Lanzara has graduated from high school and J.E. has turned eighteen.  (*See* Lanzara Decl. ¶¶ 1–2; J.E. Decl. ¶ 1.)  To the extent Defendants' argument on this point is that Student Plaintiffs' claims are moot, this argument has no merit given the "capable of repetition yet evading review" doctrine.  *See Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 170 (2016) (mootness can be overcome when a controversy is "capable of repetition, yet evading review" (citing *Spencer v. Kemna*, 523 U.S. 1, 17 (1998)).  In any event, the fact that Lanzara was eighteen and that J.E. has turned eighteen during the lifetime of this litigation amplifies, rather than winnows, their constitutional injuries.  As a non-minor high school senior, when Lanzara used her high school library, she was denied access to books that she wanted to check out because they had been moved to an offsite location pursuant to HB 710.  (Lanzara Decl. ¶¶ 6, 12; Nichols Decl. ¶¶ 12–15.)  Though she had surpassed HB 710's age limit, Lanzara nevertheless was subject to its sweep because she was still — though legally an adult — a high school student and thus required to follow Rocky Mountain library's procedures for accessing removed and relocated titles just the same as her younger peers.  (*See* Lanzara Decl. ¶ 12 (noting that Lanzara was "unaware of how [she] might be able to get around the limitations of HB 710 to check out books that [she] was otherwise legally permitted to access").)  Similarly, though J.E. has now aged out of the Act's ostensible age limit, he is still subject to the potential consequences of HB 710 in his school library.

Decl. ¶¶ 9–10.)  Student Plaintiff Lanzara was unable to check out non-obscene works from her school library during her senior year of high school because they had been removed from general circulation pursuant to HB 710.  (Lanzara Decl. ¶ 6.)  Student Plaintiff J.E. reasonably fears that many books he wishes to read will soon disappear from his school library, (*see* Consolidated Doc. 82-8, J.E. Decl. ¶¶ 3, 9, 10, 13), having seen libraries across Idaho — like Lanzara's — "comply with H.B. 710's . . . unconstitutional directive," *see Northwest Dist. Ct.*, 776 F. Supp. 3d at 859.  Parent Plaintiff Ersland's "fear of Defendants' enforcement," *id.*, likewise comes directly from examples of schools and libraries statewide that are "withhold[ing] non-obscene reading material," *id.*, due to their own fear of sanction pursuant to the Act.  Indeed, in places like Eagle, where Parent Plaintiff Cull lives, her local library has already, pursuant to HB 710's private enforcement provision, restricted minors' access to works which are not obscene as to them.  (Cull Decl. ¶¶ 7–10); *see also Northwest Dist. Ct.*, 776 F. Supp. 3d at 859 (noting that the parent plaintiffs did not allege or name as a defendant any library responsible for "withholding non-obscene materials"; in this suit, Parent Plaintiffs *do* make allegations against and name as a Defendant the Eagle Public Library).  Thus, Student and Parent Plaintiffs' injuries are either reasonably anticipated — as schools and public libraries across Idaho *are* "withholding non-obscene materials" from minors pursuant to HB 710 — or are already actively being denied the First Amendment right to receive information because their own public schools and libraries are withholding constitutionally protected materials to avoid litigation under the Act.

For the same reasons that Defendants' "failure to disavow enforcement" of HB 710 as to Publisher and Author Plaintiffs "establish[es] a credible threat" of enforcement, *see supra* Section I(A)(3) (citing *Matsumoto*, 122 F.4th at 797), Defendants' "failure to disavow enforcement" against Student and Parent Plaintiffs likewise constitutes a "credible threat of enforcement," *see*

15

*Peace Ranch*, 93 F.4th at 489–90.  And, though enjoining Defendants would not entirely eliminate the threat of enforcement responsible for Student and Parent Plaintiffs' ongoing First Amendment injuries, "partial amelioration" of these injuries "suffices for redressability."  *See supra* Section I(A)(4); *Matsumoto*, 122 F.4th at 801.

Taken together, satisfaction of each of these standing factors establishes that Student and Parent Plaintiffs have met the requirements to show that they have independent Article III standing.

### D.  The Donnelly Public Library Plaintiff May, and Should, Remain as a Plaintiff Regardless of the Political Subdivision Rule.

Moving Defendants argue that Public Library Plaintiff Donnelly Library lacks standing to sue because it is a political subdivision of the State of Idaho.  (*See* Labrador Renewed MTD 7; Valley Cnty. Renewed MTD 3–4.)

Plaintiffs recognize that the Ninth Circuit maintains a rule against political subdivisions bringing constitutional challenges against their parent states in federal court, and that, on its face, this rule applies to Donnelly Public Library.[12]  *See S. Lake Tahoe*, 625 F.2d at 233–34; *City of San*

---

[12] The Ninth Circuit's formulation of this rule, however, has been widely criticized since its inception, including by sitting judges on the Ninth Circuit itself.  *See, e.g.*, *City of S. Lake Tahoe v. Cal. Tahoe Reg'l Planning Agency*, 449 U.S. 1039 (1980) (White & Marshall, JJ., dissenting from denial of certiorari) ("Such a *per se* rule is inconsistent with [*Board of Education v.*] *Allen* [, 392 U.S. 236 (1968)]"); *City of San Juan Capistrano v. Cal. Pub. Utils. Comm'n*, 937 F.3d 1278, 1282–84 (9th Cir. 2019) (Nelson, J., concurring) ("[I]t is worth this court's consideration to revisit our rationale for our per se rule (which would have to occur en banc) to decide whether we remain on the correct path.  At least three of our colleagues have previously suggested such a course." (collecting cases)); *Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104, 1108–11 (9th Cir. 1999) (Hawkins, J., concurring) ("Because the current law in this circuit calls for a ban on any constitutional challenge by a political subdivision against its 'parent state' — an interpretation at odds with at least three other circuits — I believe our en banc court should take another look at South Lake Tahoe and its progeny. . . .  We have . . . never satisfactorily stated our rationale for including all constitutional challenges within the ban.").

Plaintiffs agree that the Ninth Circuit's sweeping approach to the political subdivision rule merits revisiting, particularly on the facts here.  The underlying rationale for the political subdivision rule does not make sense as applied to an entity like a library engaged in inherently non-governmental

16

*Juan Capistrano*, 937 F.3d at 1280.  However, as discussed above, if the Court finds that *any* Plaintiff has standing against each Defendant, the Court need not examine the Donnelly Library's standing or wade into the political subdivision rule.  Thus, even assuming that the political subdivision rule applies to the Donnelly Library, the library may, and should, nonetheless remain as a Plaintiff in this action.[13]

\*       \*       \*

For these reasons, Plaintiffs have established standing as to all Defendants on all of their claims.  If this Court finds, however, that standing is lacking on any of Plaintiffs' claims, Plaintiffs ask that the Court dismiss any such claims without prejudice, such that Plaintiffs may amend their Complaint to remedy any pleading deficiencies.

## II.  PLAINTIFFS STATE A CLAIM AS TO OVERBREADTH, VAGUENESS, AND VIEWPOINT DISCRIMINATION.

Even accepting *arguendo* Defendant Labrador's flawed reading of the Ninth Circuit's decision in *Northwest*, his contention that such decision acts as "law of the case" that "forclose[s]" Plaintiffs' claims at the pleading stage is misplaced.  It is hornbook law that federal courts may reach different conclusions when deciding motions to dismiss and motions for preliminary injunction because of the different standards applicable to each such motion.  On a motion to

---

functions, particularly in the First Amendment context.  Moreover, the Donnelly Library faces a direct conflict between two sets of laws enacted by its "creator," the State of Idaho, with the First Amendment rights of its staff and patrons caught in the middle (not to mention the oath of office each of the Donnelly Library's Trustees took to support the Constitution in carrying out their official duties, *see* Idaho Code §§ 33-2702, 33-2715).

[13] Indeed, in a constitutional challenge to Arkansas' now enjoined book ban statute, the United States District Court for the Western District of Arkansas allowed a public library, denominated in the case caption as "a political subdivision" of its corresponding city and state, to remain as a plaintiff given the One Good Plaintiff Rule, despite being "less certain" of the library's standing. *See Fayetteville Pub. Libr. v. Crawford Cnty.*, 684 F. Supp. 3d 879, 896 n.22 (W.D. Ark. 2023).

17

dismiss, a court asks whether the complaint alleges facts sufficient to make the claims plausible on their face. *Iqbal*, 556 U.S. at 678. In contrast, on a motion for preliminary injunction, a court asks whether the movant has demonstrated a likelihood of success on the merits. *Tohono O'Odham Nation v. United States Dep't of the Interior*, 138 F.4th 1189, 1202 (9th Cir. 2025). This Court acknowledged as much in *Northwest*, where it determined that the *Northwest* Plaintiffs' allegations that HB 710 violated their First and Fourteenth Amendment rights were "adequate to state a claim for relief," while also noting that "whether Plaintiffs are likely to succeed on these claims . . . is a different question." *Northwest Dist. Ct.*, 776 F. Supp. 3d at 861.

Before the Ninth Circuit in *Northwest* was the *Northwest* Plaintiffs' appeal of the order denying their motion for preliminary injunction. *See Nw. Ass'n of Indep. Schs. v. Labrador*, 166 F.4th 1148, 1154 (9th Cir. 2026). This Court's order denying Defendant Labrador's motion to dismiss was not appealed and, as such, was not before the Ninth Circuit. Accordingly, even accepting *arguendo* Defendant Labrador's strained contention that the Ninth Circuit's *Northwest* decision "rejected" certain legal questions at issue in this case, it did so via application of the separate standard for preliminary injunction motions and, thus, does not foreclose the Court's consideration on the instant motion as to whether the Complaint states a plausible claim for relief.

In any event, Defendant Labrador misreads the Ninth Circuit's decision in *Northwest* in at least two material respects. *First*, the Ninth Circuit's unremarkable statement that HB 710's "single distinction between adults and minors as a class" "makes sense" is not the slam dunk Defendant Labrador suggests it is. As detailed at length in Plaintiffs' memorandum of law in support of their preliminary injunction motion, the Act's unconstitutional overbreadth results not from the fact that it treats minors as a separate class distinct from adults but, rather, the way in which it defines what is harmful or obscene as to minors as a class. (*See, e.g.,* Pls.' Renewed PI

18

Mot. 20–21 ("[M]aterials arguably obscene as to the youngest of minors may not be obscene to the eldest.  It follows, then, that obscenity statutes like HB 710 that, by their plain language, define and regulate obscenity as to 'any minor' — as opposed to 'all minors' — ignore this reality and, in doing so, unjustifiably burden older minors' right to access materials not obscene or harmful as to them.").)  As Plaintiffs' memorandum of law in support of their preliminary injunction motion also details, the Legislature's amendments to HB 710 — whether modeled after the Supreme Court's recent decision in *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 481 n.7 (2025), or not — do not save the Act from overbreadth.  (Pls.' Renewed PI Mot. 21 (even as amended, the Act "extends far beyond the State's permissible reach in restricting older minors' access to material not obscene as to them, and it [thus] cannot be saved from overbreadth given its plain language").)

*Second*, in *Northwest*, overbreadth was the only legal issue before the Ninth Circuit.  The Ninth Circuit was not presented with, and did not decide, the *Northwest* Plaintiffs' likelihood of success on any other grounds, including vagueness or viewpoint discrimination.  As this Court has acknowledged, "[a] law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process." *Northwest Dist. Ct.*, 776 F. Supp. 3d at 866 (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 497 (1982)).  Accordingly, although the Ninth Circuit's findings as to overbreadth may inform certain aspects of a vagueness analysis, they in no way "forecloses any vagueness arguments," as Labrador contends.  (Labrador Renewed MTD 14.)  As alleged in the Complaint and as detailed at length in Plaintiffs' memorandum of law in support of their preliminary injunction motion, the Act is void for vagueness as to its: (i) definitions of "minor," "adolescent minor," "sexual conduct," and "sexually explicit";

(ii) failure to provide minimal guidelines for enforcement; and (iii) private right of action.  (*See* Compl. ¶¶ 167–78; Pls.' Renewed PI Mot. 24–30.)

The Court should reject the motions to dismiss out of hand on the same grounds that it denied Defendant Labrador's motion to dismiss in *Northwest*, and focus its further consideration of the merits on Plaintiffs' pending motion for preliminary injunction.

## III.  NEITHER THE GOVERNMENT SPEECH DOCTRINE NOR THE CURRICULUM DOCTRINE APPLY HERE.

### A.  There Is No Government Speech at Issue in this Case.

As a threshold point, Defendant Labrador's reliance on the government speech doctrine in an attempt to avoid Plaintiff's First Amendment challenge betrays a fundamental misunderstanding of the doctrine.  Although it is true that the First Amendment does not constrain "government speech," that term, and thus the scope of the rule, is nowhere near as broad as Defendant Labrador suggests.  (Labrador Renewed MTD 15–16.)  Where the government is the speaker and delivers its own message, the First Amendment does not impose "a requirement of viewpoint-neutrality on government speech." *Matal v. Tam*, 582 U.S. 218, 234 (2017).  Where, however, the government creates entities vested with their own independent governance, or a mandate to make information widely available to the public, it cannot then, under the guise of government speech, arbitrarily limit access to information "necessary to the proper functioning of those systems." *See Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 544 (2001).

The Supreme Court's decision in *Shurtleff v. City of Boston* underscores this distinction. There, the Court outlined a "holistic inquiry" for courts to determine if the government intends to speak, which is guided by the following factors:  (1) "the history of the expression at issue"; (2) "the public's likely perception as to who (the government or a private person) is speaking"; and (3) "the extent to which the government has actively shaped or controlled the expression."

20

596 U.S. 243, 252 (2022).  The Ninth Circuit applies a corresponding list of factors to "determine whether speech can be reasonably viewed as coming from the government":  responsibility for the speech; access to the forum; editorial control; and the forum's purpose.  *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 728 (9th Cir. 2022).

Although the Ninth Circuit has yet to address application of the government speech doctrine under the specific circumstances presented here, another circuit court has recently done so in *GLBT Youth in Iowa Schools Task Force v. Reynolds*, 114 F.4th 660, 667 (8th Cir. 2024).  Relying on the *Shurtleff* factors, the *GLBT* court rejected arguments that the state-ordered removal of books from public school libraries constituted government speech shielded from First Amendment protections.  *Id*.  In doing so, the court distinguished the permanent monuments in a public park from *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) — a case relied on by Defendant Labrador (*see* Labrador Renewed MTD 15 (incorporating by reference *Penguin* Doc. 36-1, Labrador MTD 4 (citing *Summum*, 555 U.S. at 472–73))) — from public school libraries, *GLBT Youth in Iowa Schools*, 114 F.4th at 667–68.  Other federal courts have followed suit, refusing to extend the government speech doctrine to regulation of library materials.[14]

*Little v. Llano County*, 138 F.4th 834 (5th Cir. 2025), upon which Defendant Labrador stakes nearly his entire government speech argument, does not move the needle, for several

---

[14] *See, e.g., E.K. by & through Keeley v. Dep't of Def. Educ. Activity*, 807 F. Supp. 3d 517, 537 (E.D. Va. 2025), *appeal docketed*, No. 26-1002 (4th Cir. Jan. 2, 2026) ("Here, library books are different in kind from established government speech, such as a set of limited public monuments displayed on government property or license plate designs that the government actively controls." (citing *Summum*, 555 U.S. at 470–73)); *Crookshanks as next friend of C.C. v. Elizabeth Sch. Dist.*, 775 F. Supp. 3d 1160, 1176 (D. Colo. 2025) ("The Court holds that it is Plaintiffs' First Amendment rights at stake—not the [government']s"); *Penguin Random House LLC v. Gibson*, 796 F. Supp. 3d 1052, 1069 (M.D. Fla. 2025) (holding that "[a] blanket content-based prohibition on materials, rather than one based on individualized curation, hardly expresses any intentional government message at all" and "[s]lapping the label of government speech on book removals only serves to stifle the disfavored viewpoints"); *Virden v. Crawford Cnty., Arkansas,* No. 2:23-

21

reasons.  Not only is the government speech portion of *Little* an obvious outlier among other recent decisions, that portion of the decision was not joined by a majority of the Fifth Circuit's *en banc* panel and thus lacks precedential value, even within the Fifth Circuit.  Moreover, unlike in *Little*, Plaintiffs here do not challenge "a library's collection decisions," *id.* at 837, but instead a vague and overbroad statute that forces Plaintiffs to undertake drastic self-censorship measures in a sincere attempt to avoid liability under HB 710.

Put simply, neither public school libraries nor public community libraries engage in "government speech," because they do not exist to deliver government messages; rather, they exist to serve the diverse needs of their patrons or students, foster curiosity, promote civic and community engagement, and nurture critical thinking by providing access to a broad array of resources and materials.  (*See* Scheline Decl. ¶¶ 5, 8; Nichols Decl. ¶¶ 3, 18.)

### B.    This Case is Not Controlled by *Hazelwood*.

Defendant Labrador's contention that Plaintiffs' claims are barred by the school-sponsored speech doctrine, as established by the Supreme Court in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), fares no better.

---

CV-2071, 2024 WL 4360495, at *5 (W.D. Ark. Sept. 30, 2024) (granting plaintiffs' summary judgment motion because, *inter alia*, the government speech doctrine did not extend to library curation decisions); *Parnell v. Sch. Bd. of Lake Cnty., Fla.*, 731 F. Supp. 3d 1298, 1314 (N.D. Fla. 2024) (declining to dismiss claims that book removal decision constituted government speech, noting "[t]he potential for the government to 'silence or muffle the expression of disfavored viewpoints' under the guise of government speech" and the corresponding need for courts to "exercise great caution before extending" the doctrine (citation omitted)); *PEN American Center, Inc. v. Escambia County School Board*, 711 F. Supp. 3d 1325, 1331 (N.D. Fla. 2024) ("the Court simply fails to see how any reasonable person would view the contents of the school library (or any library for that matter) as the government's endorsement of the views expressed in the books on the library's shelves"); *Fayetteville Pub. Libr. v. Crawford Cnty., Arkansas*, 760 F. Supp. 3d 811, 834 (W.D. Ark. 2024) (challenged statute limiting and removing public access to public library collections had "nothing to do with the library's curation decisions").

At issue in *Hazelwood* was whether school administrators' exercise of editorial control over two articles "written and edited by [students in] a journalism class, as part of the school's curriculum" violated the student authors' First Amendment rights. *Id.* at 262. Under the facts presented, the Supreme Court found no constitutional error, holding that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities, so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. Accordingly, under what has become known as the *Hazelwood* school-sponsored speech doctrine, when speech bears the "imprimatur of the school," school officials may place restrictions on that speech without running afoul of the First Amendment if any such restrictions are "reasonably related to legitimate pedagogical concerns." *Id.* at 267, 270–73.

State legislative action that regulates access to public library materials, such as HB 710, does not fall within *Hazelwood*'s scope as a matter of law for several reasons. *First*, neither library books themselves nor the curation of a library collection bears the school's "imprimatur." While school-sponsored speech need not "occur in a traditional classroom setting," the Supreme Court has directed that it must nevertheless be limited to speech reasonably "characterized as part of the school curriculum" — that is, "supervised by faculty members and designed to impart particular knowledge or skills to student participants and audiences." *Id.* at 271. As multiple federal courts have explained, "[p]lacing books in the library, albeit necessary, has little to nothing to do with the school's curriculum." *Esquivel v. San Francisco Unified Sch. Dist.*, 630 F. Supp. 2d 1055, 1061 (N.D. Cal. 2008); *see also Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 723 (2d Cir. 1994) ("[T]he distinguishing factor between library resources and curriculum is that library resources are something that students voluntarily may view at their leisure, whereas

curriculum is required material for students."); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 862 (1982) ("[T]he only books at issue in this case are *library* books, books that by their nature are optional rather than required reading. Our adjudication of the present case thus does not intrude into the classroom, or into the compulsory courses taught there."). In fact, "the traditional purpose of a library is to provide information on a broad range of subjects and viewpoints" — not compulsory instruction on "particular knowledge or skills." *Silano*, 42 F.3d at 723.

*Second*, the Supreme Court premised its *Hazelwood* decision in large part on the policy determination that *educators* should be allowed to "exercise greater control over [school-sponsored speech] to assure that participants learn whatever lessons the activity is designed to teach, that readers or listeners are not exposed to material that may be inappropriate for their level of maturity, and that the views of the individual speaker are not erroneously attributed to the school." *Hazelwood*, 484 U.S. at 271. Applying *Hazelwood*'s school-sponsored speech doctrine here would turn that policy determination on its head by excusing from constitutional scrutiny a statewide, one-size-fits-all statute that *removes*, rather than enhances, educators' discretion to make decisions for their students.

*Third*, the Ninth Circuit has made clear that *Hazelwood* requires, consistent with First Amendment jurisprudence in other contexts, that any restrictions on student speech be viewpoint neutral. *See Planned Parenthood of S. Nevada, Inc. v. Clark Cnty. Sch. Dist.*, 941 F.2d 817, 829–30 (9th Cir. 1991); *see also Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1010–11 (9th Cir. 2000) (stating that restrictions on school-sponsored speech in a nonpublic forum must be viewpoint neutral). As alleged in Plaintiffs' Complaint, and as further described in Plaintiffs' memorandum of law in support of their motion for preliminary injunction, HB 710's definition of

"sexual conduct" targets materials that depict "any act of homosexuality" and thereby discriminates based on viewpoint in violation of the First and Fourteenth amendments.  (*See* Compl. ¶¶ 179–89; Pls.' Renewed PI Mot. 30–33.)  The plainly viewpoint-discriminatory nature of HB 710's definition of "sexual conduct" raises questions as to whether the Legislature was motivated by "a legitimate pedagogical interest in prohibiting speech involving sexual content," as Defendant Labrador asserts (Labrador Renewed MTD 17), or by a desire to limit access to constitutionally protected materials on the basis of viewpoint.

*Fourth*, HB 710 reaches beyond public *school* libraries to regulate minors' access to library materials in *any* public library across the state.  Thus, even assuming *arguendo* that the *Hazelwood* school-sponsored speech doctrine has any applicability in the context of school library materials or school library curation, application of that doctrine here would not bar Plaintiffs' claims, which challenge HB 710's application to *both* public school libraries and public libraries without any school affiliation.

Rather than address these apparent and oft-cited barriers to application of the *Hazelwood* school-sponsored speech doctrine, Defendant Labrador relies exclusively on *Penguin Random House LLC v. Robbins,* 172 F.4th 581 (8th Cir. 2026), a recent decision from the Eighth Circuit applying *Hazelwood* in the public school library context, on grounds that "a school library bears the imprimatur of the school and is properly characterized as part of the school's curriculum." *Id.* at 587.  Notably, the *Robbins* court came to this conclusion without any meaningful analysis, merely proclaiming, without citation to authority, that "[i]t is indisputable that the purposes of a school library are to enhance education, supplement classroom learning, and facilitate the development of students' knowledge and skills." *Id*. *Robbins*, however, is an outlier — and for

25

good reason. Of the remaining federal courts to consider the issue, not one has found a school library part of the school's curriculum.[15]

---

[15] *See, e.g., E.K. by & through Keeley*, 807 F. Supp. 3d at 544 (holding that defendants did not demonstrate "legitimate pedagogical interests" in removing books from school libraries, and expressing skepticism over whether library books can "bear the imprimatur of the school" under *Hazelwood*); *Crookshanks as next friend of C.C.*, 775 F. Supp. 3d at 1184 (holding school district could not show that regulating library book curation was "school-sponsored speech"); *Roe v. Rutherford Cnty. Bd. of Educ.*, No. 3:25-CV-00429, 2025 WL 3205703, at *5 n.8 (M.D. Tenn. Nov. 17, 2025) ("[T]he case before the Court today is not concerned with student speech per se as in *Hazelwood*, but is instead focused on the removal of books from a public school library."); *Parnell*, 731 F. Supp. 3d at 1315 (denying motion to dismiss on viewpoint discrimination grounds and noting that "there are issues with applying" the *Hazelwood* standard: "the speech at issue does not form part of a course of study in a school's curriculum. This is a school library book case." (citation omitted)); *PEN Am. Ctr., Inc. v. Escambia Cnty. Sch. Bd.*, 711 F. Supp. 3d at 1331 (declining to decide whether *Hazelwood* governs school library book removal and restriction decisions, and denying motion to dismiss on viewpoint discrimination grounds); *Case v. Unified Sch. Dist. No. 233, Johnson Cnty., Kan.*, 895 F. Supp. 1463, 1469 (D. Kan. 1995) ("*Hazelwood* is distinguishable from the present case because it was a curriculum case."); *Campbell v. St. Tammany Par. Sch. Bd.*, 64 F.3d 184, 189 (5th Cir. 1995), *overruled on other grounds by Little v. Llano Cnty.*, 138 F.4th 834 (5th Cir. 2025) (library book removal decision concerned "non-curricular matter" and thus was subject to greater First Amendment scrutiny than scrutiny available under *Hazelwood*).

26

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that this Court deny Moving Defendants' motions to dismiss in their entirety.

Dated: May 29, 2026                Respectfully submitted,

By: <u>Deborah A. Ferguson</u>

Deborah A. Ferguson
Craig H. Durham
FERGUSON DURHAM, PLLC

Michael J. Grygiel
Daniela del Rosario Wertheimer
CORNELL LAW SCHOOL FIRST
AMENDMENT CLINIC[16]

Kelly L. McNamee
Christina N. Hernsdorf
FOLEY HOAG LLP

*Attorneys for Penguin Plaintiffs*

---

[16] The Clinic is housed within Cornell Law School and Cornell University. Nothing in this brief should be construed to represent the views of these institutions, if any.

27